**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| South Carolina Electric & Gas Company,<br><br>              Plaintiff,<br><br>v.<br><br>Swain E. Whitfield, in his official capacity as Chairman of the South Carolina Public Service Commission; Comer H. Randall, in his official capacity as Commissioner of the South Carolina Public Service Commission; John E. Howard, in his official capacity as Commissioner of the South Carolina Public Service Commission; Elliott F. Elam, Jr., in his official capacity as Commissioner of the South Carolina Public Service Commission; Elizabeth B. Fleming, in her official capacity as Commissioner of the South Carolina Public Service Commission; Robert T. Bockman, in his official capacity as Commissioner of the South Carolina Public Service Commission; and G. O'Neal Hamilton, in his official capacity as Commissioner of the South Carolina Public Service Commission.<br><br>              Defendants. | Civil Action No. 3:18-cv-1795-JMC |

## VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT AND TEMPORARY, PRELIMINARY, AND PERMANENT INJUNCTIVE RELIEF

South Carolina Electric & Gas Company ("SCE&G") seeks declaratory and temporary, preliminary and permanent injunctive relief from the implementation of the unconstitutional 2018 South Carolina Laws Act 287 (H.B. 4375) (codified as amended in scattered sections of S.C. Code Ann. Chapter 33 Title 58) (the "Act" or "Act 287"), which became law on June 28, 2018, and 2018 South Carolina Laws Resolution 285 (S. 0954) (the "Joint Resolution" or

"Resolution 285"), which will become law upon the Governor's signature or by July 5, 2018, if not signed.  In support, SCE&G states as follows:

## PRELIMINARY STATEMENT

1.      SCE&G invested billions of dollars in constructing two new nuclear power facilities in reliance on a South Carolina statute, the Base Load Review Act ("BLRA"), that was designed to encourage investment in the construction of new clean energy facilities by promising South Carolina utilities that as long as their investments were prudently incurred, the associated costs could be recovered in their rates.  As provided by the BLRA, the South Carolina Public Service Commission ("PSC") in a series of orders authorized SCE&G to construct the nuclear power facilities and approved the rate increases necessary for SCE&G to recover its investments.

2.      Bowing to extreme political pressure, the South Carolina General Assembly now wishes that it had not enacted the BLRA and, through two new laws (Act 287 and Resolution 285), seeks to punish SCE&G by retroactively eliminating all rate increases since 2010 authorized under the BLRA.  The General Assembly's actions are unconstitutional, violate SCE&G's constitutional rights, and impermissibly interfere with interstate commerce.

3.      Because the General Assembly's statutory amendments impermissibly strip SCE&G of its rights — violating foundational constitutional principles prohibiting the government from effecting uncompensated takings, imposing bills of attainder, and acting without due process — SCE&G has filed this lawsuit asking the Court to strike down the General Assembly's improper and unconstitutional actions.  If the Court does not grant immediate relief, SCE&G will suffer massive and irreparable harm, including millions of dollars in damages that cannot be recovered, a substantial loss of goodwill, and other permanent injuries.

4.     This lawsuit seeks review only of the unconstitutional statutory provisions enacted by the South Carolina General Assembly.  It does not challenge or seek review of any order by the PSC or any other South Carolina agency.

## INTRODUCTION AND OVERVIEW

5.     SCE&G has become the focus of a political and media firestorm as a result of exercising its rights under existing South Carolina law to abandon construction of two new nuclear facilities in South Carolina.

6.     The PSC — the regulatory agency with exclusive authority over SCE&G's retail electric rates — has repeatedly reviewed SCE&G's plans with respect to these facilities and approved its construction budgets and the costs it incurred.  Pursuant to South Carolina law, and so as to provide incentives for SCE&G to construct these nuclear facilities, the PSC authorized SCE&G to recover from its customers certain financing costs associated with the construction.

7.     The law that authorized this result — the Base Load Review Act ("BLRA"), 2007 South Carolina Laws Act 16 (S.B. 431), *codified at* S.C. Code Ann. § 58-33-210 *et seq.* (Supp. 2009) — was designed to encourage investment in new base load facilities, including new nuclear facilities.  The South Carolina General Assembly enacted the BLRA, Section 2 of Act 16, as part of a comprehensive legislative package that focused on certain aspects of utility law pertaining to electric suppliers, including SCE&G.  *See* 2007 South Carolina Laws Act 16 (S.B. 431), (codified as amended in scattered sections of S.C. Code Ann. Chapter 33 Title 58) ("Act 16").

8.     In addition to establishing the BLRA, Act 16 amended the law concerning the service rights of electric suppliers, which governs the geographic areas where SCE&G is authorized to provide electric service in South Carolina.  *See* Act 16 §§ 4−8.  Act 16 also

amended the law to allow an electric utility, such as SCE&G, to recover certain environmental costs and emissions allowance costs incurred in the production of electric power.  Act 16 § 9. Act 16 also amended the law to provide the PSC with additional time to issue an order under certain circumstances.  *See* Act. 16 § 3.  These provisions of Act 16 remain in effect today.  It is only Section 2 that the General Assembly seeks to repeal through unconstitutional measures, thereby singling out and severely punishing SCE&G for its decision to abandon construction of the nuclear facilities.

9.      When the General Assembly enacted the BLRA, it identified the statute's carefully designed provisions as critical to spurring investment in the construction of new nuclear base load facilities, and those provisions were essential to SCE&G's decision to build the facilities to serve South Carolina customers.  In making its decision to invest significant capital in the construction effort, SCE&G relied on the BLRA, its provisions providing incentives to utilities to abandon projects that have become uneconomical to complete, and the repeated review and approval by the PSC of costs associated with the new nuclear facilities to be recovered by SCE&G in the rates it charged South Carolina retail electric customers.  Those approved rate increases, reflecting financing costs already incurred by SCE&G, total approximately $37 million per month.

10.      Now, despite existing law, the PSC's oversight of SCE&G's activities, and the fact that there are and have been ongoing proceedings to evaluate SCE&G's construction efforts, the General Assembly has elected to change the proverbial rules of the game after it has ended. Through the Act, the General Assembly has, without allowing notice or hearing, mandated that the PSC order SCE&G to eliminate from the rates all increases permitted after 2010 under the BLRA. Act § 3(B).

11.     The impact of these unconstitutional provisions will be to reduce the rate increases allocated pursuant to the BLRA by more than 82 percent, so that only approximately 3.2 percent of the average residential customer's total electricity bill will be attributable to new nuclear financing costs rather than 18 percent of that bill. The Act also purports to retroactively redefine the standard of care that was binding on SCE&G when it decided to construct, and later abandon, the nuclear construction project. Act § 1. The Joint Resolution also removes the procedural protection ordinarily offered to utilities that guaranteed either a PSC decision within 6 months of the utility's application or approval of the application.

12.     These "amendments" to the BLRA— which are effectively an attempt to retroactively and partially repeal the BLRA — are unconstitutional. The amendments operate, individually, and as a whole, to inflict significant injury on SCE&G, including its employees and investors, and, if not enjoined, will cause immediate irreparable harm to SCE&G.

## PARTIES

13.     Plaintiff SCE&G is a wholly owned subsidiary of SCANA Corporation. It is organized under South Carolina law and headquartered in Cayce, South Carolina.

14.     Defendants, Swain E. Whitfield, Comer H. Randall, John E. Howard, Elliot F. Elam, Jr., Elizabeth B. Fleming, Robert T. Bockman, and G. O'Neal Hamilton are Commissioners of the PSC. They are being sued in their official capacities, and each of the Defendants has offices in Columbia, South Carolina.

15.     By law, the PSC oversees public utilities in the State of South Carolina. The PSC's authority includes regulating electric utilities, oversight and approval of electric rates that SCE&G charges to retail electric ratepayers, and prudency determinations of SCE&G's actions under the BLRA. *See* S.C. Code Ann. § 58-3-140.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) because SCE&G is suing defendants pursuant to 28 U.S.C. § 1983 for violations of its rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution; the Bill of Attainder Clause of Article 1, § 10 of the United States Constitution; and the Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution.

17.     Venue in the District of South Carolina is appropriate under 28 U.S.C. § 1391(b).

## RELEVANT BACKGROUND

**I.     Reasons for the Base Load Review Act**

18.     Beginning as early as 2005, South Carolina faced a significant need for new energy generation resources in order to meet the needs of South Carolina customers.

19.     Projections prepared at the time showed that SCE&G — a utility serving approximately a quarter of the South Carolina market for electricity — would need to add approximately 600 megawatts (MW) of base load capacity by 2016 and another 600 MW in the following years to meet demand and keep its reserve level above twelve percent through 2022.

20.     These projections were based on conservative estimates of annual demand growth of 1.7 percent, as compared to historical growth rates at the time of approximately 2.5 percent.

21.     Meeting this need for additional base load capacity was particularly difficult in light of the laws that applied before 2007 when the General Assembly enacted the BLRA.

22.     Before the BLRA, the PSC allowed utilities to recover the financing costs of base load generation projects during construction by filing periodic electric retail rate cases in which all aspects of a utility's operations, finances, accounting, and rate design were placed in issue.

23.     This rate-case process was used successfully by SCE&G to build a coal-fired plant and a combined-cycle natural gas plant in the 1990s and 2000s.  But the process was impractical for the construction of nuclear units, including because of the multi-year construction cycle involved and the need to file comprehensive, general rate cases frequently through the cycle.   Coal-fired plants and combined-cycle natural gas plants involve much shorter construction periods than nuclear units.

24.     Without an effective mechanism to recover financing costs during construction, SCE&G's only alternative would have been to add those financing costs to the cost of the plant and to recover them from customers with carrying costs when the plant was completed.

25.     This was the approach used by many utilities when building nuclear plants in the 1970s and 1980s.  A substantial part of the ultimate cost of those plants was not just the cost for the bricks-and-mortar construction, but also capitalized financing costs (interest) to borrow the money to finance the projects.  As a result, customers paid higher costs for decades.

26.     Without cash returns on construction investment during the construction cycle, a utility would have less cash to pay debt service on newly issued bonds or to generate earnings on new equity issuances when constructing new facilities.  As a result, the utility's debt service coverage ratios, earnings per share, and other financial metrics would deteriorate steadily as construction progressed and invested capital increased.  This would have made it financially impossible for small- and medium-size utilities to consider nuclear generation.

27.     Without a vehicle for binding prudency reviews before construction and investment began, a utility was required to raise the capital necessary to build a new plant with no ability to assure investors that they would be repaid when the plant was complete.

28.     For these reasons, before 2007 it was considered impractical for SCE&G to consider nuclear construction.

29.     In 2007, the South Carolina General Assembly addressed these issues and acted to incentivize investment in new, clean energy by enacting the BLRA.

## II.     The Base Load Review Act

30.     The BLRA made it possible to finance the massive investment required to build new nuclear capacity by establishing pre-construction prudency reviews for proposed projects and a mechanism to recover the financing costs of those projects while construction was ongoing.

31.     The General Assembly specified in the BLRA's text that its purpose was "to provide for the recovery of the prudently incurred costs associated with new base load plants . . . when constructed by investor-owned electrical utilities, while at the same time protecting customers of investor-owned electrical utilities from responsibility for imprudent financial obligations or costs." *Id.*

32.     To balance the Constitutional protections of the utilities' investors with the customers' interests in keeping utility costs low, the BLRA delegated to the PSC the responsibility for evaluating applications filed for new base load construction. The BLRA delegated to the Office of Regulatory Staff ("ORS") — the State agency charged with representing the public interest in utility regulation — ongoing monitoring and oversight of the BLRA construction projects and provided for ORS to charge utilities for the cost of hiring dedicated professional staff and outside experts to monitor construction.

A.     **The Initial Application**

33.     The BLRA provides that a utility may file a combined application for (1) a certificate of environmental compatibility, public convenience and necessity, and (2) a base load review order (a "combined application").  *See* S.C. Code Ann. §§ 58-33-220(6), 58-33-230(A).

34.     A utility constructing a nuclear power plant may include in its application or combined application a petition for revised rates to recover the financing costs of its initial construction efforts through rates that become effective when the BLRA order is issued.  *See* S.C. Code Ann. §§ 58-33-230(E), 58-33-250(11).

35.     The BLRA requires utilities to include eleven categories of information in any application for a base load review order, including information concerning the anticipated construction schedule and capital cost schedule for the plant, the prudency of the technology selected for the plant, the qualifications and capabilities of the contractors and principal subcontractors for the plant, as well as the proposed rate design and class allocation factors to be used in formulating revised rates.  S.C. Code Ann. § 58-33-250.

B.     **The Hearing on an Application for a Base Load Review Order**

36.     The BLRA provides for a hearing on any application for a base load review order, and it provides the criteria the PSC must apply when determining whether to grant or deny the application.  *See* S.C. Code Ann. § 58-33-270(A).

37.     During all proceedings before the PSC, the ORS is required to "safeguard the public interest" and ascertain the "reasonableness and necessity of all costs to be recovered under this article," S.C. Code Ann. § 58-33-230(F).  Interested parties may intervene as formal parties to BLRA proceedings and, even without intervention, members of the public have the right to appear before the PSC to testify in opposition or in support of the application.

38.     The BLRA provides that, after a hearing on an application or combined application for a plant to be built in South Carolina, the PSC "shall issue a base load review order approving rate recovery for plant capital costs if it determines: (1) that the utility's decision to proceed with construction of the plant is prudent and reasonable considering the information available to the utility at the time" and (2) "that the utility has satisfied the requirements of Section 58-33-160 of the Utility Facility Siting and Environmental Protection Act, either in a past proceeding or in the current proceeding if the current proceeding is a combined proceeding."  S.C. Code Ann. § 58-33-270(A).

39.     "A base load review order shall constitute a final and binding determination that a plant is used and useful for utility purposes, and that its capital costs are prudent utility costs and expenses and are properly included in rates so long as the plant is constructed or is being constructed within the parameters of: (1) the approved construction schedule including contingencies; and (2) the approved capital costs estimates including specified contingencies."  S.C. Code Ann. § 58-33-275(A).

40.     The PSC's prudency determination "may not be challenged or reopened in any subsequent proceeding, including proceedings under Section 58-27-810," which governs petitions for rate revisions.  S.C. Code Ann. § 58-33-275(B).

C.     **Subsequent Revisions to the Base Load Review Order**

41.     The BLRA provides that, after the PSC issues a base load review order, a utility may "petition the [PSC], with notice to the [ORS], for an order modifying any of the schedules, estimates, findings, class allocation factors, rate designs, or conditions that form part of any base load review order issued under this section."  S.C. Code Ann. § 58-33-270(E).

42.     The ORS and all interested parties have the opportunity to participate in the proceedings and to be heard concerning any proposed change in the utility's BLRA approved

schedules.  S.C. Code Ann. § 58-33-270(E)−(F).  These proceedings are conducted under the same procedural rules that apply to initial BLRA applications.  S.C. Code Ann. § 58-33-240.

43.     In a proceeding related to a petition for modifications or revisions to the initial base load review order, the PSC "shall grant the relief requested if, after a hearing, the commission finds: (1) as to the changes in the schedules, estimates, findings, or conditions, that the evidence of record justifies a finding that the changes are not the result of imprudence on the part of the utility . . . ."  S.C. Code Ann. § 58-33-270(E).

D.     **Revised Rates**

44.     The BLRA mandates that, "[s]o long as the plant is constructed or being constructed in accordance with the approved schedules, estimates, and projections," the utility "must be allowed to recover its capital costs related to the plant through revised rate filings or general rate proceedings."  S.C. Code Ann. § 58-33-275(C).

45.     In these revised rate proceedings, "[a] utility must be allowed to recover through revised rates its weighted average cost of capital applied to all or, at the utility's option, part of the outstanding balance of construction work in progress, calculated as of a date specified in the filing."  S.C. Code Ann. § 58-33-280(B).

46.     After obtaining a base load review order or an order revising the approved cost and construction schedules, a utility may file, up to once annually, "requests for the approval of revised rates" reflecting the costs approved.  S.C. Code Ann. § 58-33-280(A).

47.     Each revised rate request is initially evaluated by the ORS.  All interested parties have a right to submit comments to the ORS during this evaluation period.  S.C. Code Ann. § 58-33-280(C).

48.     The ORS then submits a report to the Commission.  All interested parties have the right to submit comments to the Commission during its evaluation of the ORS report.  S.C. Code Ann. § 58-33-280(E).

49.     "If the utility is granted a rate increase in the revised rates order, the utility shall provide notice to its customers with the next billing," and it may not implement revised rates "sooner than thirty days after revised rates are approved."  S.C. Code Ann. § 58-33-280(H).

50.     The BLRA authorizes "any aggrieved party" to "petition the commission for review of the revised rates order" within thirty days of entry of an order authorizing revised rates.  S.C. Code Ann. § 58-33-285(A).  "[W]here a party proves by a preponderance of the evidence that there has been a material and adverse deviation from the approved schedules, estimates, and projections," the PSC "may disallow the additional capital costs that result from the deviation. . . to the extent that the failure by the utility to anticipate or avoid the deviation, or to minimize the resulting expense, was imprudent considering the information available at the time that the utility could have acted to avoid the deviation or minimize its effect." S.C. Code Ann. § 58-33-275(E).

51.     In proceedings on a petition for review of a revised rate order, the PSC's review is "limited to issues related to whether the revised rates filed by the utility comply with the terms of" the base load review order or the "specific requirements" governing revised rate proceedings, S.C. Code Ann. § 58-33-285(B), and the PSC "shall allow limited discovery" only on those issues subject to review, S.C. Code Ann. § 58-33-285(C).

III.    **Regulatory Approval of V.C. Summer Units 2 and 3**

52.     In the years leading up to the passage of the BLRA, SCE&G identified an increasing demand for base load capacity.

53.    In evaluating the best means to meet this demand, SCE&G considered multiple potential power sources for the new base load generation, including environmentally compliant coal units, natural gas, and nuclear power.

54.    At the time, environmental regulations imposing material costs on future carbon emissions appeared imminent.

55.    Natural gas supplies were dwindling, future price and availability was uncertain, and then-current prices were highly volatile.

56.    SCE&G's analysis indicated that two nuclear units would result in significantly lower carbon emissions over their lifetime compared to coal generation or natural gas. Moreover, nuclear power would allow SCE&G to balance its generation portfolio between natural gas generation, nuclear generation, and other sources of generation; act as a hedge against historically volatile natural gas prices; and potentially earn the utility federal nuclear production tax credits.

57.    SCE&G's generation strategies preserved room for the addition of solar and other renewable resources.  However, nuclear power was believed to be the best non-emitting alternative for base load generation.

58.    These considerations led SCE&G to select nuclear power as appropriate for its projected base load need.

59.    SCE&G further concluded that building two nuclear reactors in sequence would be more cost efficient on a per-kilowatt basis than building a single reactor.

60.    Because two reactors would create more generating capacity than SCE&G projected it would need, SCE&G sought a joint venture partner to share the capacity and ultimately allow it to benefit from the cost efficiencies resulting from a two-unit construction

project.

61.     South Carolina Public Service Authority ("Santee Cooper") was the most logical partner for three reasons: (1) Santee Cooper had also projected a need to increase its capacity; (2) SCE&G and Santee Cooper had experience jointly building and operating SCE&G's existing nuclear facility, V.C. Summer Unit 1 ("Unit 1"); and (3) Santee Cooper was a state agency with a strong credit rating.

62.     SCE&G and Santee Cooper agreed that SCE&G would be responsible for 55 percent of the costs and capacity of each unit, and Santee Cooper would be responsible for the remaining 45 percent.

63.     Pursuant to the BLRA, on May 30, 2008, SCE&G filed a Combined Application for Certificate of Environmental Compatibility, Public Convenience and Necessity and For a Base Load Review Order ("Combined Application") with the PSC.

64.     In the Combined Application, SCE&G requested approval for construction and contingency costs of $6.3 billion, representing its share of the anticipated costs of construction of new nuclear Units 2 and 3 at the V.C. Summer site.

65.     Consistent with the Engineering, Procurement, and Construction Contract entered into between (1) SCE&G, for itself and as agent for Santee Cooper; and (2) a consortium of Westinghouse Electric Company, LLC, and Stone & Webster, Inc., on May 23, 2008 (the "EPC Contract"), the construction schedule included the substantial completion dates of April 1, 2016, for Unit 2 and January 1, 2019, for Unit 3, as well as "milestone" dates for the completion of more than 100 different construction-related tasks.

66.     SCE&G's Combined Application also disclosed numerous risks related to the project, including risks related to scheduling and price.

67.    In light of the risks and uncertainties surrounding the project, SCE&G included a scheduled contingency in its Combined Application of 36 months, which would have resulted in completion dates of April 1, 2019 and January 1, 2022.

68.    The Combined Application disclosed that SCE&G would need to obtain a Combined Operating License (a "COL") from the United States Nuclear Regulatory Commission (the "NRC") before beginning nuclear safety related construction, and that the NRC's review could uncover flaws with the selected reactor design, which could cause significant delays and cost increases.

69.    SCE&G also disclosed the risk of delay in obtaining licenses, including environmental licenses, and state permits.

70.    SCE&G explained that manufacturing issues with component parts and equipment "could lead to schedule delays for the Units and increased costs."

71.    SCE&G noted the risk of repairs and rework due to unanticipated problems, which could delay the schedule and increase costs "both from the repair and rework itself, and from the time and expense required to diagnose the cause of the problem."

72.    SCE&G explained the choice of Westinghouse and Westinghouse technology; presented information on the contractors and subcontractors that would build the project; and provided the commission with an overview of the commercial terms and a copy of the EPC Contract under which the project would be built.

73.    From December 1, 2008 to December 17, 2008, the PSC held a three-week hearing on SCE&G's Combined Application, spanning 14 sessions over 10 days. In addition to the ORS, two groups intervened in the application proceedings and were represented by counsel at the hearing — the environmental group, Friends of the Earth, and the South Carolina Energy

Users Committee, which represents industrial customers of SCE&G. Five individuals also intervened *pro se*.

74. So that the PSC could evaluate this project fully, SCE&G devoted substantial time and resources to this proceeding to explain the plans for the project. During the hearings, nine SCANA employees testified, including its most senior executives: SCANA CEO Kevin Marsh, Senior Vice President and Chief Operating Officer Stephen Byrne, CFO Jimmy Addison, and Manager of Resource Planning Joseph Lynch.

75. SCE&G submitted extensive testimony concerning the technology selected, the qualifications of Westinghouse and the other contractors, and the terms of the EPC Contract.

76. The ORS hired both permanent staff and expert consultants to assist it in the evaluation of the application.

77. Counsel for the represented intervenors, the *pro se* intervenors, and members of the PSC questioned each of SCE&G's witnesses at length. The PSC also heard testimony from ORS staff members and consultants, along with sixteen members of the public.

78. On March 2, 2009, the PSC entered Order No. 2009-104(A) granting SCE&G's Combined Application. The PSC's Order identified the risks to the cost schedule, including the risk of delays and increasing costs. A true and correct copy of PSC Order No. 2009-104(A) is attached hereto as Exhibit 1.

79. In 2010, the South Carolina Supreme Court issued two opinions affirming, in almost all respects, the PSC's Order granting the Combined Application. *See Friends of the Earth v. Pub. Serv. Comm'n of S.C.*, 692 S.E. 2d 910 (2010); *S.C. Energy Users Comm. v. Pub. Serv. Comm'n of S.C.*, 697 S.E. 2d 587 (2010). In the latter order, the South Carolina Supreme Court's opinions affirmed the PSC's base load review order and also instructed the PSC to

remove the owner's capital cost contingency from the approved capital cost schedules stating that unanticipated costs should be added to the schedules through future proceedings to update cost schedules under S.C. Code Ann. § 58-33-270(E).

## IV.     Construction of V.C. Summer Units 2 and 3

### A.     Selection of Westinghouse

80.     After identifying Santee Cooper as the appropriate partner to jointly own the new nuclear facilities, SCE&G identified three possible nuclear reactor designs.

81.     After conducting a request-for-proposals process and carefully considering its options, SCE&G chose the AP1000 Advanced Passive Safety reactor designed by Westinghouse, which was based on Westinghouse's pressurized water reactor design, which had been in use since the 1960s.  Several factors informed the decision to use Westinghouse technology, including SCE&G's experience since the 1980s in operating the existing nuclear reactor at the V.C. Summer station, which is a Westinghouse pressurized water reactor; Westinghouse's experience with the nuclear technology; the reduced risk of significant safety incidents associated with a passive design; and the reduction in the complexity of safety-related systems that this passive safety design permitted.

82.     Westinghouse was a world leader in reactor design and maintenance, and, at the time, the AP1000 reactor was a prominent focus of Westinghouse's future business plans. Preliminary applications for NRC licenses had been filed by U.S. utilities to construct a total of 14 Westinghouse AP 1000 units at the time SCE&G selected the Westinghouse technology.

83.     Moreover, and even before negotiations over a contract with SCE&G began, Westinghouse had entered into an arrangement with Stone & Webster under which all AP1000 units built in the United States would be engineered and constructed by a consortium of the two

17

companies (the "Consortium").

84.     Solicitations for bids from competing nuclear technology suppliers and negotiations with the Consortium over the EPC Contract lasted for three years, and they were hard-fought.

85.     SCE&G pressed the Consortium for as much cost and schedule certainty as reasonably could be obtained without unduly adding to the price.  At one point late in the process, SCE&G temporarily broke off negotiations with Westinghouse and asked all vendors to re-price their proposals to ensure that the Westinghouse price was reasonable.

86.     Following the negotiations and the consideration of other potential partners, SCE&G and Santee Cooper (the "Owners") concluded that Westinghouse was the most viable option to lead this Consortium and eventually reached an agreement on the terms of the EPC Contract in May 2008.

    B.    **EPC Contract**

87.     Pursuant to the EPC Contract, the Consortium was responsible for the design, engineering, procurement, and installation of the equipment and materials, as well as construction and testing of units 2 and 3 (the "Units").

88.     The EPC Contract did not set a fixed price for the entire scope of work required under the EPC Contract.

89.     The EPC Contract included four cost categories that were either fixed in absolute terms or firm but subject to escalation at contractually fixed rates or at rates based on specified inflation indices.  At the time the EPC Contract was signed, approximately 57% of the EPC Contract costs were in these fixed or firm categories.  SCE&G negotiated an increase to that percentage to more than two-thirds in 2010, and by October 2015 SCE&G had negotiated 100%

fixed pricing for practically all remaining EPC scopes of work.

90.     The EPC Contract also included two Target price categories where the Owners paid actual costs for such things as construction labor and associated commodities.

91.     A "time and materials" cost category reflected an allowance for engineering and consulting support that the Owners would require from Westinghouse.

92.     SCE&G also had the responsibility for the cost of the transmission system upgrades required to deliver power to its load centers in the Columbia and Charleston areas ("Transmission Costs").

93.     The EPC Contract also provided guaranteed substantial completion dates for the nuclear reactors to be constructed in the Project.

94.     The Consortium began work on the project in the fall of 2008 pursuant to a PSC order allowing initial construction while the Combined Application was pending.

95.     On May 15, 2012, SCE&G filed a Petition for Updates and Revisions (the "2012 Petition for Updates").   In the 2012 Petition for Updates, SCE&G disclosed a delay in the substantial completion date for Unit 2 from April 1, 2016, until March 15, 2017, but a projected acceleration in the substantial completion date for Unit 3 from January 1, 2019 to May 15, 2018. SCE&G also projected a cost increase of approximately $283 million, from $4.27 billion to $4.5 billion.

96.     On November 15, 2012, the PSC entered Order No. 2012-884 granting the 2012 Petition for Updates as to all but $4.95 million of the additional costs, which were deferred for consideration in future proceedings as being prematurely requested.   A true and correct copy of PSC Order No. 2012-884 is attached as Exhibit 2.  In that order, the PSC found that the approved costs were "the result of the normal evolution and refinement of construction plans and budgets

for the Units." The PSC further held that "that the changes in the construction schedule presented here reflect a reasonable and prudent response to the effects of the unanticipated delay in issuing the COL for the Units and other matters."

97. The Project involved many challenges, due in part to the sweeping scope of this project, the fact that it was being built under an entirely new and untested NRC licensing and oversight structure, the reliance on modular construction techniques that were being used for the first time in the new nuclear construction industry, and due to the project's overall complexity.

98. SCE&G's proactive management included daily meetings each morning regarding the status of the project, so-called "plan of the week" meetings, monthly project-review meetings with Santee Cooper and the Consortium (for both construction and commercial issues), and monthly project-status reports.

99. Through the information learned at these meetings and other efforts to oversee the project, SCE&G learned of various concerns and issues with the project that it attempted to address.

100. SCE&G maintained a new nuclear deployment group, which with supporting personnel from SCANA's administrative services subsidiary, SCANA Services, Inc., numbered over 600 people at the close of the project. Among these were approximately 100 people whose job it was to monitor and report on the Consortium's activities. Among those people were engineering experts, construction management experts, quality control and quality assurance experts, and engineers assigned to monitor quality and schedule at fabrication sites across the country.

101. As SCE&G worked diligently to keep the project on track, it disclosed its efforts to the ORS and the PSC and requested revisions to the capital cost and construction schedules to

reflect the status of the project.

102.    During this time, the ORS had multiple personnel dedicated to the oversight of the project and an ORS office at the construction site.  ORS personnel attended the monthly project review meetings between the Consortium leadership and SCE&G/Santee Cooper leadership and participated in other meetings as requested.  They were given access to the reports and other documents exchanged between the Consortium and SCE&G.  They audited construction invoices on a continuous basis and were given access to the construction site itself on the same basis as non-construction SCE&G personnel.

103.    On March 12, 2015, SCE&G filed its fourth Petition for Updates and Revisions ("2015 Petition for Updates").  In the 2015 Petition for Updates, SCE&G disclosed a delay in substantial completion date for Unit 2 from March 15, 2017, until June 19, 2019, and for Unit 3 from May 15, 2018, until June 16, 2020. SCE&G also projected a cost increase of $698.2 million, in 2007 dollars, from $4.55 billion to $5.25 billion.

104.    On September 10, 2015, the PSC entered Order No. 2015-661 granting the 2015 Petition for Updates upon conditions stipulated by ORS and SCE&G in a settlement agreement. A true and correct copy of PSC Order No. 2015-661 is attached as Exhibit 3 .  In its Order No. 2015-661, the PSC found that "[t]he evidence shows that difficulties in submodule production are the effective cause of [the] delay" in the completion dates for the Units, "and SCE&G was in no sense imprudent in its management of this aspect of the project." Despite the Owners' intense efforts, and the various measures put in place to resolve Consortium issues as they were identified, delays and cost-overruns continued.

105.    During this period, SCE&G became increasingly concerned about problems with the Consortium structure and the Consortium's failure to meet schedule and productivity targets.

106.    With limited authority under the EPC contract, SCE&G began withholding millions of dollars of payments against Consortium invoices where it did not believe the Consortium had performed adequately based on the belief that the Consortium was not meeting general construction industry standards and was causing low productivity and delays.  SCE&G understood that its actions were placing stress on the Consortium and ran the risk of the Consortium claiming breach of the EPC Contract by SCE&G and walking off the job.

107.    On October 27, 2015, as concerns related to the Consortium's progress continued, the Owners and the Consortium executed an Amendment to the EPC (the "EPC Amendment"), along with related agreements, that fundamentally altered the structure of the Consortium and provided significant benefits to the Owners.

108.    Pursuant to the EPC Amendment and the related agreements, Chicago Bridge & Iron—a company that had purchased an original Consortium member under the EPC Contract, Stone & Webster—exited the project; Westinghouse acquired Stone & Webster; and Westinghouse agreed to engage Fluor Corporation as the primary subcontractor on the project.

109.    For the first time, the project was under a single contractor—Westinghouse—that had sole responsibility and authority for all matters related to design, engineering, procurement, construction, and staffing under the EPC Contract.  In the EPC Amendment, Westinghouse agreed to amended terms, including an increase in liquidated damages and other penalties for failing to meet certain construction milestones. Coupled with incentive payments if Westinghouse completed construction on time, Westinghouse agreed to put itself at risk for penalties of approximately $1 billion dollars if it did not meet schedule commitments.

110.    Most importantly, the EPC Amendment allowed the Owners to exercise an option, at an additional cost, to accept fixed prices for practically all of the remaining scopes of

work under the EPC contract, thereby significantly reducing the risks of additional increases in costs to the Owners. The EPC Amendment thus fundamentally altered the structure of the Owners' relationship with the Consortium, and the Consortium accepted the risk of EPC Contract cost increases arising from most future problems with the project.

111.    Through the EPC Amendment, the Owners secured a critically important change to the structure of the Consortium and had shifted the risk of any future cost increases away from the Owners and onto Westinghouse.

112.    The EPC Amendment also revised the substantial completion dates for Units 2 and 3 to August 31, 2019, and August 30, 2020, respectively, although both remained within the time period of eligibility for the federal nuclear production tax credits, and penalized Westinghouse for any delays, with significant penalties incurred if Westinghouse failed to meet the deadline for qualifying for the tax credits.

113.    On May 26, 2016, SCE&G filed its fifth Petition for Updates and Revisions ("2016 Petition for Updates") with the PSC for review and approval of the October 2015 amendments to the EPC Contract. In that filing, SCE&G sought revisions to the capital cost and construction schedules reflecting the EPC Amendment and approval of its intention to exercise the fixed-price option.

114.    In the 2016 Petition for Updates, SCE&G increased the estimated cost of the Units by approximately $1.56 billion (in 2007 dollars) — from $5.25 billion to $6.81 billion — and reflected the changes in substantial completion dates identified in the EPC Amendment.

115.    As it had in previous petitions for updates, SCE&G provided the ORS, the PSC, and other interested parties with detailed studies demonstrating why completing the Units was reasonably believed to be the lowest cost option for meeting future generation requirements and

that it was in the best interest of customers from both a cost and rate standpoint to complete the construction. Those studies showed that completing construction of the Units was expected to save customers hundreds of millions, or even billions, of dollars over their operating lives, as compared to the alternative of abandoning them and replacing them with alternative generation.

116.    By order dated November 28, 2016 (PSC Order No. 2016-794), the PSC granted the 2016 Petition for Updates. A true and correct copy of PSC Order No. 2016-794 is attached as Exhibit 4. In Order No. 2016-794, the PSC found that "[t]he additional costs that SCE&G is incurring as Owner of the project are not the result of imprudence on the part of SCE&G," and that "SCE&G was not imprudent in its management of this aspect of the project" as it pertained to the delay in the substantial completion dates. The PSC further found that the record "demonstrate[d] that $698.2 million in newly identified and itemized costs are not the result of imprudence on the part of SCE&G."

117.    Including escalation, the cost of the Project in current dollars that was approved in 2016 was $7.68 billion, or 21% more than the $6.313 billion cost of the project in current dollars as approved in 2009.

C.    **SCE&G and Santee Cooper Investment**

118.    SCE&G and Santee Cooper were each responsible for the share of construction costs for the nuclear power plant reflecting their respective ownership interests in the project.

119.    Because the PSC lacks jurisdiction over Santee Cooper, only SCE&G sought approval for the project from the PSC and applied for a base load review order.

120.    As of September 30, 2017, SCE&G and Santee Cooper had incurred construction costs as a result of the project — approximately $5 billion for SCE&G.

121.    In addition, SCE&G and Santee Cooper were each responsible for their own costs

associated with constructing and updating transmission facilities that would deliver electricity from the new nuclear power plants.

122.    As of September 30, 2017, SCE&G had incurred approximately $316 million in transmission costs related to delivery facilities associated with the project.

     D.    **BLRA-Approved Contribution**

123.    Pursuant to the BLRA, SCE&G sought recovery of its initial cost of capital in its Combined Application, and thereafter petitioned for revised rates every year from 2009 through 2016 to recover its cost of capital as applied to its incremental investment in constructing the Units.

124.    Each year the ORS audited SCE&G's request for revised rates and eliminated any amounts from the request that the ORS believed were unjustified, premature, or otherwise not recoverable.  During the nine years of reviewing revised rates, the ORS identified no material amounts that were imprudently expended.

125.    Each year the ORS presented its report to the PSC showing the amount of additional prudent investment in the project since the last revised rates for orders which were subject to BLRA recovery.

126.    Each year the PSC approved the ORS's findings and entered orders granting SCE&G's petitions for revised rates as adjusted by the ORS.

127.    In no year did any interested party petition for a hearing before the PSC to challenge the finding that the revised rates in question were associated with prudent investment in the project.

128.    In its initial base load review order — PSC Order No. 2009-104(A) — issued on March 2, 2009, the PSC approved recovery of $7,802,491.  This amount was associated with

prudently invested capital of $65,960,797. *See* Exhibit 1.

129.    By order dated September 30, 2009 (PSC Order No. 2009-696), the PSC approved additional recovery of $22,533,000 following SCE&G's 2009 petition for revised rates. This amount was associated with prudently invested capital of $198,364,000 for a cumulative total of $264,324,797. A true and correct copy of PSC Order No. 2009-696 is attached hereto as Exhibit 5.

130.    By order dated September 30, 2010 (PSC Order No. 2010-625), the PSC approved additional recovery of $47,301,000 following SCE&G's 2010 petition for revised rates. This amount as associated with prudently invested capital of $399,146,000 for a cumulative total of $663,470,797. A true and correct copy of PSC Order No. 2010-625 is attached hereto as Exhibit 6.

131.    By order dated September 30, 2011 (PSC Order No. 2011-738), the PSC approved additional recovery of $52,783,342 following SCE&G's 2011 petition for revised rates. This amount was associated with prudently invested capital of $436,725,000 for a cumulative total of $1,100,195,797. A true and correct copy of PSC Order No. 2011-738 is attached hereto as Exhibit 7.

132.    By order dated September 28, 2012 (PSC Order No. 2012-761), the PSC approved additional recovery of $52,148,913 following SCE&G's 2012 petition for revised rates. This amount was associated with prudently invested capital of $436,229,000 for a cumulative total of $1,536,424,797. A true and correct copy of PSC Order No. 2012-761 is attached hereto as Exhibit 8.

133.    By order dated October 2, 2013 (PSC Order No. 2013-680(A)), the PSC approved additional recovery of $67,240,232 following SCE&G's 2013 petition for revised rates. This

amount was associated with prudently invested capital of $569,356,000 for a cumulative total of $2,105,780,797. A true and correct copy of PSC Order No. 2013-680(A) is attached hereto as Exhibit 9.

134. By order dated September 30, 2014 (PSC Order No. 2014-785), the PSC approved additional recovery of $66,238,000 following SCE&G's 2014 petition for revised rates. This amount was associated with prudently invested capital of $561,062,000 for a cumulative total of $2,666,842,797. A true and correct copy of PSC Order No. 2014-785 is attached hereto as Exhibit 10.

135. By order dated September 30, 2015 (PSC Order No. 2015-712), the PSC approved additional recovery of $64,526,000 following SCE&G's 2015 petition for revised rates. This amount was associated with prudently invested capital of $547,224,000 for a cumulative total of $3,214,066,797. A true and correct copy of PSC Order No. 2015-712 is attached hereto as Exhibit 11.

136. By order dated October 26, 2016 (PSC Order No. 2016-758), the PSC approved additional recovery of $64,428,000 following SCE&G's 2016 petition for revised rates. This amount was associated with prudently invested capital of $574,150,000 for a cumulative total of $3,788,216,797. A true and correct copy of PSC Order No. 2016-758 is attached hereto as Exhibit 12.

137. The PSC calculated SCE&G's authorized rate recovery for each year by multiplying the amount of approved capital costs SCE&G had incurred by SCE&G's weighted average cost of capital, adjusted for taxes.

138. The product of the costs incurred ("construction work in progress" or "CWIP") and the weighted average cost of capital represented additional revenue SCE&G sought to

collect, beyond that which SCE&G could collect for costs incurred and associated with the remainder of its rate base.

139.    As a result of revised rates approved from 2008 to 2016, the PSC has approved recovery related to the project of approximately $445 million annually for SCE&G's cost of capital.

E.    **SCE&G's Plan of Finance**

140.    A key risk factor in SCE&G's plan to construct the Units was SCE&G's ability to successfully raise the money through equity and debt issuances to pay for them.

141.    Between 2008 and 2017, investors committed approximately $5 billion to the project in the form of, among other things, investments in SCE&G's bonds, earnings which investors allowed SCE&G to retain and invest in the project, and SCANA stock sales, the proceeds of which were invested in SCE&G.

142.    Rating agencies, investment analysts, and other members of the investment community routinely pointed to the protections of the BLRA as fundamentally necessary to SCE&G receiving access to the capital needed to construct the Units on reasonable terms.

143.    At the time of the 2015 BLRA update proceeding, SCE&G computed that the favorable interest rates it received on its bonds due in part to protections afforded by the BLRA were expected to save SCE&G's customers approximately $1.2 billion in interest costs compared to the projections that were made when the project began in 2008.

144.    Around the same time, the ORS hired an accounting firm to conduct an independent study on the impact of the BLRA.  On January 15, 2016, the ORS announced the results of this study, which confirmed that the BLRA's revised rate methodology saved customers money and was in the public interest.  A true and correct copy of the ORS's press

release is attached hereto as Exhibit 13.

145.     Tens of thousands of individual investors, SCE&G employees and retirees, mutual funds, and retirement funds invested in the project on the strength of the BLRA and South Carolina's commitment to honor its terms.

## V.     Westinghouse Bankruptcy and Ramifications

### A.     Evaluation of Alternatives

146.     With only a few weeks' notice to the Owners, on March 29, 2017, Westinghouse filed a voluntary petition for Chapter 11 bankruptcy relief.

147.     At the time of the bankruptcy filing, Westinghouse informed the Owners that it intended to use the provisions of the Bankruptcy Code to reject its obligations to complete the Units under the fixed-price provisions of the EPC Contract, as amended.

148.     Westinghouse's announcement of its intention to reject the EPC Contract meant that SCE&G and Santee Cooper could no longer rely on Westinghouse to complete construction of the project under the fixed-price guarantees contained in the EPC Amendment.

149.     After Westinghouse's bankruptcy filing and its notice of intent to reject the EPC Contract, the Owners were left with no good options related to the project. For its part, SCE&G evaluated all of its options, including completing both Units, abandoning both Units, and completing one Unit while delaying or abandoning the other.

150.     Through an Interim Assessment Agreement with Westinghouse, which was executed at the time of Westinghouse's bankruptcy filing, SCE&G obtained direct access to Westinghouse's internal and proprietary construction scheduling and cost data, commodity quantity and installation rates, vendor and supplier contracts, and other information, most of which had been previously unavailable to SCE&G.

151.    This internal Westinghouse information revealed significant deficiencies in Westinghouse's estimation of the timeline and costs associated with completion of the project.

152.    After a careful assessment of the Westinghouse internal data (which only became available following the bankruptcy filing), SCE&G concluded that, despite Westinghouse's repeated representations and guarantees to the contrary, the Consortium likely would not have been able to complete Unit 2 until December 31, 2022, and Unit 3 until March 31, 2024.

153.    SCE&G further determined that its total cost to complete both Units—even after accounting for a guaranty payment by Toshiba of approximately $1.1 billion—would be $8.8 billion in future dollars, an increase of $1.1 billion from the $7.7 billion (in future dollars) estimated as of the 2016 Petition for Revisions.  Meanwhile, the cost to complete only Unit 2 would be approximately $7.1 billion.

154.    In light of this newly discovered information, in order for SCE&G to continue with the project, a continued partnership with Santee Cooper was essential. SCE&G determined that it might be able to complete Unit 2 while abandoning or delaying completion of Unit 3, so long as Santee Cooper would remain a 45% partner in the venture.

155.    On July 31, 2017, Santee Cooper announced that it was suspending construction of the project as a result of Westinghouse's anticipated rejection of the EPC Contract.  Based upon Santee Cooper's decision to abandon the project, SCE&G was left with no commercially reasonable option to move forward with the project.

156.    Because SCE&G could not complete Unit 2 on its own, SCE&G announced that it would cease construction of the Units and request recovery of its abandoned costs, an outcome expressly contemplated by the BLRA.

B.    **Abandonment**

157.    On August 1, 2017, SCE&G filed with the PSC a Petition for Prudency Determination Regarding Abandonment, Amendments to the Construction Schedule, Capital Cost Schedule and Other Terms of the BLRA Orders for the V.C. Summer Units 2 & 3 and Related Matters (the "Petition for Prudency Determination Regarding Abandonment").

158.    In the Petition for Prudency Determination Regarding Abandonment, SCE&G requested that the PSC enter an order finding that SCE&G's decision to abandon the construction of the Units was reasonable and prudent.

159.    SCE&G also sought authorization to calculate revised rates reflecting SCE&G's incurred construction costs and costs of abandonment, pursuant to the BLRA.

160.    On August 9, 2017, the ORS moved to dismiss SCE&G's Petition for Prudency Determination Regarding Abandonment.

161.    Among other things, ORS argued that the PSC should allow review of the facts by the Governor of South Carolina, the V.C. Summer Nuclear Project Senate Review Committee, the Utility Ratepayer Protection House Committee, and the South Carolina Public Utilities Review Committee.

162.    On August 15, SCE&G voluntarily withdrew its Petition for Prudency Determination Regarding Abandonment in order to provide the opportunity for legislative review and a potential resolution of the issues attendant to abandonment of the project.

163.    The petition was voluntarily withdrawn only after legislative leadership demanded more time for legislators to review the project and threatened to bring the South Carolina General Assembly back into a special session for the specific purpose of preventing SCE&G from recovering its abandoned costs.

164.    Subsequently, SCE&G leadership made several attempts to seek a

comprehensive, reasonable settlement of the cost recovery issues. However, such efforts failed to get the traction necessary to present it to the PSC.

165.    Efforts to achieve a resolution failed after prominent legislators sought to disavow the BLRA by continually insisting SCE&G's customers should not bear any costs associated with the project, that SCE&G should refund all amounts previously collected for the project, and that the company's investors should shoulder the entire financial burden relating to the construction of Units 2 and 3.

## VI.    South Carolina Politicians Express a Desire to Make SCE&G Pay for the Abandonment

166.    After SCE&G announced the abandonment, "[m]ore than 25 state lawmakers signed a letter to the new Energy Caucus calling for utility investors to eat billions of dollars in remaining costs." Andrew Brown, *State Lawmakers Demand Action over Cancelled South Carolina Nuclear Reactors, but Can't Agree on What Comes Next*, The Post and Courier, (Aug. 5, 2017), available at http://www.postandcourier.com/business/state-lawmakers-demand-action-over-cancelled-south-carolina-nuclear-reactors/article_bd018f42-7854-11e7-8140-235d2f3fc6fd.html.

167.    Eager to blame SCE&G, the South Carolina Attorney General reported that "his office plans to launch an investigation, [and] urg[ed] lawmakers to stop the utilities from paying off the project's failure on the backs of customers." *Id.*

168.    The Governor expressed that he wanted the law to be changed to force SCE&G to pay for expenses in order "to see that rate payers don't lose their money." Libba Holland, *Gov. McMaster Speaks about Failed Nuclear Plant during Lowcountry Visit*, WCBD News 2 (Oct. 25, 2017), available at http://counton2.com/2017/10/25/gov-mcmaster-speaks-about-failed-nuclear-plant-during-lowcountry-visit/.

169.    South Carolina State Representative James Smith expressed his outrage at SCE&G for its decision to abandon construction on the nuclear facilities, stating that "[t]he absolute arrogance of the leadership of that company and their response to their own conduct is outrageous." Jamie Self and Avery G. Wilks, Failed Nuclear Project Ripe for Federal Investigation, SC Lawmakers Say, *The State* (Sept. 21, 2017), available at http://www.thestate.com/news/local/article174596156.html.

170.    In considering various forms of legislation improperly designed to punish SCANA and SCE&G, South Carolina House Speaker Jay Lucas touted his intent that legislation would allow consumers to "rest assured that utility companies will never take advantage of ratepayers' trust under the Base Load Review Act again." Maurice T. Miller, *Lawmakers Take Step toward Lowering SCE&G Bills*, WCBD News 2 (Feb. 1, 2018), available at http://counton2.com/2018/02/01/lawmakers-take-step-toward-lowering-sceg-bills/.

171.    Senator Shane Massey, co-chair of the South Carolina Senate's V.C. Summer Nuclear Project Review Committee, used the social media platform Twitter to endorse Representative Peter McCoy's views that SCANA behaved in a manner deserving of punishment: "SCANA execs knew the project was tanked but moved forward to boost profits & lock down bonuses.  This is criminal.  Nothing more, nothing less." See Shane Massey, *Shane Massey Retweeted Peter M. McCoy, Jr.* (Mar. 29, 2018), available at https://twitter.com/shanemassey?lang=en; *see also* Shane Massey, *Shane Massey Retweeted Peter M. McCoy, Jr.* (May 15, 2018), available at  https://twitter.com/shanemassey?lang=en ("I've said it since late last summer, SCANA execs handling of this project is nothing short of criminal.  Meanwhile, each day passes ratepayers continue to fork out millions.").

172.     In numerous tweets over the course of several weeks, Senator Massey expressed his desire to punish SCE&G for its decision to abandon the nuclear facilities.  *See* Shane Massey, *Shane Massey Retweeted Avery Wilks*, (Mar. 28, 2018), available at https://twitter.com/shanemassey?lang=en ("Honestly, this [proposal to slash 13 percent of SCE&G bills] is a very conservative approach.  As I've said before, I'd like to go to zero."); Shane Massey, *Shane Massey Retweeted Avery Wilks*, (Mar. 27, 2018), available at https://twitter.com/shanemassey?lang=en ("This study confirms . . . what SCE&G has been telling you is just not true, from the very beginning."); Shane Massey, *Replying to @AveryGWilks*, (Apr. 18, 2018), available at https://twitter.com /shanemassey/status/986782946731417601 ("For SCANA to use the word 'disappointing' to describe anything other than the reflection in the mirror is laughable."); *see also* Avery G. Wilks, *Ahead of Vote that May Kill Dominion-SCANA Deal, Study Finds Sale Would Help SC Economy*, The State (Apr. 17, 2018), available at https://www.thestate.com/news/politics-government/article209115149.html (noting that Senator Massey "scoffed" at a University of South Carolina report detailing that Dominion Energy's proposed purchase of SCANA "would offer the S.C. economy an $18.7 billion boost").

173.     In addition to the expressed animus toward SCE&G, at least one lawmaker commented on the Act's definitions of prudency and imprudency, explaining that these "are the definitions that are going to be lasting, that are going to be around when this situation goes to the PSC, or when this situation potentially goes in front of a circuit court or court of appeals or a Supreme Court . . . Those definitions **create a much, much higher standard for prudency and imprudency**." Avery G. Wilks, *SC Lawmakers Make Last-Minute Deal to Cut SCE&G Power Bills, Pass Other Nuclear Laws*, The State (June 27, 2018), available at https://www.thestate.

com/news/politics-government/article213886594.html (quoting Representative Peter McCoy) (emphasis added).

174.    Also relevant to this specific version of the Act, Senator Massey explained that the lawmakers justified the Act's reduction in rates "based on the bad acts that we found." Avery G. Wilks, *SC Lawmakers Make Last-Minute Deal to Cut SCE&G Power Bills, Pass Other Nuclear Laws*, The State (July 27, 2018), available at https://www.thestate.com/news/politics-government/article213886594.html (quoting Senator Massey).    In other words, lawmakers weighed information presented to legislative committees without the benefit of rules of evidence, cross-examination, and procedural rules applicable to an evidentiary proceeding, determined that SCANA was imprudent after 2010, and imposed the ACT as punishment.    *Id.* (quoting Senator Massey explaining that the Act would remove rate increases under the BLRA after 2010 because they had not "been able to find any evidence that SCANA knew they were having serious problems before 2010).

## VII.    The General Assembly Enacts Act  287 and Passes Resolution 285

175.    With the purpose of taking property to which SCE&G was entitled under existing law, including the payments the PSC has previously determined could be collected by SCE&G, and in an attempt to punish SCE&G for its decision to abandon the nuclear reactor facilities and to improperly oust SCE&G of critical procedural protections related to the PSC proceedings, the South Carolina General Assembly passed Resolution 285 and enacted and overrode the Governor's veto to ratify Act 287 into law.

176.    Using hindsight, the Act eliminates legal entitlement to recover costs and settled investment-backed expectations by attaching new legal consequences to those prior actions.

177.    The Act targets SCE&G by referring to it multiple times in its few sections, including by reference to the specific PSC docket in which SCE&G's rate-related proceedings have occurred and the specific direction that "[a]ny provision of Article 7, Chapter 27, Title 58 in conflict with the provisions of this chapter . . . are suspended for purposes of the utility rates . . . for any pending matters related to V. C. Summer Nuclear Reactor Units 2 and 3 at Jenkinsville, South Carolina, pending before the commission on or after the effective date of this chapter." Act 287 § 3.

178.    The Act expressly targets SCE&G by referring to "[t]he investor-owned utility holding the majority interest in the V.C. Summer Nuclear Reactor Units 2 and 3 at Jenkinsville, South Carolina."  Act 287 § 3(A).

179.    The Act also explains that the new, confiscatory rate "shall apply to all customers of the investor-owned utility identified . . . , which has imposed nine rate increases for the purpose of funding the V.C. Summer project."  Act 287 § 3(B).

180.    The Act further mandates that the PSC, within five calendar days of the ACT's effective date, shall "provide an experimental rate that customers of the utility identified . . . shall pay during the pendency of litigation currently before the commission . . . or until replaced by an order of the commission under Section 58-34-30." —that is, customers of SCE&G.  Act 287 § 3(B).

181.    The Act provides that this "experimental rate" *cannot* include "rate increases imposed under the provisions of the Base Load Review Act in the Public Service Commission's orders" following 2010.  Act 287 § 3(B).

182.    Before the Act went into effect, SCE&G was legally entitled to those rate increases, having had those increases specifically approved by the PSC after full evidentiary hearings regarding the prudency of the costs to be recovered.

183.    The Act requires that the "experimental rate" go into force five calendar days after it is issued, without any prior notice or hearing.  Act 287 § 3(B).

184.    The Act suspends SCE&G's right to petition for a hearing on the rate change or any rate change going forward "for any pending matters related to V.C. Summer Nuclear Reactor Units 2 and 3 at Jenkinsville, South Carolina."   Act 287 § 3(B) ("Any provision of Article 7, Chapter 27, Title 58 in conflict with the provisions of this chapter, including, but not limited to, Section 58-27-870(B), are suspended for purposes of the utility rates provided for by this chapter and for any pending matters related to V.C. Summer Nuclear Reactor Units 2 and 3 at Jenkinsville, South Carolina.").

185.    The Act requires the PSC to "monitor the net effect of the experimental rate," and it allows for an alteration of the experimental rate, but "only if [the PSC] determines that an adjustment to the experimental rate is necessary to satisfy constitutional requirements of utility ratemaking." Act 287 § 3(B).  Even then, the Act mandates that the new rate imposed must be "the lowest possible rate within the zone of reasonableness." Act 287§ 3(B).

186.    By these terms, the direction given to the PSC is to confiscate as much of SCE&G's legally-promised rates as it can.

187.    By the same terms, the Act strips SCE&G of any opportunity to be heard by the PSC regarding the experimental rate at any time — before or after the rate goes into effect.  Only at its own initiative, may the PSC make any adjustments to the experimental rate.

188.    If the PSC *sua sponte* decides to change the experimental rate in light of its unreasonableness, the Act provides no mechanism for SCE&G to recover money for the period during the experimental rate was in effect.

189.    In addition to confiscating SCE&G's rates and restricting SCE&G's procedural protection, the Act also purports to redefine the standard of care required by the BLRA.  *See* Act 287 § 1.  The Act retroactively defines prudency to require "a high standard of caution, care, and diligence."  *Id.*  And it imposes on SCE&G the requirement that not only it have behaved prudently, but also imposes that same requirement on *all of its* "officers, board, agents, employees, contractors, subcontractors, consultants" and other "third part[ies]."  *Id.*

190.    Moreover, the Act requires any "prudency" determination to consider the "commission of a fraudulent act," and then defines "fraud" more broadly than its traditional legal understanding to include "concealment, omission, misrepresentation, or nondisclosure of a material fact in any proceeding or filing before the commission or Office of Regulatory Staff." Act 287 § 1.  This language appears to target the nondisclosure of the Bechtel report, which was discussed heavily in the news.  *See, e.g.*, Andrew Brown & Thad Moore, *New Documents Raise Doubts about SCANA's Efforts to Hide Critical Audit of Failed Nuclear Project*, The Post & Courier (May 23, 2018), available at https://www.postandcourier.com/business/new-documents-raise-doubts-about-scana-s-efforts-to-hide/article_03588dea-5e93-11e8-a9c5-ef1872c842f6.html.

191.    Like the Act, the Joint Resolution explicitly and implicitly targets SCE&G and SCANA for punishment.  Indeed, in the preamble, the Joint Resolution clarifies that it was enacted because "SCANA has taken steps to reduce its own costs related to the abandoned Project . . . [but] its customers' rates continue to reflect of authorized Project costs prior to abandonment."  Resolution 285 Preamble.

192.  Moreover, in a complete about face from the BLRA's abandonment protection, the Joint Resolution states that "SCANA's legal rights and remedies does not require that SCANA customers continue to pay one hundred percent of the rates previously authorized by the Commission when the Project was expected, upon completion, to provide valuable services to the customers."  Resolution. 285 Preamble.

193.  The application of the Joint Resolution affects SCE&G alone because SCE&G is the only entity that has "a docket in which requests were made pursuant to the Base Load Review Act."  Resolution 285 § 1.  Indeed, similarly situated parties that are on the opposite side of this dispute are not impacted by the Joint Resolution because their requests were made pursuant to laws other than the Base Load Review Act.

194.  The text of the Joint Resolution's Preamble — that the General Assembly "has no desire or intention to set a rate that is unjust, unreasonable, or confiscatory, nor does it intend to jeopardize SCANA's ability to satisfy bond payment obligations associated with the V.C. Summer nuclear units 2 and 3" —  rings hollow when its substantive provisions gut the laws on which SCE&G relied.

195.  Rather than uphold SCE&G's constitutional rights, the Joint Resolution makes clear that it believes SCE&G did not comply with the BLRA in good faith, and for that reason it should not be able to rely upon incentives offered by the General Assembly and guaranteed by the law.  *See* Resolution 285 Preamble ("[T]he General Assembly also believes it is in the public interest of all its citizens, both private citizens and corporate, to rely upon incentives offered by the General Assembly to encourage growth in South Carolina; however, this reliance should be predicated upon a good faith effort to comply with all terms of any incentives so that

noncompliance or misrepresentation in order to obtain offered incentives are not unfairly born by South Carolina's citizens.").

## VIII.  Impact of Act 287 and Resolution 285

196.    Because the Act provides that the PSC must issue an order revoking SCE&G's right to revised rates, the Act will result in immediate and irreparable injury, loss, and damage to SCE&G.

197.    The Act will have far reaching effects on both intrastate and interstate commerce.

198.    The BLRA contains specific provisions governing electricity generation and transmission that crosses state borders.  *See, e.g.*, S.C. Code Ann. § 58-33-230(C) (setting forth application requirements applicable if "the plant is to be located outside South Carolina but will serve retail customers in this State"); S.C. Code Ann. § 58-33-230(D) (providing additional requirements applicable "[f]or plants located outside South Carolina that will serve retail customers in this State").

199.    The BLRA authorizes SCE&G to recover its capital costs associated with the project, as approved by the PSC.

200.    SCE&G's project capital costs include hundreds of millions of dollars of costs for material and equipment fabricated in other states or in other countries.

201.    The Act will prevent SCE&G from recovering its costs associated with those interstate purchases.

202.    On January 3, 2018, Dominion announced that it reached an agreement with SCANA for the companies to combine in a stock-for-stock merger.

203.    Under the terms of the merger, SCANA shareholders would receive 0.6690 shares of Dominion Energy common stock for each share of SCANA common stock.

204.    Including assumption of debt, the value of the transaction is approximately $14.6 billion.

205.    The agreement also calls for significant benefits to SCE&G electric customers to offset costs related to nuclear project, including a $1.3 billion cash payment within 90 days upon completion of the merger to all customers, worth $1,000 for the average residential electric customer.

206.    Dominion also proposed an estimated additional five percent rate reduction from current levels, equal to more than $7 a month for a typical SCE&G residential customer, resulting from a $575 million refund of amounts previously collected from customers and savings of lower federal corporate taxes under recently-enacted federal tax reform.

207.    The merger agreement, however, provides that Dominion may terminate the merger if the PSC or the South Carolina General Assembly prevents SCE&G from recovering the capital costs it incurred pursuant to the PSC's base load review order and subsequent orders approving amendments to the cost and construction schedules.

208.    The failure of the Dominion-SCE&G merger will impact energy operations for the entire region.

209.    Both SCANA and Dominion have investors in states across the United States and in countries around the world.

210.    SCANA is listed on the New York Stock Exchange under the symbol "SCG."

211.    Dominion is listed on the New York Stock Exchange under the symbol "D."

212.    The Act expressly contemplates that it will interfere with this merger by identifying that "[t]he investor-owned utility holding the majority interest in the V.C. Summer Nuclear Reactor Units 2 and 3 at Jenkinsville, South Carolina, has entered into a merger

agreement with an out-of-state investor-owned utility[,] . . . [which] contemplates the continuation of rate increases imposed under the Base Load Review Act." Act 287 § 3(A).

213.    The Joint Resolution's removal of procedural protection for utilities that have made requests under the BLRA also threatens the merger.

214.    In addition, if the Act and Joint Resolution were to take effect, SCANA could be forced to divest assets or take other emergency measures to raise cash to fund operations.

215.    These impacts are in addition to the deprivation of Constitutionally-guaranteed due process owed to SCE&G and the alterations to existing law that are designed to single-out SCE&G for punishment and deprive it of due process.

## CLAIMS FOR RELIEF

### COUNT I
#### (Declaratory and Injunctive Relief)

### VIOLATION OF THE TAKINGS CLAUSE
#### (U.S. Const. amend. V; U.S. Const. amend, XIV; 42 U.S.C. § 1983)

216.    SCE&G re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs, as if fully alleged and set forth herein.

217.    The Takings Clause "limits a State's authority to redefine preexisting rights," and "a State by *ipse dixit*, may not transform private property into public property without compensation." *Washlefske v. Winston*, 234 F.3d 179, 183 (4th Cir. 2000).

218.    The Fifth and Fourteenth Amendments protect against both temporary and permanent uncompensated takings.  *First English Evangelical Lutheran Church of Glendale v. Cty. of Los Angeles*, 482 U.S. 304, 318 (1987) ("'[T]emporary takings . . . are not different in kind from permanent takings.")

219.   The BLRA entitled SCE&G to recover its prudent investment in nuclear reactors even in the event of abandonment.

220.   In reliance on the BLRA, SCE&G invested billions of dollars in the construction of new nuclear facilities in Jenkinsville, South Carolina.

221.   SCE&G has a property right in the recovery of its prudent investments.

222.   The Act purports to redefine SCE&G's property right in the recovery of its prudent investments and just, reasonable, and non-confiscatory rates.

223.   The Act immediately prohibits SCE&G from recovering investments made after June 30, 2010, pursuant to the BLRA.

224.   The Constitution protects utility companies from rate-setting schemes that are "arbitrary, opportunistic, or undertaken with a confiscatory purpose." *Verizon Commc'ns, Inc. v. Fed. Commc'ns Comm'n*, 535 U.S. 467, 572 (2002).

225.   The purpose of the Act is to confiscate SCE&G's property, including the payments the PSC has previously determined may be collected by SCE&G.

226.   Regardless of the methodology adopted by the State, "the Constitution protects the utility from the net effect of the rate order on its property." *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 314 (1989).

227.   The constitutional baseline for utility rate regulation is that States cannot limit the rates that utilities are able to charge to an amount "so 'unjust' as to be confiscatory." *Id.* at 307 (quoting *Covington*, 164 U.S. at 597).

228.   The effect of the Act is to set a confiscatory rate.

229.   The Act violates SCE&G's right to protection against the taking of its property without just compensation under the United States Constitution.

230.    SCE&G is likely to succeed on the merits of it claim for violation of the Takings Clause; is likely to suffer irreparable harm in the absence of temporary, preliminary and permanent injunctive relief; the balance of the equities tips in SCE&G's favor; and an injunction is in the public interest.  Accordingly, SCE&G is entitled to a declaratory judgment that the Act violates the Takings Clause and is entitled to temporary, preliminary and permanent injunctive relief preventing implementation of the Act.

### COUNT II
### (Declaratory and Injunctive Relief)

**VIOLATION OF SUBSTANTIVE COMPONENT OF THE DUE PROCESS CLAUSE**
**(U.S. Const. amend. XIV; 42 U.S.C. § 1983)**

231.    SCE&G re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs, as if fully alleged and set forth herein.

232.    A statute violates due process if the legislature acted "in an arbitrary and irrational way." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976).

233.    Retroactive statutes are particularly susceptible to due-process challenges, and the justifications for prospective legislation "may not suffice" for retroactive legislation.  *Id.* at 17.

234.    The Act unreasonably and impermissibly attaches new legal consequences to already-completed investments and an already-completed abandonment decision.

235.    The Act sweeps away settled expectations suddenly as a means of retribution against SCE&G for its lawfully abandoned project.

236.    The Act retroactively redefines SCE&G's legal standard of care for past actions.

237.    The Act is arbitrary and irrational.

238.    SCE&G is likely to succeed on the merits of it claim for violation of of the Due Process Clause; is likely to suffer irreparable harm in the absence of temporary, preliminary and

permanent injunctive relief; the balance of the equities tips in SCE&G's favor; and an injunction is in the public interest.

239.    SCE&G is entitled to a declaratory judgment that the Act violates the Due Process Clause and is entitled to temporary, preliminary and permanent injunctive relief preventing implementation of the Act.

## COUNT III
### (Declaratory and Injunctive Relief)

### VIOLATION OF PROCEDURAL COMPONENT OF THE DUE PROCESS CLAUSE
### (U.S. Const. amend. XIV; 42 U.S.C. § 1983)

240.    SCE&G re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs, as if fully alleged and set forth herein.

241.    Before an individual is finally deprived of a property interest, "some form of hearing is required." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

242.    State legislation that deprives a person of his or her property without providing an opportunity to be heard "work[s] a deprivation of property without due process of law." *See Fuentes v. Shevin*, 407 U.S. 67, 98 (1972); *cf. Huemmer v. Mayor & City Council of Ocean City*, 632 F.2d 371, 372 (4th Cir. 1980).

243.    Under the BLRA, SCE&G is lawfully entitled to receive compensation through reasonable and non-confiscatory rates for its prudent investments.

244.    The Act deprives SCE&G without notice and hearing of its lawful entitlement to reasonable rate payments for its investments made pursuant to and in reliance on the BLRA.

245.    The Act strips SCE&G of any opportunity to be heard regarding the experimental rates required by the Act.

246.    The Act also alters existing law to remove various procedural protections instrumental to SCE&G's under the BLRA and critical to SCE&G's decision to pursue the Project in the first place.

247.    The Joint Resolution similarly removes the procedural protection that guaranteed utilities either a timely opportunity to be heard or a decision in their favor.

248.    SCE&G is likely to succeed on the merits of it claim for violation of the Due Process Clause; is likely to suffer irreparable harm in the absence of temporary, preliminary and permanent injunctive relief; the balance of the equities tips in SCE&G's favor; and an injunction is in the public interest.

249.    SCE&G is entitled to a declaratory judgment that the Act violates the Due Process Clause and is entitled to temporary, preliminary and permanent injunctive relief preventing implementation of the Act.  SCE&G is also entitled to a declaratory judgment that the Joint Resolution violates the Due Process Clause and is entitled to temporary, preliminary and permanent injunctive relief preventing implementation of the Joint Resolution.

**COUNT IV**
**(Declaratory and Injunctive Relief)**

**VIOLATION OF BILL OF ATTAINDER CLAUSE**
**(U.S. Const. art. I § 10; 42 U.S.C. § 1983)**

250.    SCE&G re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs, as if fully alleged and set forth herein.

251.    The Constitution prohibits States from enacting "bills of attainder." U.S. Const. art. I, § 10.

252.    A bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468 (1977).

253.    A State can violate the constitutional prohibition on bills of attainder by legislatively determining the guilt of and inflicting punishment upon a utility company for a politically unpopular act. *See Consol. Edison Co. v. Pataki*, 292 F.3d 338, 343 (2d Cir. 2002).

254.    The Act singles out SCE&G for punishment on matters related to V.C. Summer Nuclear Reactor Units 2 and 3 at Jenkinsville, South Carolina and, therefore, violates the Constitutional prohibition against bills of attainder.

255.    The Act punishes SCE&G by depriving it of the payments to which SCE&G is lawfully entitled and, therefore, violates the Constitutional prohibition against bills of attainder.

256.    The Joint Resolution likewise targets SCE&G for punishment.  It does so expressly by naming its parent company SCANA and by impacting only SCE&G.  Moreover, the Joint Resolution determines SCE&G's guilt by explaining in a thinly veiled manner that SCE&G is not entitled to rely on the law because it made misrepresentations in order to obtain incentives. *See* Resolution 285 Preamble.

257.    SCE&G is likely to succeed on the merits of it claim for violation of the Constitutional prohibition against bills of attainder; is likely to suffer irreparable harm in the absence of temporary, preliminary and permanent injunctive relief; the balance of the equities tips in SCE&G's favor; and an injunction is in the public interest.

258.    SCE&G is entitled to a declaratory judgment that the Act violates the Constitutional prohibition against bills of attainder and is entitled to temporary, preliminary and permanent injunctive relief preventing implementation of the Act.  SCE&G is also entitled to a declaratory judgment that the Joint Resolution violates the Constitutional prohibition against bills of attainder and is entitled to temporary, preliminary and permanent injunctive relief preventing implementation of the Joint Resolution.

## PRAYER FOR RELIEF

WHEREFORE, SCE&G requests that the Court:

A.     Enter a declaratory judgment declaring that Act 287 and Resolution 285 are unconstitutional in that they constitute an unlawful taking; violate the substantive and procedural components of the Due Process Clause, and constitute an unlawful bill of attainder.

B.     Enter a temporary, preliminary and permanent injunction that directs the Chairman and Commissioners of the PSC, and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them, to refrain from implementing the unconstitutional Act and Joint Resolution.

C.     Order such other and further relief as the Court deems just and proper.

s/ Steven J. Pugh
Steven J. Pugh (Fed. ID No. 7033)
Benjamin P. Carlton (Fed. ID No. 11797)
RICHARDSON PLOWDEN & ROBINSON, P.A.
1900 Barnwell Street (29201)
Post Office Drawer 7788
Columbia, South Carolina 29202
(803) 771-4400
spugh@richardsonplowden.com
bcarlton@richardsonplowden.com

and

I.S. Leevy Johnson (Fed. ID No. 2194)
George Craig Johnson (Fed. ID No. 6538)
JOHNSON, TOAL & BATTISTE, P.A.
Post Office Box 1431
Columbia, South Carolina 29202
(803) 252-9700
islg@jtbpa.com
George@jtbpa.com

and

David L. Balser (*pro hac vice* forthcoming)
Ashley C. Parrish (*pro hac vice* forthcoming)
Jonathan R. Chally (*pro hac vice* forthcoming)
KING & SPALDING, LLP
1180 Peachtree Street NE
Atlanta, Georgia 30309
(404) 572-4600
dbalser@kslaw.com
jchally@kslaw.com

ATTORNEYS    FOR    SOUTH    CAROLINA
ELECTRIC & GAS COMPANY

June 29, 2018