**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| South Carolina Electric & Gas Company, | |
| Plaintiff, | Case No. 3:18-cv-01795-JMC |
| v. | |
| Swain E. Whitfield, in his official capacity as Chairman of the South Carolina Public Service Commission; Comer H. Randall, in his official capacity as Commissioner of the South Carolina Public Service Commission; John E. Howard, in his official capacity as Commissioner of the South Carolina Public Service Commission; Elliott F. Elam, Jr., in his official capacity as Commissioner of the South Carolina Public Service Commission; Elizabeth B. Fleming, in her official capacity as Commissioner of the South Carolina Public Service Commission; Robert T. Bockman, in his official capacity as Commissioner of the South Carolina Public Service Commission; G. O'Neal Hamilton, in his official capacity as Commissioner of the South Carolina Public Service Commission, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND FOR CONSOLIDATION OF
<u>PRELIMINARY INJUNCTION HEARING WITH A TRIAL ON THE MERITS</u>**

Plaintiff South Carolina Electric & Gas Company ("SCE&G") seeks a preliminary injunction to preserve the status quo, stay the effect of the 2018 South Carolina Laws Act 287 (H.B. 4375) (the "Act"), which became law on June 28, 2018, and enjoin the State or any instrument of the State from instituting or implementing any of the Act's provisions, including its mandated retail electric rate reduction and refund provisions, until further order of the Court. Pursuant to Rule 65(a)(2), SCE&G requests that the Court expedite proceedings and that this motion be consolidated with a trial on the merits, to be held within 30 days. To further protect the interests of all parties, including ratepayers, SCE&G is prepared to place in escrow the funds that would otherwise be taken from SCE&G by operation of the Act, pending the Court's resolution of SCE&G's request for declaratory judgment and injunctive relief. This limited, prophylactic relief is in the public interest, will not harm any party, and will aid the Court in its consideration of the important constitutional issues raised in this case. It is also necessary to prevent substantial and irreparable harm to SCE&G.

## **INTRODUCTION**

Relying on a South Carolina statute known as the Base Load Review Act ("BLRA"), which was designed to encourage investment in nuclear power, SCE&G, along with South Carolina Public Service Authority ("Santee Cooper"), invested approximately $9 billion in the development and construction of two new nuclear reactors. The Public Service Commission ("PSC") closely oversaw SCE&G's development and construction activities and approved its investment as prudently incurred, entitling SCE&G to recover those costs from ratepayers, as provided under the BLRA.

After almost a decade of planning and construction of the nuclear facilities, in March 2017, SCE&G's contractor, Westinghouse Electric Company LLC ("Westinghouse"), filed for Chapter

11 bankruptcy protection and announced its intention to reject the fixed price construction contract for the nuclear facilities. After the Westinghouse bankruptcy filing, SCE&G obtained access to Westinghouse's confidential data and determined that the project would cost billions more and would take substantially longer to complete than Westinghouse had projected. As SCE&G was weighing its options, SCE&G's 45% partner in the project, Santee Cooper, announced that it would stop funding its portion of construction costs. Without a solvent contractor, without a fixed price contract, and without the support of its 45% partner, SCE&G determined that the project was no longer economically viable for the ratepayers of South Carolina and announced that it would abandon the project.

Following the announcement that SCE&G intended to exercise its right to abandon further construction efforts, a political firestorm erupted. Both chambers of the South Carolina General Assembly launched investigations into SCE&G; more than ten different lawsuits (most putative class actions) were filed; and prominent politicians were quoted as interested in seeking some form of retribution against SCE&G.

While the PSC had before it multiple proceedings to consider a lawful response to this matter, including a request submitted by the South Carolina Office of Regulatory Staff ("ORS") to reduce the rates SCE&G is allowed to charge, the General Assembly sought to short-circuit the administrative process and dictate its preferred outcome, without allowing any regulatory matter to run its course. The Act robs SCE&G of the payments it is entitled to under the BLRA and the process it is due under the United States Constitution and the Constitution and statutes of South Carolina.

SCE&G is entitled to a preliminary injunction preventing the Commissioners from enforcing or giving effect to the Act because SCE&G satisfies each of the requirements for

immediate injunctive relief.

SCE&G is likely to succeed on the merits because the Act is unconstitutional. By redefining SCE&G's property rights and cutting SCE&G's rates to confiscatory levels, the Act violates the Takings Clause. The Act identifies, imposes guilt, and punishes SCE&G in violation of the Bill of Attainder Clause. The Act is also an arbitrary use of retroactive legislation, designed to impose costs on a politically unpopular company, violating SCE&G's substantive due process rights. And by withdrawing SCE&G's right to notice and a hearing, the Act violates basic procedural-due-process requirements.

SCE&G will suffer immediate and irreparable harm if the Court does not issue an injunction, an injunction is in the public interest, and an injunction will not harm any other party. If the Act is not enjoined, Dominion Energy, Inc. ("Dominion Energy") will have the contractual right not to close on its merger agreement with SCE&G's parent company (SCANA Corporation ("SCANA")).[1] The Act will also cause significant and irreparable monetary loss, depriving SCE&G of more than $365 million in annual revenue and forcing SCE&G to pay immediate refunds to customers of more than $100 million, amounts that, absent an injunction, SCE&G has no hope of recovering due to the state sovereign immunity prohibition against claims for monetary damages against states and provisions outlawing retroactive ratemaking (utilities may not set rates to recover past losses). The immediacy of that harm is absolute as the Act requires the PSC to enter an order for the revised rates and the refunds within five calendar days of the Act's adoption — meaning that the PSC's implementation of the Act could occur at any moment. Indeed, the PSC has already issued notice of a special commission business meeting for July 2, 2018, to consider implementing the Act. *See* Notice, attached as Ex. 1.

---

[1] SCE&G is a wholly owned subsidiary of SCANA.

## BACKGROUND

### I.    THE BASE LOAD REVIEW ACT

The South Carolina General Assembly enacted the BLRA in 2007 to incentivize utilities to invest in new clean energy.  *See* BLRA, 2007 South Carolina Laws Act 16 (S.B. 431), *codified at* S.C. Code Ann. § 58-33-210 *et seq.* (2015).  The BLRA's stated purpose was "to provide for the recovery of prudently incurred costs associated with the new base load plants . . . when constructed by investor-owned electrical utilities, while at the same time protecting customers of investor-owned electrical utilities from responsibility for imprudent financial obligations or costs." *Id.*  The BLRA allows utilities to seek a "base load review order" from the PSC that deems a new base load plant "to be used and useful for utility purposes such that its capital costs are prudent utility costs and are properly included in rates," while the plant is under construction.  *See* S.C. Code Ann. § 58-33-220(4).

In proceedings on an application for a base load review order, the ORS is required to "safeguard the public interest," and members of the public have the right to testify.  *Id.* § 58-33-230(F).  After a hearing, the PSC will issue an order approving rate recovery for plant capital costs if it determines that "the utility's decision to proceed with construction of the plant is prudent and reasonable considering the information available at the time."  *Id.* § 58-33-275(A).  A base load review order is "a final and binding determination" that a utility's capital costs are prudent and properly included in rates, and that prudency determination "may not be challenged or reopened in any subsequent proceeding."  *Id.* § 58-33-275(A), (B).

### II.    SCE&G PARTNERS WITH SANTEE COOPER TO INVEST UNDER THE BLRA

In 2005, SCE&G recognized a need for additional generation resources for its customers.  After considering several potential sources, including natural gas and coal, SCE&G ultimately chose nuclear power.  SCE&G partnered with Santee Cooper to construct nuclear reactor units 2 and 3 at SCE&G's

existing V.C. Summer nuclear facility site in Jenkinsville, South Carolina ("the Project").

On May 30, 2008, SCE&G filed with the PSC a Combined Application for Certificate of Environmental Compatibility, Public Convenience and Necessity and For a Base Load Review Order (the "Application"). SCE&G's Application included the plant's anticipated construction schedule and capital costs, as well as the proposed rate design and class allocation factors to be used in formulating revised rates. SCE&G requested approval for construction and contingency costs of $4.5 billion in 2007 dollars. The construction schedule included forecasted substantial completion dates of April 1, 2016, for Unit 2, and January 1, 2019, for Unit 3. It also disclosed numerous risks related to the project, including risks related to scheduling and price.

The PSC held a three-week hearing, spanning fourteen sessions over ten days. Nine SCANA/SCE&G employees (along with additional expert witnesses) testified, including senior executives: SCANA CEO Kevin Marsh, Chief Nuclear Officer Stephen Byrne, CFO Jimmy Addison, and Manager of Resource Planning Joseph Lynch. The environmental group Friends of the Earth and the South Carolina Energy Users Committee intervened, as did five *pro se* individuals. ORS was also a party. Counsel for the represented intervenors, the *pro se* intervenors, and members of the PSC questioned each of SCE&G's witnesses at length. The PSC also heard testimony from ORS's experts, which consisted of internal ORS personnel as well as ORS's external consultants. And it heard testimony from 26 members of the public.

On March 2, 2009, the PSC entered a base load review order ("Order") granting SCE&G's Application. The Order identified the risks to the cost schedule, including the risk of delays and increasing costs, and found that the costs and anticipated schedule "are reasonable and prudent." In 2010, the South Carolina Supreme Court issued two opinions affirming the Order in almost all respects. *See Friends of the Earth v. PSC*, 387 S.C. 360 (2010); *S.C. Energy Users Comm. v. PSC*,

388 S.C. 486 (2010).

## III.   SCE&G EXECUTES THE EPC CONTRACT AND CONSTRUCTION BEGINS

Construction of the Project was governed by the Engineering, Procurement, and Construction Agreement ("EPC Contract") between (1) SCE&G, for itself and as agent for Santee Cooper (collectively, the "Owners") and (2) a consortium of Westinghouse and Stone & Webster, Inc. (the "Consortium").  The Consortium took responsibility for the design, engineering, procurement, and installation of the equipment and materials, as well as construction of the units.  The EPC Contract set an expected price for construction, which was broken down into several components, including fixed prices for certain equipment and labor, firm prices for other equipment, and actual costs for labor, and time and materials.  The EPC Contract also required the Consortium to provide accurate work schedules, financial projections, and updates on the progress of the Project.

After SCE&G received a PSC order authorizing the commencement of certain work, the Consortium began work on the Project in the fall of 2008, with SCE&G providing regular updates to the ORS.  SCE&G petitioned the PSC periodically over the next several years, requesting alterations to the capital-cost and construction schedules.  Each time, the PSC granted SCE&G's request, subject to certain modifications agreed to by ORS and SCE&G, concluding the adjustments were "a normal and expected part of implementing a construction plan of the size and scope of the present project." SCE&G also petitioned the PSC for revised rates every year beginning in 2008.  The PSC granted each of SCE&G's requests, authorizing SCE&G to recover from ratepayers the financing costs incurred during construction.

In 2015, SCE&G filed its fourth petition for updates and revisions with the PSC, disclosing a delay in the substantial completion dates for the units as well as a projected cost increase of $698.2 million in 2007 dollars.  The PSC granted SCE&G's petition for updates, finding that "SCE&G was

in no sense imprudent in its management" of the Project.  Also in 2015, the Owners and the Consortium amended the EPC Contract (the "EPC Amendment"), resolving certain concerns related to the Consortium's progress.  The EPC Amendment also allowed the Owners to exercise an option to accept fixed prices for approximately 99 percent of all EPC costs, thereby significantly reducing the risk of additional increases in costs to the Owners.  The PSC reviewed the EPC Amendment and approved SCE&G's exercise of the fixed-price option.

## IV.     THE DECISION TO ABANDON THE PROJECT

On March 29, 2017, Westinghouse filed a voluntary petition for Chapter 11 bankruptcy. Westinghouse informed the Owners that it intended to use the Bankruptcy Code to reject its obligations to complete the Project under the EPC Contract.

SCE&G evaluated its options, including completing both units, abandoning both units, and completing one unit and delaying or abandoning the other.  After carefully assessing all available data — most of which became available from Westinghouse only after the bankruptcy filing — SCE&G concluded that Westinghouse likely would not have completed Unit 2 until December 31, 2022, and Unit 3 until March 31, 2024.  SCE&G further determined that its total cost to complete both units without the fixed price contract — even after accounting for anticipated guaranty payments by Westinghouse's parent company of approximately $1.1 billion — would be $8.8 billion in future dollars.  That would have amounted to an increase of $1.1 billion from the $7.7 billion (in future dollars) estimated in 2016.

In light of this new information, continued partnership with Santee Cooper was critical. SCE&G evaluated completing Unit 2 while abandoning or delaying completion of Unit 3, so long as Santee Cooper remained a 45% partner.  There would have been significant risks with that approach, including the possibility that Congress would not extend the 2020 federal production

tax credits deadline for the plants to begin producing energy.  When Santee Cooper announced on July 31, 2017, that it was suspending construction of the Project as a result of Westinghouse's anticipated rejection of the EPC Contract, SCE&G was left with no commercially reasonable option to move forward.  Because SCE&G could not complete Unit 2 on its own without taking extraordinary financial risks due to the absence of the fixed-price protections of the EPC Contract, SCE&G announced that it intended to abandon the Project. Shortly thereafter, SCE&G filed a petition with the PSC, requesting pursuant to the BLRA that the PSC find that its decision to abandon the Project was prudent.  In direct response to threats received from the Senate's President Pro Tempore, SCE&G withdrew its petition.[2]

## V.     POLITICAL UPROAR

SCE&G's announcement was publicly and politically unpopular.  Headlines of the "failed nuclear project" became a daily occurrence, with South Carolina lawmakers welcoming "[e]very available option" to determine the "root of this $9 billion problem."[3]  Both the South Carolina House and Senate formed special committees to investigate the Project, holding contentious hearings with SCE&G executives.  The South Carolina Attorney General reported that "his office plan[ned] to launch an investigation, [and] urg[ed] lawmakers to stop the utilities from paying off the project's failure on the backs of customers."[4]  Within months, South Carolina law enforcement

---

[2] Avery G. Wilks, *Inside the Pivotal Moments that Led SC Legislators to Slash SCE&G's Power Bills*, The State (June 29, 2018), available at https://www.thestate.com/news/politics-government/article214066869.html.

[3] *See, e.g.*, Jamie Self & Avery G. Wilks, *Failed Nuclear Project Ripe for Federal Investigation, SC Lawmakers Say*, The State, (Sept. 21, 2017), available at http://www.thestate.com/news/local/article174596156.html (House Speaker "welcom[ed] the federal investigation into the nuclear-reactor construction project").

[4] Andrew Brown, *State Lawmakers Demand Action over Cancelled South Carolina Nuclear Reactors, but Can't Agree on What Comes Next*, The Post and Courier, (Aug. 5, 2017), available

and federal agencies also launched investigations into the Project. And the Governor personally expressed his desire for a legislative change to force SCE&G to pay for expenses in order "to see that rate payers don't lose their money."[5]

SCE&G's decision to abandon the Project also became the subject of various lawsuits, as well as agency actions pending before the PSC. SCE&G is a defendant in various putative class actions pending in state and federal court brought on behalf of alleged ratepayers.[6] These actions challenge the rates approved by the PSC under the BLRA. The actions pending before the PSC were initiated by the ORS as well as certain environmental organizations and likewise challenge the rates related to the Project. *See Friends of the Earth v. SCE&G*, Docket No. 2017-207-E; *see also In re Request of the Office of Regulatory Staff for Rate Relief to SCE&G pursuant to S.C. Code Ann. § 58-27-920*, Docket No. 2017-305-E. The PSC is also tasked with determining the prudency of SCE&G's decision to abandon the Project pursuant to a petition filed by SCE&G in connection with its planned merger with Dominion Energy, Inc. *See Docket No. 2017-370-E.*

The PSC proceedings are particularly relevant to this motion. When the General Assembly passed the Act, the PSC was evaluating a request that, as it relates to rate relief, looks very similar to what the Act achieves. In that particular PSC proceeding, the PSC was tasked with evaluating evidence SCE&G submits related to the impact of these revised rates and determining whether they comply with the Constitutional protections guaranteed utilities. In the Act, the General

---

at        http://www.postandcourier.com/business/state-lawmakers-demand-action-over-cancelled-south-carolina-nuclear-reactors/article_bd018f42-7854-11e7-8140-235d2f3fc6fd.html.

[5] Libba Holland, *Gov. McMaster Speaks About Failed Nuclear Plant During Lowcountry Visit*, WCBD News 2 (Oct. 25, 2017), available at http://counton2.com/2017/10/25/gov-mcmaster-speaks-about-failed-nuclear-plant-during-lowcountry-visit/.

[6] SCANA and certain officers and directors of SCANA are also named as defendants in putative class and derivative actions challenging disclosures made in filings with the Securities and Exchange Commission and other board activity related to the Project.

Assembly has taken this decision away from the PSC and dictated a result without allowing for consideration of the evidence SCE&G had submitted to the PSC showing that the rates the General Assembly has now dictated are confiscatory and inappropriate.

## VI.     AMENDMENTS TO THE BLRA

On June 28, 2018, the South Carolina Governor vetoed the Act.  Then, the General Assembly overrode his veto, and upon that action, the Act became law.  This amendment to the BLRA has the effect of (1) singling out SCE&G by ordering the PSC to dramatically reduce SCE&G's retail electric rates, and (2) eliminating SCE&G's right to the process that South Carolina law otherwise guarantees in ratemaking.

The statute singles out SCE&G by eliminating from the current rates the specific  increases authorized by six duly-issued, final, and unappealable rate orders entered by the PSC  after 2010 under the BLRA.  Act § 3, § 58-34-20.  That will reduce the BLRA-authorized rate increases by more than 82%, so that only approximately 3.2% of the average residential customer's total electricity bill will be attributable to new nuclear financing costs.  *See id*.  The Act also purports to retroactively redefine the standard of care that was binding on SCE&G when it decided to construct, and was later forced to abandon, the Project.  *Id*. § 1.  Were that not enough, the Act directs that to the extent it conflicts with the previous statutory scheme — the premise on which SCE&G (and, in turn, its equity and debt investors, including many of its employees and other residents of South Carolina) relied when making its decision to invest in nuclear construction — the old statutory scheme is "suspended."  *See id.* § 3, §§ 58-34-40 & 58-34-50. The suspension of the BLRA is not generally applicable; it applies only to SCE&G and, even more narrowly, to "utility rates for matters related to V.C. Summer Nuclear Reactor Units 2 and 3 at Jenkinsville, South Carolina."  *Id.*  §§ 58-34-40 & 58-34-50.  The Act also eliminates SCE&G's

right to suspend the lower rates pending a hearing — or to obtain a hearing on any other new matter arising under the BLRA. *See id.* § 2.A. (stating that the PSC "must not accept a base load review application, nor may it consider any requests made pursuant to Article 4, Chapter 33 of Title 58 other than in a docket currently pending before the Commission."); *see also id.* § 3, § 58-34-50 (noting that certain provisions "are hereby suspended for purposes of the utility rates provided by for this chapter and for any pending matters related to V.C. Summer Nuclear Reactor Units 2 and 3 at Jenkinsville, South Carolina[.]").

The Act's express text underscores the General Assembly's intent to abuse its power to single out and legislatively punish SCE&G. The Act targets SCE&G by referring to "[t]he investor-owned utility holding the majority interest in the V.C. Summer Nuclear Reactor Units 2 and 3 at Jenkinsville, South Carolina." Act § 3, § 58-34-10(A). The Act also explains that the new, confiscatory rate "shall apply to all customers of the investor-owned utility identified . . . , which has imposed nine rate increases for the purpose of funding the V.C. Summer project." *Id.* § 58-34-10(B). It mandates that, within five calendar days of the Act's effective date, the PSC "provide an experimental rate that customers of the utility identified . . . shall pay during the pendency of litigation currently before the commission . . . or until replaced by an order of the commission under Section 58-34-30" — that is, customers of SCE&G. *Id.* § 58-34-20.

The Act does not afford SCE&G any notice or opportunity for a hearing before the "experimental rate" takes effect. *Id.* § 58-34-20. Instead, it suspends SCE&G's right to petition for a hearing on the rate change or any rate change going forward "for any pending matters related to V.C. Summer Nuclear Reactor Units 2 and 3 at Jenkinsville, South Carolina." *Id.* § 58-34-40 ("Any provision of Article 7, Chapter 27, Title 58 in conflict with the provisions of this chapter. . . are suspended for purposes of the utility rates provided for by this chapter and for any pending

matters related to V.C. Summer Nuclear Reactor Units 2 and 3 at Jenkinsville, South Carolina . . . .").  Although the Act requires the PSC to "monitor the net effect of the experimental rate," it does not afford SCE&G any right to participate.  *See id.* § 58-34-30 (allowing the PSC to alter the experimental rate "on its own motion").  Moreover, the Act permits the experimental rate to be altered only if the PSC "determines that an adjustment to the experimental rate is necessary to satisfy constitutional requirements of utility ratemaking."  *Id.*  Even if the PSC is inclined to alter the rate, it is required to impose "the lowest possible rate," which necessarily denies SCE&G a reasonable return.  *See id.*

SCE&G filed this action for declaratory and injunctive relief the day after the General Assembly passed the Act, seeking (1) a declaration that the Act is unconstitutional, and (2) a preliminary and permanent injunction.  The Court should issue an order preliminarily enjoining enforcement of the Act for a period of thirty days and, within that time, schedule a hearing on the merits of SCE&G's complaint seeking to declare the Act unconstitutional.

## ARGUMENT

A party is entitled to injunctive relief if (1) it is "likely to succeed on the merits;" (2) it is "likely to suffer irreparable harm in the absence of preliminary relief;" (3) the "balance of equities tips" in its favor; and (4) "an injunction is in the public interest."  *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  All factors here weigh in favor of relief.

## I.    SCE&G IS LIKELY TO SUCCEED ON THE MERITS.

SCE&G is likely to prevail on the merits of its challenges to the Act.  As a general rule, a legislature must accomplish its desired results "by rules of general applicability."  *United States v. Brown*, 381 U.S. 437, 461 (1965).  This basic principle constrains legislative activity.  *Fletcher v. Peck*, 10 U.S. 87, 136 (1810) (Marshall, C.J.) ("It is the peculiar province of the legislature to

prescribe *general* rules for the government of society." (emphasis added)). Fundamental separation-of-powers principles reflect, in part, the Framers' "concern that a legislature should not be able to unilaterally impose a substantial deprivation" on individuals or narrow groups of individuals. *INS v. Chadha*, 462 U.S. 919, 962 (1983) (Powell, J., concurring).

The Act flies in the face of this constitutional baseline. The Act forecloses SCE&G's ability to recover payments to which it is legally entitled and purposefully sets a confiscatory rate in violation of the Takings Clause. The Act punishes SCE&G in violation of the Bill of Attainder Clause for making the prudent — but politically unpopular — decision to abandon construction of the Project. The Act sweeps away settled investment-backed expectations for no legitimate government purpose, in violation of the Due Process Clause. And the Act strips SCE&G's of its property rights and its due process rights to notice and a hearing on the experimental rates and SCE&G's pending requests before the PSC.

### A. The Act Effects an Unconstitutional Taking.

The Takings Clause provides that "[n]o person shall be . . . deprived of . . . property, without due process of law, nor shall private property be taken for public use, without just compensation." U.S. Const. amends. V. This clause "applies to the States as well as the Federal Government." *Brown v. Legal Found. of Washington*, 538 U.S. 216, 232 n.6 (2003); *see also* U.S. Const. amend. XIV. Among the most basic purposes of the Takings Clause is to prohibit any form of legislative targeting. As the Supreme Court has recognized, the Takings Clause "was designed to bar the government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960); *Palazzolo v. Rhode Island*, 533 U.S. 606, 607 (2001).

By legislatively dictating a revised rate — one that denies SCE&G a reasonable return and

takes away its ability to recover previously-approved costs— the Act violates the Takings Clause.[7]

### 1. The Act Was Passed with a Confiscatory Purpose.

"[A] State's decision to arbitrarily switch back and forth between methodologies in a way which required investors to bear the risk of bad investments . . . would raise serious constitutional questions." *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 315 (1989). That is precisely what the General Assembly has done here.

To incentivize infrastructure investment, the General Assembly passed the BLRA to guarantee that all prudent costs spent on nuclear infrastructure development could be recovered *even if* the construction effort was abandoned as long as the decision to abandon was prudent. *See* S.C. Code. Ann. § 58-33-280(K). In reliance on that guarantee, SCE&G invested billions of dollars in construction efforts but ultimately concluded that abandoning the Project was prudent. Now that abandonment has happened — an action specifically contemplated and encouraged by the BLRA with financial incentives for doing so — the State has changed the rules of the game to prevent SCE&G from recovering its costs. "[O]pportunistic changes in ratesetting methodologies," like the change mandated by the Act, give rise to "a taking challenge." *Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467, 527 (2002). The text of the Act, the Act's timing, and the statements made by legislators and politicians all show that the Act was targeted at SCE&G to

---

[7] SCE&G's requested relief is not barred by the Johnson Act because SCE&G only seeks review only of the unconstitutional statutory provisions enacted by the General Assembly; it does not challenge or seek review of any order by the PSC or any other South Carolina agency. *See, e.g.*, *PUC v. United States*, 355 U.S. 534, 540 (1958) (holding the Johnson Act inapplicable because "the challenge is not to a rate 'order' but to a statute which requires the United States to submit its negotiated rates to the California Commission for approval"); *Monongahela Power Co. v. Schriber*, 322 F. Supp. 2d 902, 914 (S.D. Ohio 2004) ("Because [the utility] challenges the [rate-freeze] statute, and not the PUCO orders per se, the Johnson Act does not divest this Court of jurisdiction as to [a due-process claim]."). The Johnson Act also does not apply because South Carolina has "interfere[d] with interstate commerce." 28 U.S.C. § 1342(2).

confiscate the payments guaranteed by law.

The text of the Act demonstrates that it was designed to confiscate SCE&G's property. There can be no debate over the fact that SCE&G is the Act's identifiable target. The Act refers to SCE&G multiple times in its few sections, including by reference to the "[t]he investor-owned utility holding the majority interest in the V.C. Summer Nuclear Reactor Units 2 and 3 at Jenkinsville, South Carolina." Act § 3, § 58-34-10(A). The Act also explains that the new, confiscatory rate "shall apply to all customers of the investor-owned utility identified . . . , which has imposed nine rate increases for the purpose of funding the V.C. Summer project" — *i.e.*, SCE&G. *Id.* § 58-34-10(B). It also mandates that the PSC shall "provide an experimental rate that customers of the utility identified . . . shall pay during the pendency of litigation currently before the commission . . . or until replaced by an order of the commission under Section 58-34-30" — that is, customers of SCE&G. *Id.* § 58-34-20. It specifically references six valid and legally adopted revised rates orders that apply only to SCE&G, and the Act decrees their legislative revocation. The Act's improper confiscatory purpose cannot be described more clearly: the General Assembly intended to prevent SCE&G from collecting the vast majority of payments promised to it under the BLRA. *See Verizon Commc'ns*, 535 U.S. at 527 ("[T]here may be a taking challenge distinct from a plain-vanilla objection to arbitrary and capricious agency action if a ratemaking body were to make opportunistic changes in ratesetting methodologies just to minimize return on capital investment in a utility enterprise.").

If the text were not clear enough, the Act's inappropriate purpose is confirmed by legislators' comments. On July 31, 2017, SCE&G announced that it was abandoning construction. The backlash was swift. Just days after that announcement, "[m]ore than 25 state lawmakers signed a letter to the new Energy Caucus calling for utility investors to eat billions of dollars in

remaining costs."[8]  And in the months leading up to the Act's enactment, politicians and legislators had no qualms expressing its confiscatory purpose.  Referencing an earlier version, South Carolina House Speaker Lucas touted his intent that this legislation would allow consumers to "rest assured that utility companies will never take advantage of ratepayers' trust under the Base Load Review Act again."[9]  The South Carolina Attorney General "urg[ed] lawmakers to stop the utilities from paying off the project's failure on the backs of customers."[10]  And the Governor said that he wanted to force SCE&G to pay for expenses in order "to see that rate payers don't lose their money."[11]  The political purpose behind the legislation was to set a confiscatory rate.

### 2.    The Act Imposes a Confiscatory Rate.

The Takings Clause forbids States from mandating utility rates that are "confiscatory." *Duquesne*, 488 U.S. at 307; *Covington & L. Tpk. Rd. Co. v. Sandford*, 164 U.S. 578, 593 (1896).  It is not the method of calculating rates but rather "the impact of the rate order which counts." *Duquesne*, 488 U.S. at 310; *Smith v. Illinois Bell Tel. Co.*, 282 U.S. 133, 160 (1930) ("In determining what is a confiscatory regulation of rates, it is necessary to consider the actual effect of the rates imposed.").  If the rate fails to "afford sufficient compensation" to a regulated utility, "the State has taken the use of" the utility's property "without paying just compensation and so

---

[8] *See Andrew Brown, State Lawmakers Demand Action over Cancelled South Carolina Nuclear Reactors, but Can't Agree on What Comes Next, The Post and Courier*, (Aug. 5, 2017), available at http://www.postandcourier.com/business/state-lawmakers-demand-action-over-cancelled-south-carolina-nuclearreactors/article_bd018f42-7854-11e7-8140-235d2f3fc6fd.html.

[9] Maurice T. Miller, *Lawmakers Take Step toward Lowering SCE&G Bills*, WCBD News 2 (Feb. 1, 2018), available at http://counton2.com/2018/02/01/lawmakers-take-step-toward-lowering-sceg-bills/.

[10] Brown, *State Lawmakers Demand Action*, The Post and Courier, (Aug. 5, 2017).

[11] Libba Holland, *Gov. McMaster Speaks about Failed Nuclear Plant during Lowcountry Visit*, WCBD News 2 (Oct. 25, 2017), available at http://counton2.com/2017/10/25/gov-mcmaster-speaks-about-failed-nuclear-plant-during-lowcountry-visit/.

violated the Fifth and Fourteenth Amendments." *Duquesne*, 488 U.S. at 308.

The Constitution guarantees a regulated utility the opportunity to earn "enough revenue not only for operating expenses, but also for the capital costs of the business." *FPC v. Hope Nat. Gas Co.*, 320 U.S. 591, 603 (1944); *see also Michigan Bell Tel. Co. v. Engler*, 257 F.3d 587 (6th Cir. 2001); *Guaranty Nat'l Ins. Co. v. Gates*, 916 F.2d 508 (9th Cir. 1999).

> From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital.

*Hope*, 320 U.S. at 603 (citations omitted); *see also Bluefield Waterworks & Imp. Co. v. Pub. Serv. Comm'n of W. Va.*, 262 U.S. 679, 692–93 (1923) ("[R]eturn[s] should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties").

The Act sets a confiscatory rate that prevents SCE&G from earning enough revenue for its capital costs and, in fact, "jeapordize[s]" SCE&G's "financial integrity." *Duquesne*, 488 U.S. at 312.  The Act prohibits SCE&G from recovering a reasonable return on its investment, takes away SCE&G's ability to charge rates sufficient to recover amounts spent in reliance on the BLRA, would allow Dominion Energy to back out of a company-sustaining merger, and jeopardizes SCE&G's ability to access capital to fund short-term operations.  Contrary to established precedent and in disregard of SCE&G's constitutional rights, the Act makes no attempt to determine the effect of the experimental rate on SCE&G.  Instead, it mandates an arbitrary experimental rate and authorizes the PSC to adjust the rate, only if and when the PSC in its sole discretion deems it necessary.  This "shoot first and ask questions later" approach has been the General Assembly's

reaction from the beginning, and it has now been codified in violation of the United States and South Carolina Constitutions. The Act's confiscatory purpose effects an unconstitutional Taking.

### 3.     The Act Appropriates SCE&G's Property.

In a "classic taking," the "government directly appropriates private property for its own use." *Horne v. Dept. of Agriculture*, 135 S. Ct. 2419, 2425 (2015); *Quinn v. Bd. of Cnty. Comm'rs for Queen Anne's Cnty.*, 862 F.3d 433, 438 (4th Cir. 2017) (The Takings Clause "requires compensation for direct government appropriation . . . of private property."). Any appropriation of private property is a per se taking requiring just compensation, regardless of whether the property is real property, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426−35 (1982); intellectual property, *James v. Campbell*, 104 U.S. 356, 358 (1882); personal property, *Horne*, 135 S. Ct. at 2425; or money, *Brown v. Legal Found. of Washington*, 538 U.S. 216, 235 (2003).

In South Carolina, property rights are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law — rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Snipes v. McAndrew*, 313 S.E. 2d 294, 297 (S.C. 1984) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)).

The Supreme Court of South Carolina has held that a law that guarantees a person a future payment creates a cognizable property interest in that payment. *See Grimsley v. SLED*, 721 S.E.2d 423 (2012). In *Grimsley*, employees of the South Carolina Law Enforcement Division ("SLED") sued the division, arguing that it had taken part of their salary in violation of the Fifth and Fourteenth Amendments. *Id.* at 279. The employees claimed that SLED had "taken" a portion of their salary in which they had a vested property interest. The South Carolina Supreme Court

agreed, holding that the employees had a "cognizable property interest rooted in state law" in the amount by which the salary was reduced.  The court looked to the retirement statute to determine whether a property right had been created, and determined that the mandatory language contained in the statute created a property interest: "[a]n employer *shall* pay to the system the employer contribution."  *Id*. (*quoting* S.C. Code. Ann. § 9-11-90(4)(b)).

Similar mandatory language is found in the BLRA.  Under the BLRA, prudent capital costs "shall" be recoverable regardless of whether the plants are being constructed, constructed, or abandoned.  *See* S.C. Code Ann. § 58-33-275(A) ("[A] base load review order *shall* constitute a final and binding determination . . . that [the] capital costs are prudent utility costs . . . and are properly included in rates so long as the plant is constructed or being constructed" within certain parameters) (emphasis added); *id.* § 58-33-280(K) ("[w]here a plant is abandoned . . . the capital costs . . . *shall* nonetheless be recoverable" (emphasis added)).  The statute goes on to clarify that "recovery of capital costs and the utility's cost of capital associated with them may be disallowed *only* to the extent" that the utility behaved imprudently.[12]  *Id.* § 58-33-280(K) (emphasis added). Moreover, the BLRA's self-described purpose is, in part, "to provide for the recovery of the prudently incurred costs associated with new base load plants."  *South Carolina Energy Users Comm. v. South Carolina Elec. & Gas*, 764 S.E.2d 913, 916 (S.C. 2014) (citing S.C. Code Ann. § 58-33-210 (Supp. 2009) (Editor's Note)).  There can be no doubt that the BLRA "secure[d] certain benefits" to utilities in order to incentivize investment.  *See Snipes*, 313 S.E.2d at 297.  The statute created a property interest in the recovery of all prudent capital costs, and a deprivation of that right is a taking.  *See Grimsley*, 721 S.E.2d 423 at 285.

---

[12] Under the BLRA, "cost of capital" incorporates "the return on equity."  S.C. Code Ann. § 58-33-220(22).

South Carolina law entitled SCE&G to collect rate payments so as to recover its prudently incurred capital costs related to the nuclear facility construction and the cost of that capital. Under the Takings Clause, the State cannot now "redefine [this] preexisting right[]," nor by "*ipse dixit* . . . transform private property into public property without compensation." *Washlefske*, 234 F.3d at 183. Taking specific and identifiable money without just compensation violates the Takings Clause. The Act purports to do precisely that. It prohibits SCE&G from recovering all rate increases granted pursuant to the BLRA after 2010. *See* Act § 3, § 58-34-20. This 180-degree redefinition of property rights is a categorical appropriation of property. *See Brown*, 538 U.S. at 234−35; *see also Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 242 (1984) (redistribution of land to correct deficiencies in the market was an exercise of the eminent domain power). If South Carolina wishes to appropriate SCE&G's property and give it to SCE&G customers, it may do so *only if* it is willing to compensate SCE&G for its loss. The Act provides for no just compensation, and thus violates the Takings Clause.

### 4.    Deprivation of SCE&G's Property Is a Taking Even If Temporary.

That the Act contemplates that the PSC, on its own, might at some point reevaluate the experimental rate does not change the constitutional analysis. Although "time is indeed a factor in determining the existence *vel non* of a compensable taking," *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 38 (2012), it is most relevant for regulatory takings, not appropriations, *see Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 324 (2002) (noting "longstanding distinction between acquisitions of property for public use" and "regulations prohibiting private uses, on the other"). Of course, there may be certain infringements of property rights so limited that they that do not rise to the threshold of a taking, *see, e.g.*, *Nat'l Bd. of YMCA v. United States*, 395 U.S. 85, 93 (1969) ("temporary,

unplanned occupation" of building by troops under exigent circumstances was not a taking), but there can be no serious argument that the State's specific, targeted, and purposeful deprivation of property to which SCE&G is entitled is akin to a "temporary, unplanned occupation."

The taking of current, past, and ongoing utility revenues is in no sense temporary. There is no methodology for SCE&G to recover the revenues lost during any "temporary' period that the experimental rates are in effect or to recover the refund that SCE&G will be required to make for collections after April 1, 2018, when the PSC issues its order implementing the Act.

The Act's confiscatory rate is still confiscatory, even if it eventually is changed by the PSC. As the Supreme Court has explained, "[i]f the rate does not afford sufficient compensation, the State has taken the use of utility property without paying just compensation and so violated the Fifth and Fourteenth Amendments." *Duquesne*, 488 U.S. at 308. The potentially temporary nature of a rate cannot save it from Takings scrutiny. If it could, nearly all rates could escape constitutional concerns, given that most rates are not fixed for eternity.

### B.     The Act Is an Unconstitutional Bill of Attainder.

The U.S. Constitution prohibits states from enacting "bills of attainder." U.S. Const. art. I, § 10. A state statute is an unconstitutional bill of attainder if it "determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468 (1977); *United States v. Lovett*, 328 U.S. 303, 315 (1946). Facing nearly identical circumstances, the Second Circuit held that a state statute violates the Bill of Attainder Clause when it prohibits a specific utility company from recovering costs solely because it undertook a politically unpopular action. *See Consol. Edison Co. v. Pataki*, 292 F.3d 338 (2d Cir. 2002).

In *Consolidated Edison*, a New York utility was forced to shut down its nuclear plant temporarily due to a defective steam generator. *Id.* at 343. Under existing law, the utility was able

to pass costs associated with the outage on to existing ratepayers, subject to a prudency review by the state's public service commission. *Id.* at 343−44. But before the PSC completed its prudency review, the New York General Assembly passed a bill ordering the PSC to prohibit the utility from recovering any costs associated with the outage. *Id.* at 344−45. "The basis for this law [wa]s the legislative finding that '[b]y continuing to operate steam generators known to be defective . . . the Consolidated Edison Company failed to exercise reasonable care on behalf of the health, safety and economic interests of its customers.'" *Id.* at 344. The utility sued to enjoin enforcement of the statute as unconstitutional. *Id.* at 345. The district court agreed that the statute was an unconstitutional bill of attainder and issued a permanent injunction, which the Second Circuit affirmed. *Id.* 356. The same result is required here.

*The Act Determines Guilt and Inflicts Punishment.* To determine whether a statute is punitive, courts consider "(1) whether [it] falls within the historical meaning of legislative punishment; (2) whether [it], 'viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes'; and (3) whether the legislative record 'evinces a congressional intent to punish.'" *Selective Serv. Sys. v. Minn. Pub. Int. Research Grp.*, 468 U.S. 841, 847 (1984). The Act satisfies all three factors.

*First*, the Act purports to take away payments to which SCE&G is legally entitled. The confiscation of property is a classic example of legislative punishment. *Fletcher*, 10 U.S. at 138 ("A bill of attainder may affect the life of an individual, or may confiscate his property, or may do both."). The Constitution's Framers were concerned that a "legislature could take advantage of the existing political landscape to usurp the functions of its fellow branches." *Consol. Edison Co. v. Pataki*, 117 F. Supp. 2d 257, 267 (N.D.N.Y. 2000). The Bill of Attainder "Clause's historical scope properly includes actions against any person or persons who are so unpopular politically that

the legislature may take unilateral action against them without fear of political retribution." *Id.*

As the *Consolidated Edison* court explained:

> Plaintiff, a powerful utility, although not the prototypical powerless victim of constitutional overreaching by any stretch of the imagination, is clearly politically unpopular. This is particularly so when it is accused of . . . unjustly passing along millions of dollars in resultant costs to the ratepayers. Indeed, this was not lost on the legislature, as one Senator proclaimed during debate of the bill that it made for "great politics" and "horrible policy." Accordingly, it fits nicely into the class of persons traditionally protected from bills of attainder.

*Id.* This reasoning applies with equal force here.

*Second*, the Act does not further any nonpunitive objective. Its only purpose is to reduce the rates paid to SCE&G. *See* Act § 3, § 58-34-20. When a legislature would not have imposed the law had the utility not committed the politically unpopular act, the law does not further "legitimate purposes." *Consol. Edison*, 292 F.3d at 353−54.

*Third*, intent to punish is evident through comments by Senators and the Governor, who purported to weigh the evidence, criticized SCANA's post-2010 conduct, and imposed this legislation as punishment. *See Nixon*, 433 U.S. at 478 (noting that courts should consider "whether the legislative record evinces a confessional intent to punish"). In Governor McMaster's State of the State Address, he said that "Santee Cooper and SCANA's decisions to suspend and abandon the construction of two nuclear reactors at the V.C. Summer nuclear station require us to take action immediately" and to present him with "a bill that replaces the Base Load Review Act . . . and [he would] sign it."[13] South Carolina House Speaker Lucas made clear that he had already pre-judged SCE&G's actions, stating that "the collapse of the V.C. Summer nuclear project was

---

[13] 2018 State of the State: As Prepared for Delivery, (Jan. 24, 2018), available at http://governor.sc.gov/Newsroom/Pages/2018StateoftheState.aspx.

much more careless and fraudulent than initially believed."[14]  And Senator Mike Fanning stated: "There has been a lot of hopelessness that we can't do anything about the two nuclear reactors and the debacle, we can't do anything about ensuring that ratepayers won't be left holding the bag. This is the first volley back across the net that, yes, we can."[15]  Relevant to this specific version of the Act, Chairman of the Senate Rules Committee, Shane Massey, explained that this 15% reduction in rates was justified "based on the bad acts that we found."[16]  Senator Massey has endorsed the view that SCANA (or more accurately, SCE&G), behaved in a manner deserving punishment, claiming  "SCANA execs knew the project was tanked but moved forward to boost profits & lock down bonuses.  This is criminal.  Nothing more, nothing less."[17]

Statutes like the Act are "exactly the kind of legislative action that the Bill of Attainder Clause was drafted to prevent."  *Consol. Edison Co.*, 117 F. Supp. 2d at 270.

> Having determined that a politically unpopular entity may have acted wrongfully, rather than setting "forth a generally applicable rule . . . and leave to the courts and juries the job of deciding what [entities] have committed the specified acts or possesses the specified characteristics," the legislature took it upon itself to determine the entity's guilt and to impose the sanction it deemed appropriate."

*Id.* (quoting *United States v. Brown*, 381 U.S. 437, 450 (1965).

---

[14] Jamie Self and Avery G. Wilks, *Failed Nuclear Project Ripe for Federal Investigation, SC Lawmakers Say*, The State (Sept. 21, 2017), available at  http://www.thestate.com/news/local/article174596156.html.

[15] Avery Wilks, *SCE&G Customers Could See Their Power Bills Shrink After SC House Passes Nuclear Bill*, The State (January 31, 2018), available at http://www.thestate.com/news/politics-government/article197610724.html.

[16] Avery G. Wilks, *SC Lawmakers Make Last-Minute Deal to Cut SCE&G Power Bills, Pass Other Nuclear Laws*, The State (June 27, 2018), available at https://www.thestate.com/news/politics-government/article213886594.html (quoting Senator Massey)

[17] *See* Shane Massey, *Shane Massey Retweeted Peter M. McCoy, Jr.* (Mar. 29, 2018), available at https://twitter.com/shanemassey?lang=en; *see also* Shane Massey, *Shane Massey Retweeted Peter M. McCoy, Jr.* (May 15, 2018), available at  https://twitter.com/shanemassey?lang=en ("I've said it since late last summer, SCANA execs handling of this project is nothing short of criminal. Meanwhile, each day passes ratepayers continue to fork out millions.").

***The Act Applies Specifically to SCE&G.***  As explained in *Consolidated Edison*, "[t]he specificity prong is satisfied if 'the challenged act singles out a person or identifiable group either by name or by describing those affected by the act 'in terms of conduct which, because it is past conduct, operates only as a designation of particular persons.'"  117 F. Supp. 2d at 267.  In this case, the Act clearly identifies SCE&G and singles out SCE&G's past conduct related to the V.C. Summer reactors.  Indeed, the Act expressly identifies "[t]he investor-owned utility holding the majority interest in the V.C. Summer Nuclear Reactor Units 2 and 3 at Jenkinsville, South Carolina," further describing the merger agreement with Dominion Energy, the future of which now hangs in the balance.  Act § 3, § 58-34-10(A)-(B).  Moreover, the Act suspends critical provisions of the BLRA, but *only* "for matters related to V.C. Summer Nuclear Reactor Units 2 and 3 at Jenkinsville, South Carolina."  *Id.* §§ 58-34-40 & 58-34-50.

***The Act Imposes Punishment Without The Protections of A Trial.***  Here, as in *Consolidated Edison*, "[t]he lack of a judicial trial is incontrovertible."  292 F.3d at 346.  The General Assembly enacted the Act "using purely legislative processes."

### C.    The Act Violates SCE&G Substantive Due Process Rights.

A statute violates due process if the legislature acted "in an arbitrary and irrational way." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976).  Though retroactivity alone does not violate the Due Process Clause, retroactive statutes are particularly susceptible to due-process challenges, and the justifications for prospective legislation "may not suffice" for retroactive legislation.  *Id.* at 17.  This heightened concern for retroactive statutes is due in part to the "[l]egislature's unmatched powers . . . to sweep away settled expectations suddenly," and because the presence of "political pressure poses a risk that [the legislature] may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals" — or

utilities. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994); *see also Romer v. Evans*, 517 U.S. 620, 635 (1996) (quoting *USDA v. Moreno*, 413 U.S. 528, 534 (1973)) ("[D]esire to harm a politically unpopular group cannot constitute a legitimate governmental interest.").[18]

The key inquiry is "whether the new provision attaches new legal consequences to events completed before its enactment." *Landgraf*, 511 U.S. at 270. The Act is retroactive because it cuts the rates to which SCE&G is entitled based on its decision to abandon the nuclear project. *See* Act § 3, § 58-34-20. The Act also withdraws legal protections required under the BLRA solely for "matters related to V.C. Summer Nuclear Reactor Units 2 and 3 at Jenkinsville, South Carolina," despite the fact that SCE&G has already made investments in reliance upon the BLRA. *Id.* §§ 58-34-40 & 58-34-50. In addition, the Act forces SCE&G to fork over $100 million it previously recovered in lawful rates. *Id.* § 58-34-20. The Act thus attaches new legal rights and consequences to events and actions that have already happened, including by re-defining "prudency," a critical term under the BLRA establishing what is, and is not, subject to capital cost recovery.[19]

The Act's impact is "particularly egregious" and should "be invalidated." *Eastern Enters.*

---

[18] Retroactive civil legislation like the Act also violates the Ex Post Facto Clause of the Constitution. *See Apfel*, 524 U.S. at 538−39 (Thomas, J., concurring) ("[T]his Court has considered the Ex Post Fact Clause to apply only in the criminal context. I have never been convinced of the soundness of this limitation.").

[19] The Act's new definition of prudency — extending to a "high standard of caution, care, and diligence" — is not limited to legal concepts that may be familiar even to sophisticated legal entities. Act, § 1. The definition of "prudent" and "imprudent" is explicitly not related to concepts of "negligence, carelessness, or recklessness," which leaves entirely unclear the standard that the PSC should impose under this new definition. *Id.* The Act extends responsibility to SCE&G for any and all decisions of a third-party to which a utility has delegated authority in connection with any decision and imputes liability to a utility for a third-party's actions without regard to whether the third party is acting in compliance with its obligations to a utility, even when the PSC has previously approved of the delegation of authority. These are fundamental alterations of the law previously applicable.

*v. Apfel*, 524 U.S. 498, 529 (1998) (plurality opinion).  The retroactive liability imposed on SCE&G is not some flaw of drafting statewide legislation — it is the feature.  And the impact of the retroactive statute is "severe[]."  *Id.* at 549 (Kennedy, J., concurring).  SCE&G invested approximately $5 billion in nuclear facilities in reliance on the BLRA.  Now, the State wants to change the rules of the game.  *See* Act § 3.  The Due Process Clause prohibits this type of opportunistic action:

> [D]ue process protection for property must be understood to incorporate our settled tradition against retroactive laws of great severity.  Groups targeted by retroactive laws, were they to be denied all protection, would have a justified fear that a government once formed to protect expectations can now destroy them.

*Apfel*, 524 U.S. at 549 (Kennedy, J., concurring).  The General Assembly passed the BLRA to protect expectations regarding nuclear infrastructure investment; now, it seeks to destroy those same protections.  To protect "[b]oth stability of investment and confidence in the constitutional system," this Court should enjoin the PSC from enforcing the unconstitutional Act.  *Id.*

### D.     The Act Violates SCE&G's Right to Procedural Due Process.

When an individual is deprived of a property interest, "some form of hearing is required." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (The bedrock principle of due process "is the opportunity to be heard at a meaningful time and in a meaningful manner.") (internal quotation marks omitted).  State legislation that deprives a person of property without providing an opportunity to be heard "work[s] a deprivation of property without due process of law."  *See Fuentes v. Shevin*, 407 U.S. 67, 98 (1972); *see also Huemmer v. Mayor & City Council of Ocean City*, 632 F.2d 371, 372 (4th Cir. 1980).

Courts analyze "procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient."

27

*Henderson v. Simms*, 223 F.3d 267 (4th Cir. 2000) (quoting *Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989)).   As explained above, SCE&G has a property interest in the payments guaranteed by the BLRA.   Moreover, SCE&G has a property interest in its existing power-generating facilities that "serv[e] the public interest."   *Duquesne*, 488 U.S. at 307.   The Act interferes with both of these protected property interests.

In determining whether the deprivation of property rights is protected by constitutionally sufficient procedural safeguards, courts consider three factors: (1) "the private interest that will be affected," (2) "the risk of an erroneous deprivation," and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that additional . . . procedural requirement would entail."   *Mathews*, 424 U.S. at 335.   Here, the private interests are substantial, and the risk of erroneous deprivation is certain.   Moreover, requiring the PSC to hold a hearing before stripping SCE&G of its lawfully-issued rates is not overly burdensome administrative process — it is the law.   *See* S.C. Const. art. I § 22 ("No person shall be finally bound by a judicial or quasi-judicial decision of an administrative agency affecting private rights *except on due notice and an opportunity to be heard*." (emphases added)).

The General Assembly does not purport to define a new mode of procedure by which the PSC can deprive SCE&G of its property.   Instead, the General Assembly has *removed* the procedures protecting SCE&G's property.   Within five calendar days of being signed into law, the Act mandates that the PSC impose an "experimental rate" that customers shall pay to SCE&G for power that SCE&G *must* provide to ratepayers.   Act § 3, § 58-34-20.   The "experimental rate" cannot include PSC-approved orders for rate increases after 2010, requiring the PSC to dramatically lower rates paid to SCE&G.   *See id.*   The "experimental rate" must go into force immediately, without any prior notice or hearing.   *Id.*   Moreover, the Act suspends SCE&G's right

to petition for a hearing on the rate change or any rate change going forward:

> Section 58-27-930 and the time limitations contained in Section 58-33-240(A) and (E) are hereby suspended for purposes of the utility rates provided for by this chapter and for any pending matters related to V.C. Summer Nuclear Reactor Units 2 and 3 at Jenkinsville, South Carolina, pending before the commission on or after the effective date of this chapter. The suspension remains in effect during the pendency of any litigation or appeal concerning the experimental or interim rates directed by the General Assembly or ordered by the Public Service Commission pursuant to this chapter, or related issues surrounding the establishment of these rates, until a final determination of the matter, including any subsequent appeals, is made by the appropriate court.

*Id.* § 58-34-50. Although the PSC is required to "monitor the net effect of the experimental rate and may alter the experimental rate, on its own motion," the Act does not give SCE&G any right to initiate or participate in that process. *See id.* § 58-34-30. That unfettered discretion flies in the face of the Due Process Clause. *See Force v. City of Phoenix*, 53 F.3d 338 (9th Cir. 1995) (rejecting provision that "would invite the very unbridled official discretion that the Due Process Clause was designed to inhibit"). And even if the PSC deigns to evaluate the rate, it *only* has authority to adjust the rate to "the lowest possible rate within the zone of reasonableness." *Id.* In other words, the PSC cannot impose the rates to which SCE&G is legally entitled or follow the law that formed the basis of SCE&G decision to invest in nuclear facilities.

## II.    THE ACT WILL CAUSE SCE&G TO SUFFER IRREPARABLE HARM.

SCE&G will suffer actual and immediate irreparable harm if the Court does not enter a preliminary injunction. Enforcement of the Act will deprive SCE&G of at least $365 million annually, jeopardize SCE&G's pending merger with Dominion Energy, inhibit SCE&G's ability to access capital for short-term operations, and will significantly impair SCE&G's goodwill.

***Unrecoverable Losses.*** The massive monetary harm SCE&G would face from the Act — more than $1 million per day — cannot be recovered because of the State's sovereign immunity. *See* Ex. 2, Declaration of Iris N. Griffin ("Griffin Dec."), ¶ 10. This monetary loss is a key reason

why SCE&G's limited injunction is necessary in this circumstance and a basis for finding irreparable harm.

"[E]conomic losses generally do not constitute irreparable harm," but "this general rule rests on the assumption that economic losses are recoverable." *N.C. Growers' Ass'n, Inc. v. Solis*, 644 F. Supp. 2d 664, 670 (M.D.N.C. 2009). Where economic losses are not recoverable, the Fourth Circuit has recognized that "the showing necessary to demonstrate irreparable harm is less strict." *Manning v. Hunt*, 119 F.3d 254, 264 (4th Cir. 1997); *see also Philip Morris USA Inc. v. Scott,* 131 S. Ct. 1, 4 (2010) ("If expenditures cannot be recouped, the resulting loss may be irreparable."); *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 360 (4th Cir. 1991) ("We believe that . . . the inability to obtain damages from the state . . . reduces the showing necessary to establish irreparable harm."), *abrogated on other grounds by Real Truth About Obama, Inc. v. Federal Election Comm'n*, 575 F.3d 342 (4th Cir. 2009); *Entergy Nuclear Vermont Yankee, LLC v. Shumlin,* 733 F.3d 393 (2d Cir. 2013) (finding a sufficient showing of irreparable harm where "Entergy would be unable to recover monetary damages from Vermont because of the Eleventh Amendment."); *Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp*., 715 F.3d 1268, 1289 (11th Cir. 2013) (noting that "numerous courts have held that the inability to recover monetary damages because of sovereign immunity renders the harm suffered irreparable"); *Chamber of Commerce of U.S. v. Edmondson,* 594 F.3d 742, 770-71 (10th Cir. 2010) (holding that "monetary damages that cannot later be recovered for reasons such as sovereign immunity constitute irreparable injury"). In addition, because retroactive ratemaking is prohibited, SCE&G has no clear basis on which to recover lost revenues from customers through future rates. "Rate-making is a prospective rather than a retroactive process." *S.C. Elec. & Gas Co. v. Pub. Serv. Comm'n*, 275 S.C. 487, 490, 272 S.E.2d 793, 795 (1980).

***Dominion Energy May Allow the Merger Agreement to Expire if the Act is Enforced.***
SCE&G and its parent company are parties to a pending merger with Dominion Energy.  *See* Act,
§ 3, § 58-24-10(A).  Dominion Energy has stated publicly, that it believes that it has the right to
decline to close on the merger if the Act is enforced.[20]  The publicly filed merger agreement makes
Dominion Energy's right not to close clear, and it gives SCE&G no protection if Dominion Energy
exercises that right because of a change in the BLRA.

Loss of such a "unique, non-replicable business opportunity" constitutes irreparable harm
to SCE&G and its parent company.  *See Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 163
(3d Cir. 1999) (holding that "the loss by one publicly traded corporation of a contractual
opportunity to acquire another publicly traded corporation through a corporate merger constitutes
irreparable harm"); *see also In re Adelphia Commc'ns Corp.*, 345 B.R. 69, 75, 84 (S.D.N.Y. 2006)
(holding that the plaintiff "plainly has shown irreparable injury[] by reason of the threatened loss
of the $17.6 billion it will receive on the sale of its business" by the defendant's effort to enjoin
the purchaser's acquisition of plaintiff's business).

***SCE&G Faces Other Irreparable Financial Harm.***  Even a temporary reduction in the
rates SCE&G is allowed to charge will adversely impact SCE&G's ability to attract the capital it
requires to operate and meet the needs of SCE&G customers.  Ex. 2, Griffin Dec., ¶¶ 26–35.  To
maintain customer service, SCE&G must continuously upgrade and renew its utility systems,
which, in turn, requires capital to be invested on an ongoing basis and for SCE&G to have access

---

[20] *See, e.g.*, Chris Martin, Brian Eckhouse, & Mark Chediak, *Dominion Sees $8 Billion Scana Deal Snared in 'High-Stakes Game'*, Bloomberg (June 27, 2018), available at https://www.bloomberg.com/news/articles/2018-06-27/south-carolina-lawmakers-are-said-to-reach-scana-rate-cut-deal (quoting Dominion Energy CEO Tom Farrell as stating that, by passing the Act, "Legislators are risking cash payments to SCE&G's electric customers of $1.3 billion — equal to $1,000 for the typical residential customer — and a permanent rate reduction of 7 percent" that would be available through the Dominion Energy merger).

to funds. *Id.* at ¶¶ 5–8. As Ms. Griffin explains, the Act risks the Company being largely unable "to attract the capital it requires to operate its system at reasonable rates," being forced to "reduce[] spending in areas that are needed to meet the needs of its customers," and the possibility of "deterioration in the Company's credit ratings and borrowing costs." *Id.* at ¶¶ 32–33. In turn, this could set in motion a series of events which could be financially detrimental to SCE&G and its customers. *Id.* at ¶ 39.

These harms are not speculative; they are already happening. On June 28, 2018, SCANA announced that it was required to reduce its dividend by approximately 80%, slashing its quarterly dividend for the first time in almost two decades.[21] These financial impacts are precisely the type of irreparable harm that necessitates injunctive relief. *See, e.g.*, *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1382 (6th Cir. 1995) (holding that "[t]he impending loss or financial ruin of [the plaintiff's] business constitutes irreparable injury"); *Maitland Co. Inc. v. Terra First Inc.*, No. 3:94-662-17, 1994 WL 773882, at *19-20 (D.S.C. Oct. 27, 1994) (finding evidence of the plaintiff's "loss of market share" and "danger of bankruptcy" was sufficient to demonstrate irreparable harm).

These impacts are exacerbated by the fact that the Act robs SCE&G of procedural protections designed to afford it an opportunity to be heard before rate reductions are imposed. The General Assembly has "suspended" portions of the BLRA only with respect to the Project so that the Act's "experimental rate" is not disturbed during any challenge to the Act. Act § 3, §§ 58-34-40 & 58-34-50. These provisions are specific to SCE&G, and they are designed to rob SCE&G

---

[21] Thad Moore, *SCE&G Owner Pares Dividend After S.C. Lawmakers Slash Electricity Rates*, The Post & Courier (June 28, 2018), available at https://www.postandcourier.com/business/sce-g-owner-pares-dividend-after-s-c-lawmakers-slash/article_5dccc8c0-7add-11e8-9508-47a1dd362cb6.html.

of the opportunity to be heard on any deprivation of property rights.

**Loss of Significant Goodwill..**  The Act will also have a dire impact on SCANA's and SCE&G's business goodwill.  As detailed above, enforcement of the Act will endanger SCANA's and SCE&G's relations with investors and creditors.[22]  The temporary nature of the Act "would not prevent damage to SCE&G's value as a business and perception of its creditworthiness.  Much of this damage could ultimately be irreversible and have a broader impact than just on SCE&G.  South Carolina's reputation as a state in which capital can be invested with a reasonable assurance of security would be injured."  Ex. 2, Griffin Dec., ¶ 32.  This harm to a business's goodwill is "incalculable." *Fed. Leasing, Inc. v. Underwriters at Lloyd's*, 650 F.2d 495, 500 (4th Cir. 1981).  Accordingly, "the Fourth Circuit has repeatedly recognized that the threat of . . . the potential loss of goodwill," as in this case, "also support[s] a finding of irreparable harm." *Update, Inc. v. Samilow*, No. 1:18CV462, 2018 WL 2289851, at *9 (E.D. Va. May 17, 2018) (quoting *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551–52 (4th Cir. 1994)) (quotation marks omitted; alterations adopted); *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 F. App'x 251, 263 (4th Cir. 2017) (affirming preliminary injunction where evidence suggested that "[t]he business's reputation continues to be tarnished" absent court intervention).

**Premature Implementation of the Act Will Harm SCE&G's Customers and Its Relationship with Those Customers.**  The avoidance of rate shock is a recognized goal of electric utility regulation.[23]  Electricity is a major monthly expense for many customers and those

---

[22] Citizens of South Carolina own in excess of 10,000,000 shares of SCANA's stock, and the impact of the Act on their investment is a critical factor to consider in evaluating this motion.

[23] *Hamm v. S.C. Pub. Serv. Comm'n,* 294 S.C. 320, 324, 364 S.E.2d 455, 457 (1988); https://www.fortnightly.com/fortnightly/2006/01/rate-shock-matter-if-or-when; https://www.fortnightly.com/fortnightly/2013/06/reducing-rate-shocks

customers manage or plan their budgets with the expectation that electricity costs will vary in predictable and manageable ways. Erratic swings in rates disrupt customers' expectations and can lead to customer anger and frustration which customers often direct toward utility management. For that reason, rate volatility is widely recognized as damaging to the relationship between customers and their utility, and this is true regardless of whether rates are being increased or reduced.

The vast swings in rates mandated by the Act, first created by the experimental rate that the Act requires and then following the likely rate increase that would be ordered if the Act is declared unconstitutional, are yet another reason why the Court should preliminarily enjoin implementation of the Act. The grave constitutional concerns can be addressed promptly and, considering SCE&G's willingness to segregate the funds collected pursuant to the BLRA while SCE&G's request for a preliminary injunction is consolidated with a trial on the merits, the short amount of time during which a preliminary injunction would be in place risks virtually nothing. In fact, with any other result, SCE&G's customers would suffer, and SCE&G would suffer irreparable harm to its relationship with customers, if the PSC were to implement the rate reductions decreed by the Act, and then were required to rescind those rate reductions as a result of the constitutional review of the Act.

## III.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR AN INJUNCTION.

The balance of equities also favors an injunction in this case. As discussed above, SCE&G stands to suffer significant and irreparable injury if an injunction is not granted. Defendants, in contrast, will not suffer any harm if an injunction is not granted. The Act requires SCE&G to refund collections made after April 1, 2018. If the Act is upheld as constitutional, and then implemented by the PSC, customers would not have suffered any harm because the money at issue

in the Act would then be refunded to them.  Particularly because of SCE&G's narrow request for a preliminary injunction to maintain the status quo while the Court is able to consider the constitutional issues on a developed record, and SCE&G's related offer to place the funds at issue in escrow pending the Court's expedited resolution of this case, there is virtually no risk to any ratepayer or any party other than SCE&G in this case.  The limited relief SCE&G requests is thus designed to preserve the balance of equities for all interested parties.

The public interest also favors an injunction.  "The public has a strong interest in implementation of constitutional legislation.  It has an equal interest in avoiding implementation of unconstitutional legislation."  *Summers v. Adams*, No. 3:08-2265-CMC, 2008 WL 11347422, at *2 (D.S.C. Dec. 11, 2008).  In this context, the constitutional interest has a practical and tangible impact.  Implementing a law that upends the "stability of investment and confidence in the constitutional system" could jeopardize future investment in the South Carolina energy industry. *See Apfel*, 524 U.S. at 549 (Kennedy, J., concurring).  Furthermore, the law's realistic threat to the financial viability of SCE&G — a company that supplies approximately a quarter of the power to South Carolina residents — could cause a legitimate energy crisis in the State.  The public interest weighs decidedly in favor of a preliminary injunction.

## CONCLUSION

SCE&G requests that the Court preliminarily enjoin implementation of the Act. Specifically, pursuant to Rule 65(a)(2), SCE&G requests that this motion be consolidated with a trial on the merits, to be held within 30 days, and until this merits hearing, preliminarily enjoin implementation of the Act, including the statutorily mandated rate reduction, to preserve the status quo until the constitutional infirmities of the Act are addressed.

Respectfully submitted this 2nd day of July, 2018.

/s Steven J. Pugh
Steven J. Pugh (Fed. ID No. 7033)
Benjamin P. Carlton (Fed. ID No. 11797)
RICHARDSON PLOWDEN & ROBINSON, P.A.
1900 Barnwell Street (29201)
Post Office Drawer 7788
Columbia, South Carolina 29202
(803) 771-4400
spugh@richardsonplowden.com
bcarlton@richardsonplowden.co

and

I.S. Leevy Johnson (Fed. ID No. 2194)
George Craig Johnson (Fed. ID No. 6538)
JOHNSON, TOAL & BATTISTE, P.A.
Post Office Box 1431
Columbia, South Carolina 29202
(803) 252-9700
islg@jtbpa.co
m
George@jtbpa.com

and

David L. Balser (*pro hac vice* forthcoming)
Ashley C. Parrish (*pro hac vice* forthcoming)
Jonathan R. Chally (*pro hac vice* forthcoming)
KING & SPALDING, LLP
1180 Peachtree Street NE
Atlanta, Georgia 30309
(404) 572-4600
dbalser@kslaw.com
jchally@kslaw.com

ATTORNEYS FOR SOUTH CAROLINA
ELECTRIC & GAS COMPANY