**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| South Carolina Electric & Gas Company, | |
| Plaintiff, | Case No. 3:18-cv-01795-JMC |
| v. | |
| Comer H. Randall, in his official capacity as Chairman of the South Carolina Public Service Commission; Swain E. Whitfield, in his official capacity as Commissioner of the South Carolina Public Service Commission; John E. Howard, in his official capacity as Commissioner of the South Carolina Public Service Commission; Elliott F. Elam, Jr., in his official capacity as Commissioner of the South Carolina Public Service Commission; G. O'Neal Hamilton, in his official capacity as Commissioner of the South Carolina Public Service Commission; and Thomas J. Ervin, in his official capacity as Commissioner of the South Carolina Public Service Commission. | |
| Defendants. | |

**CONSOLIDATED REPLY TO INTERVENORS' OPPOSITIONS TO
<u>SCE&G'S MOTION FOR A PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................2

ARGUMENT .........................................................................................................................4

I.      THE COURT HAS JURISDICTION OVER THIS CASE. ................................................4

II.     SCE&G IS LIKELY TO SUCCEED ON THE MERITS. ..................................................4

        A.      SCE&G Has Shown That the Act Is An Unconstitutional Bill of Attainder. ..........4

        B.      Public Utilities Are Protected By The Takings Clause From Confiscatory
                Ratemaking. ....................................................................................................8

        C.      SCE&G Has a Vested Property Interest In Revised Rates Approved by the
                PSC Under the BLRA. .......................................................................................9

        D.      SCE&G Has Shown That the Act Violates Its Procedural Due Process
                Rights. ...........................................................................................................13

        E.      SCE&G Has Shown That the Act Violates Its Substantive Due Process
                Rights. ...........................................................................................................15

III.    THE ACT WILL CAUSE SCE&G TO SUFFER IRREPARABLE HARM. ....................17

IV.     THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR AN
        INJUNCTION. ...............................................................................................................20

V.      THE COURT SHOULD WAIVE THE SECURITY REQUIREMENT OR SET A
        NOMINAL BOND AMOUNT. ........................................................................................21

CONCLUSION .....................................................................................................................22

# INTRODUCTION

Contrary to the BLRA's plain text and the position previously taken by the Attorney General, *see* Op. S.C. Attorney General, 2017 WL 4464415, at \*1, \*26 (Sept. 26, 2017), intervenors contend that SCE&G's right to recover previously approved rates under the BLRA "terminated" when it decided to abandon construction. *See* Dkt. 59 at 15−18; Dkt. 61 at 4−6. Intervenors thus effectively contend that Act 287 and Resolution 285 (together, the "Act") were unnecessary gestures that changed nothing. That is obviously wrong. The Act on its face makes clear that it was intended to cut rates previously approved under the BLRA and to change the legal consequences for acts that SCE&G took in reliance on the BLRA.[1]

The BLRA states that capital costs may be recovered in revised rates and, consistent with those provisions, the South Carolina Public Service Commission ("PSC") entered final and binding orders between 2009 and 2016 that set revised rates and authorized SCE&G to recover its capital costs through those rates (accounting for approximately $3.5 billion of the $5 billion total costs). S.C. Code Ann. §§ 55-33-275(C), 55-33-275(A) (H). In addition, under the BLRA, SCE&G is also entitled to recover the capital costs it incurred after 2016, which are not covered by previously entered final revised rate orders, as well as the costs associated with abandonment, which may be disallowed "only to the extent" the PSC determines that SCE&G behaved imprudently under the standards set forth in the BLRA. *Id*. § 58-33-280(K).

The Act changes these requirements retroactively. It unconstitutionally requires SCE&G to refund almost $120 million in funds collected since April 2018, purports to nullify final orders of the PSC granting revised rates for approximately $3.5 billion in capital costs, and erects a new standard for prudency designed to ensure that in future proceedings SCE&G will be denied any

---

[1] With the Court's permission, SCE&G is filing a consolidated, 23-page reply to intervenors' separate briefs, instead of individual 15-page replies.

recovery of its costs.  The Act is both confiscatory in effect and in purpose.  As counsel for intervenors has repeatedly conceded, and multiple members of the legislature admitted during floor debates, the Act was designed to take the funds granted to SCE&G (and its shareholders) under the terms of the BLRA and to transfer them to ratepayers, because of the General Assembly's conclusion that SCE&G engaged in wrongdoing.  The Act has no justification *other* than punishing SCE&G for its alleged misconduct, running afoul of principles of substantive due process.  The Act deprives SCE&G of its property while simultaneously eliminating procedural protections.  And the Act explicitly discusses SCE&G's alleged misdeeds, targets SCE&G, and punishes SCE&G — a textbook example of a Bill of Attainder.

If this Court does not enter a preliminary injunction, SCE&G faces grave and irreparable harm.  Contrary to intervenors' suggestions, it makes no difference that the Act is not expected to drive SCE&G into immediate bankruptcy.  The evidence shows that the Act will cause SCE&G to suffer enormous *unrecoverable* economic losses.  The Act will also cause grave and incalculable harms to SCE&G's financial integrity, including damaging its credit rating, increasing its cost of capital, driving away investors, depriving the company of investment opportunities, and damaging its goodwill in the marketplace.  The Act will also cause irreparable harm by depriving SCE&G of its constitutional rights without due process, including its vested property rights under the BLRA.  Moreover, the balance of interests and the public interest both weigh heavily in favor of an injunction to prevent the violation of constitutional rights.  This Court should enter a preliminary injunction to preserve the status quo and prevent the irreparable harm that would occur if the PSC were allowed to continue implementing the Act.

**ARGUMENT**

**I.    THE COURT HAS JURISDICTION OVER THIS CASE.**

Intervenor Leatherman argues that "the Court lacks subject matter jurisdiction over the claims in SCE&G's Complaint based on the Johnson Act, 28 U.S.C. § 1342, and, alternatively, should abstain from exercising jurisdiction under the Burford abstention doctrine." Dkt. 59 at 14. These matters have already been addressed in SCE&G's recent consolidated opposition to the intervenors' motions to dismiss, Dkt. 91, and that opposition is incorporated herein.

**II.   SCE&G IS LIKELY TO SUCCEED ON THE MERITS.**

SCE&G has shown that it is likely to succeed on each of its constitutional claims. If the Court agrees with SCE&G on any claim, that is sufficient to justify a preliminary injunction.

**A.    The Act Is An Unconstitutional Bill of Attainder.**

Intervenors assert that the Act is not punitive or targeted at SCE&G, and that it offers trial-like protections. Dkt. 61 at 25-30; Dkt. 59 at 25-28. Those assertions are belied by the Act's plain text, which applies only to SCE&G, imposes a drastically reduced rate, requires the return of previously collected rates, expressly suspends ordinary hearing procedures, and makes clear that the General Assembly passed the Act in response to "serious questions . . .regarding the prudency of incurred costs that have led to rate increases pursuant to the BLRA." Resolution 287, Preamble; *see also id.* (noting that ability to rely on "incentives offered by the General Assembly . . . should be predicated upon a good faith effort to comply . . . so that noncompliance or misrepresentation in order to obtain offered incentives are not unfairly born by South Carolina's citizens").

What is obvious from the text is supported by the legislative history. When debating the Act, legislators made plain their targeted and punitive intent:

> [A]s hard as I've looked, and I promise y'all I've looked, there's just no evidence as yet that we found that the original orders were as a result of bad acts. There's no — they didn't start with the intention of failing, but they figured out within two

> or three years that this thing was going downhill in a hurry and they kept going and they — and I'm convinced they didn't fully disclose everything to ORS, which means the PSC didn't get it when they were making the determinations on the rate increases.  And that's how we're justifying going back [to] 2011 based on the testimony we've received just by pulling those rates out.

Sen. Hrg. Vol. 1 at 57:4-14 (June 27, 2018) (remarks of Senate Majority Leader Massey); *see also* Am. Compl. ¶¶ 168-76 (alleging statements from legislators evincing a punitive purpose).  In fact, even intervenors' own motions confirm the Act's punitive purpose.  *See* Dkt. 91 at 6 (quoting intervenors' various punitive representations).

Intervenors have no response to this unmistakably stated punitive intent, other than to advance the curious claim that these admissions are somehow not evidence.  That is absurd.  When evaluating bill of attainder claims, courts are supposed to consider "whether the legislative record evinces a confessional intent to punish."  *Nixon v. Adm'r of Gen. Servs*., 433 U.S. 425, 480 (1977) ("absence from the legislative history of any congressional sentiments express" of a punitive purpose "is probative"); *see also United States v. Lovett*, 328 U.S. 303, 315 (1946) (finding an employment ban to constitute a bill of attainder where committee reports characterized the affected persons as "subversive" and "unfit" for government service); *Consol. Edison Co. v. Pataki*, 292 F.3d 338, 355 (2d Cir. 2002) (using statements of legislators to reinforce the "independent conclusion that a substantial part of the legislation cannot be justified by any legislative purpose but punishment").  The legislative history overwhelmingly confirms that the General Assembly targeted SCE&G and intended to punish it for what the legislature viewed as wrongdoing, without affording SCE&G any opportunity to defend itself or rebut the legislature's ill-informed finding.  Intervenors have no plausible non-punitive explanation for the Act that can be reconciled with its text and legislative history.

A state statute is an unconstitutional bill of attainder if it "determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial."

*Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468 (1977); *Lovett*, 328 U.S. at 315. Contrary to intervenors' suggestions, the constitutional prohibition on bills of attainder is not limited to certain types of legislative punishment. Confiscation of property is a classic example of "punishment." *Fletcher v. Peck*, 10 U.S. 87, 136 (1810) (Marshall, C.J.) ("A bill of attainder may affect the life of an individual, or may confiscate his property, or may do both.").

Facing a nearly identical confiscation of property from a utility, the Second Circuit held that a state statute violates the Bill of Attainder Clause when it prohibits a specific utility from recovering costs solely because it undertook a politically unpopular action. *See Consol. Edison Co. v. Pataki*, 292 F.3d 338 (2d Cir. 2002). There, a New York utility was forced to shut down its nuclear plant temporarily due to a defective steam generator. *Id.* at 343. Under existing law, the utility was able to pass costs associated with the outage on to existing ratepayers, subject to a prudency review by the state's public service commission. *Id.* at 343−44. Before the PSC completed its prudency review, the New York General Assembly passed a bill ordering the PSC to prohibit the utility from recovering any costs associated with the outage. *Id.* at 344−45. "The basis for this law [wa]s the legislative finding that '[b]y continuing to operate steam generators known to be defective . . . the Consolidated Edison Company failed to exercise reasonable care on behalf of the health, safety and economic interests of its customers.'" *Id.* at 344. The utility sued to enjoin enforcement of the statute as unconstitutional. *Id.* at 345. The district court agreed that the statute was an unconstitutional bill of attainder and issued a permanent injunction, which the Second Circuit affirmed. *Id.* at 356.

The same result is required here. The Act confiscates payments to which SCE&G is legally entitled under the BLRA, and — despite intervenor Leatherman's attempt to distinguish the rate in *Consolidated Edison* as permanent, versus the "temporary" rate here, *see* Dkt. 59 at 26 — even

6

requires the return of payments already lawfully collected.  Moreover, despite intervenors' attempt to distinguish *Consolidated Edison* on the ground that the statute there "explicitly assigned fault to the utility for a specific past incident," Dkt. 61 at 27, the punitive purpose of the Act — to reduce the rates paid to SCE&G — is clear from the Act's text, *see* Act § 3, S.C. Code Ann. § 58-34-20, which (as noted above) justifies the BLRA's abrogation because "reliance should be predicated upon a good faith effort to comply with all terms of any incentives," Resolution 285, Preamble. In purpose and effect, the Act served as the conclusion of an impermissible "trial by legislature." *Consol. Edison*, 292 F.3d at 346.  Not only were there no trial-like protections when the General Assembly passed the Act, the General Assembly also took steps to ensure that none would be provided.  The Act directs the PSC to set a new confiscatory rate with no opportunity for a meaningful hearing.  It suspends the statutory provisions that permit objections to PSC orders.  *See infra* at 14-15.  Moreover, while it is true that the PSC could revise the rate on its own initiative, it cannot do so at the urging of SCE&G, since the Act prohibits any such petition.  Far from securing trial-like protections, the Act works to strip SCE&G of any right to challenge the General Assembly's targeted, punitive legislation.

The Act's boiler-plate assurances that SCE&G "has legal rights and remedies that must be considered and respected," Dkt. 61 at 29, is only more evidence that the General Assembly knew precisely what it was doing.  It does not change the Act's substance:  The General Assembly undid the provisions of the BLRA and imposed a punitive rate that applies only to SCE&G; constrained the PSC from adjusting that rate; and ordered the retroactive return of rates already lawfully collected, all without notice and a hearing.

**B.     Public Utilities Are Protected Under The Takings Clause From Confiscatory Ratemaking.**

Because the assets of public utilities are "employed in the public interest to provide consumers of the State with electric power," but "owned and operated by private investors," the "status of utility property creates its own set of questions under the Takings Clause of the Fifth Amendment." *Duquesene Light Co. v. Barasch*, 488 U.S. 299, 307 (1989).

It is well settled that to comply with the Constitution, a rate must be sufficient so that "the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks." *Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591 (1944). In addition, the return "should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital." *Id.* As SCE&G has demonstrated in evidence and through testimony, the Act's unconstitutional rate is *not* sufficient to assure that its return on equity is commensurate with returns on investments in other similar enterprises, *see* Dkt. 55-2 ¶¶ 72, 75, 84, 85; Dkt. 55-4 ¶¶ 59–60; is not sufficient to assure confidence in SCE&G's financial integrity, *see* Dkt. 55-4 ¶¶ 45, 61, 74; and is not adequate for SCE&G to maintain its credit and to attract capital, *see* Dkt. 55-4 ¶¶ 13, 52, 54. If an injunction is not entered, the evidence shows that SCE&G will likely be foreclosed from accessing certain capital markets altogether. *See* Dkt. 55-3 ¶ 10 (explaining that access to sources of short-term liquidity through the sale of commercial paper notes "would likely disappear").

Intervenor Lucas relies on a 1985 Pennsylvania Supreme Court decision for the proposition that *Hope*'s discussion of the constitutional baseline for ratemaking determinations is not binding. *See* Dkt. 61 at 6–11 (citing *Pennsylvania Electric Co. v. Pennsylvania Pub. Utilities Comm'n*, 502 A.2d 130 (Pa. 1985)). With all due respect to the Pennsylvania Supreme Court, the decision's analysis is flawed and, in any event, is not binding on this Court. Since *Pennsylvania Electric*, the

U.S. Supreme Court has repeatedly referred to a utility's financial integrity as a baseline for evaluating whether a rate is reasonable or confiscatory. *See Duquesne*, 488 U.S. at 312 ("No argument has been made that these slightly reduced rates jeopardize the financial integrity of the companies, either by leaving them insufficient operating capital or by impeding their ability to raise capital."); *Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467, 524, 526 n.36 (2002) (a confiscatory rate is one that "threaten[s]" the utility's "financial integrity").

There is also "a taking challenge distinct from a plain-vanilla objection to arbitrary or capricious agency action if a rate making body were to make opportunistic changes in ratesetting methodologies just to minimize return on capital investment in a utility enterprise." *Verizon*, 535 U.S. at 527. That is exactly what the Act does. Instead of abiding by the BLRA, the General Assembly short-circuited the administrative ratemaking process and changed the ratemaking method to "resolve[] cost recovery issues for the abandoned Project." Resolution 285 Preamble. In other words, the State has "arbitrarily switch[ed] back and forth between methodologies in a way which require[s] investors to bear the risk of bad investments," a practice that raises "serious constitutional questions." *Duquesne*, 488 U.S. at 315.

### C.     SCE&G Has a Vested Property Interest In Revised Rates Approved by the PSC Under the BLRA.

Separate and distinct from the longstanding, historic protection under the Takings Clause that all public utilities possess against confiscatory rates, SCE&G *also* possesses a property right guaranteed by the BLRA to recover prudently incurred costs approved through final and binding orders of the PSC. Intervenor Leatherman argues that the taking of property does not violate the Takings Clause, so long as it is not confiscatory as a whole. But that conflates the issues. The taking of property guaranteed by state law without just compensation violates the Takings Clause, separate from the inquiry as to whether a rate is confiscatory.

9

It is clear that the BLRA provides SCE&G with a property right in the previously approved PSC rates. Even intervenors appear to concede that the BLRA provides SCE&G with a property right to PSC-approved rates while it was constructing the nuclear projects. *See* Dkt. 59 at 15; Dkt. 61 at 12. That is significant because the Act retroactively changes the BLRA by requiring SCE&G to refund money already collected, nullifying final PSC orders that approved revised rates, and requiring the PSC to revisit its earlier prudency determinations and apply a new prudency standard. With no meaningful response, intervenors attempt to run away from the Act, arguing that the Act was effectively unnecessary because the BLRA itself supposedly stripped SCE&G of its property right when the company decided to abandon construction. In their view, the BLRA entitled SCE&G to recover its capital costs through revised rates only when the plant "[wa]s constructed or being constructed." *See, e.g.*, Dkt. 59 at 15. Once the plant was abandoned, they argue, previous final PSC orders approving the recovery of capital costs through revised rates no longer apply and SCE&G is prevented from recovering any costs — even costs previously determined to be prudent — until the PSC later determines whether SCE&G prudently abandoned the plant.

That position relies on an implausible and meritless interpretation of the BLRA. If the interpretation were correct, the BLRA would cause rate shocks and create incentives for utilities to continue construction under the BLRA even after a project is not feasible. Neither intervenor has attempted to provide any plausible support for their statutory interpretation. They cite no provision in the BLRA permitting the PSC to claw back revised rates approved in previous orders. Nor does their position take into account the BLRA's structure as a whole. For the Court's convenience, the following briefly describes the key statutory provisions.

***Pre-Construction Prudency Review***. The statute establishes a process before construction for the PSC to issue a base load review order approving rate recovery for plant capital costs if the

PSC determines that constructing the plant is prudent.  S.C. Code Ann. § 58-33-270(A).  The BLRA makes clear that "[a] base load review order shall constitute a *final and binding determination* that a plant is used and useful for utility purposes, and that its *capital costs are prudent* utility costs and expenses and are properly included in rates so long as the plant is constructed or being constructed" in accordance with certain schedules and estimates.  *Id.* § 58-33-275(A) (emphasis added).  In short, before any obligation is imposed on rate payers to pay for the capital costs associated with construction, the PSC must enter an order determining that the proposed project is prudent and establishing, among other things, construction schedules (including contingencies), the return on equity, and the inflation indices to be used for costs of plant construction.  *Id.* § 58-33-270(A), (B).

> *Revised Rate Orders Entered During Construction.*  The BLRA then sets forth a process for the utility to recovery its capital costs while construction is ongoing.  Section 58-33-275 makes clear that "[s]o long as the plant is constructed or being constructed with the approved schedules, estimates, and projections set forth [in other statutory provisions], the utility must be allowed to recover its capital costs related to the plant through revised rate filings or general rate proceedings."  *Id*. § 58-33-275(C).  In turn, section 58-33-280 describes the steps that a utility may take to obtain approval of revised rates from the PSC.  The provision allows revised rate orders to be entered "no earlier than one year" after the application is filed, and "no more frequently than annually thereafter."  *Id*. § 58-33-280(A).  It sets deadlines for the PSC to complete its review of any revised rates requested by a utility, and it sets out a process for written comments to be considered and for the Office of Regulatory Staff to complete an audit and report its results to the PSC.  *See id*. §§ 58-33-280(A), (C), (D), and (E).  The BLRA is clear that "[a] utility *must be allowed to recover through revised rates* its weighted average cost of capital applied to all or, at the utility's option,

part of the outstanding balance of construction work in progress, calculated as of a date specified in the filing." *Id.* § 58-33-280(B). The statute requires the PSC to enter a revised order "granting, modifying, or denying revised rates" within four months of the filing and, if the PSC grants a rate increase, requires the utility to "provide notice to its customers." *Id.* §§ 58-33-280(F), (H). Every one of the PSC's revised rate orders is subject to administrative review and then judicial review. *See id.* §§ 58-33-285, -287, -310.

*Post-Construction Process*. The statute then has separate provisions that apply after a plant is constructed or if the plant is abandoned. If construction is completed, no sooner than seven months before the plant commences commercial operations, the "utility may file *a final set of revised rates* for a plant to go into effect upon commercial operation of the plant." *Id.* § 58-33-280(J)(i) (emphasis added). Alternatively, if the plant is abandoned "after a base load review order approving rate recovery has been issued," the utility may still seek another rate order to approve the recovery of its remaining capital costs and the costs of abandonment — the costs not covered by any existing rate order — provided the utility is able to show that "the decision to abandon construction of the plant was prudent." *Id.* § 58-233-280(K). The BLRA makes clear that "recovery of capital costs and the utility's cost of capital associated with them may be disallowed only to the extent that the failure by the utility to anticipate or avoid the allegedly imprudent costs, or to minimize the magnitude of the costs." *Id.* It also sets out a standard to be applied to determine whether the utility acted imprudently — specifically, the PSC must "consider[] the information available at the time" to determine if "the utility could have acted to avoid or minimize the costs." *Id.*

These provisions, read together, make clear that the intervenors' interpretation of the BLRA is wrong. There is nothing in the BLRA that nullifies the final and binding revised rate

orders entered by the PSC allowing SCE&G to recover its capital costs. To the contrary, the BLRA specifically contemplates that once a plant is constructed or its abandoned, the utility will seek to recover any costs not addressed in previous orders in a final set of revised rates. But there is no requirement to re-evaluate the previously-approved orders made final and binding while the plant was being constructed. Nor is there any basis for stripping the utility of the rate increases that have been previously authorized consistent with the statute and as a result of an adjudicatory process overseen by the PSC finding that costs were prudently incurred. SCE&G was entitled to rely on these statutory protections to the revised rates already granted by the PSC and, for any costs not covered by those previous rate orders, to recover those costs in a final set of revised rates after the prudency of company's abandonment decision evaluated under the standards set out in the BLRA. These property rights cannot be stripped away and taken by the legislature. The Takings Clause "limits a State's authority to redefine preexisting rights," and "a State by *ipse dixit*, may not transform private property into public property without compensation." *Washlefske v. Winston*, 234 F.3d 179, 183 (4th Cir. 2000). *Cf. Grimsley v. SLED*, 721 S.E.2d 423 (S.C. 2012).[2]

**D.     The Act Violates SCE&G's Procedural Due Process Rights.**

Intervenors argue that the Act does not violate SCE&G's procedural due process rights because it "has no property interest in the full recovery of revised rates," and "has not been finally deprived of this alleged property interest" because the PSC could revise the applicable rate when making a prudency determination later this year. Dkt. 61 at 25. *See generally* Dkt. 59 at 30-31; Dkt. 61 at 24-25. Intervenors are wrong on this point, too.

---

[2] Intervenor Leatherman notes that if permanent rate reductions in *Duquesne* were constitutional, then rates imposed for nine months are constitutional. His argument is not rooted in law or common sense. Although the legislatively prescribed rate may be in place for a temporary amount of time, the deprivation of the money is permanent. Also, in *Duquesne*, a Pennsylvania utility had invested $35 million; in contrast, even the most conservative estimate by intervenor Lucas notes that "at least $270 million" is at issue with the experimental rates. Dkt. 61 at 33.

When an individual is deprived of a property interest, "some form of hearing is required." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (due process requires an "opportunity to be heard at a meaningful time and in a meaningful manner"). The BLRA created property interests in SCE&G: it stated that prudent capital costs "shall" be recoverable in revised rates regardless of whether the plants are being constructed, constructed, or abandoned, S.C. Code Ann. §§ 58-33-275(A), -280(K); and prohibits the State from confiscating those recovery costs unless they are imprudent, *id*. § 58-33-280(K). The Act rolls back these property rights by revising the rate to prohibit recovery of capital costs, including costs previously determined to be prudently incurred and approved by the PSC, and forcing the return of revised rates lawfully collected by SCE&G. "SCE&G has a property right in the recovery of its prudent investments," Am. Compl. § 244, and the State has "arbitrarily switch[ed] back and forth between methodologies in a way which require[s] investors to bear the risk of bad investments," a practice that raises "serious constitutional questions," *Duquesne*, 488 U.S. at 315.

Moreover, the Act eviscerates any avenue for challenging the experimental rate — which intervenors appear to acknowledge with their emphasis on the fact that the deprivation is supposedly not yet "final." The Act suspends the statutory provisions that permit objections to PSC orders. Act 287 § 3, codified at § 58-34-50. Other provisions of the State Code are equally unavailing. Section 58-27-2130 provides the PSC with authority to rescind or amend its orders or decisions, but it does not provide utilities the right to a petition or hearing. S.C. Code Ann. § 58-27-2130. Section 58-27-2150 provides that a utility may seek a "rehearing." *Id*. § 58-27-2150. A "rehearing" suggests that there has already been one hearing, something that Act 287 forecloses: the PSC may only alter the rate "on its own motion" and only if it determines the Act's rate is constitutionally impermissible. *Id*. § 58-34-30. Procedural protections that would otherwise

14

provide SCE&G with the right to move to alter the rate are "suspended." *Id.* § 58-34-40. Act 287 also eviscerates the right to file suit: To file litigation, SCE&G must first petition the PSC for a rehearing, *id*. § 58-27-2310, but the Act provides no initial hearing from which SCE&G could seek *re*-hearing.

Intervenors also argue that there is no procedural due process violation because the PSC will eventually make a prudency determination, from which appeal to the South Carolina Supreme Court and the U.S. Supreme Court may be available. Dkt. 59 at 31; Dkt. 61 at 25. That is absurd. The Constitution requires that "some form of hearing is required *before* an individual is finally deprived of a property interest." *Mathews*, 424 U.S. at 333 (emphasis added). Blithe assurances that the appellate courts will rectify these constitutional violations are insufficient.

### E.     The Act Violates SCE&G's Substantive Due Process Rights.

Intervenors argue that SCE&G's substantive due process rights have not been violated. According to intervenor Lucas, the Act meets constitutional muster because "it did not order [retroactive rate] refunds," and because the rate can be set higher if needed to meet constitutional requirements. Dkt. 61 at 23. Both intervenors argue that even if the Act is retroactive, that is permissible if the legislation is needed "'to ensure that costs of a program are borne by the entire class of persons' the General Assembly 'rationally believes should bear them.'" Dkt. 61 at 24 (quoting *United States v. Sperry Corp*., 493 U.S. 52, 65 (1989)); *see also* Dkt. 59 at 29-30.

The key inquiry is "whether the new provision attaches new legal consequences to events completed before its enactment." *Landgraf v. USI Film Prods*., 511 U.S. 244, 270 (1994). The Act clearly does. First, it re-defines "prudency," a critical term under the BLRA establishing what is, and is not, subject to capital cost recovery, and imposes on SCE&G a new requirement that not only it have behaved prudently, but also that all of its "officers, board, agents, employees, contractors, subcontractors, consultants" and other "third part[ies]" also behaved prudently. S.C.

Code Ann. § 58-34-50. The Act cuts the rates to which SCE&G is entitled. *Id*. § 58-34-20. It withdraws legal protections required under the BLRA solely for "matters related to V.C. Summer Nuclear Reactor Units 2 and 3 at Jenkinsville, South Carolina," despite the fact that SCE&G has already made investments in reliance on the BLRA. *Id*. §§ 58-34-40 & 58-34-50; Am. Compl. ¶ 224. In addition, the Act forces SCE&G to return more than $120 million it previously recovered in lawful rates by making the reduction in rates retroactive to April 2018. *Id*. § 58-34-20; Am. Compl. ¶¶ 11, 216, 248.

Intervenors' reliance on *United States v. Sperry Corporation* is inapt. In that case, a claimant won a $2.8 million award from a trust established to pay damages to Americans whose property was seized by the government of Iran. In between the time the claim was granted and its final disbursal, however, the United States imposed a retroactive 2 percent fee on awards to pay for the administrative costs of the award tribunal. *Sperry*, 493 U.S. at 57. The Court held that this retroactive application of the new fee did not violate Sperry's due process rights, because there was a rational purpose behind the retroactive application:

> If Congress had made the [fee] prospective only, the costs of the Tribunal would have fallen disproportionately on the claimants whose awards, for whatever reason, were delayed. . . . Claimants who were fortunate enough to obtain awards prior to the enactment of the statute would have obtained a windfall.

*Id*. at 64–65. The claimant in *Sperry* was in a far different position than SCE&G (and, for similar reasons, the utility in *Duquesne*, another case on which intervenors rely, *see* Dkt. 59 at 29). Intervenors are leaving out an important part of the story — that SCE&G had certain rights set by an affirmative enactment of the General Assembly through the BLRA, which the General Assembly then revoked in a law that was not only retroactive, but targeted at a single entity. This is not a case in which a requirement of general applicability has been imposed retroactively; instead, the General Assembly has passed punitive, targeted legislation that upends settled property

16

rights and strips SCE&G — and *only* SCE&G — of a host of procedural protections that otherwise would allow it to challenge this confiscatory rate.

The Act thus attaches new legal rights and consequences to events and actions that have already occurred, exactly the kind of opportunistic action the Due Process Clause prohibits:

> [D]ue process protection for property must be understood to incorporate our settled tradition against retroactive laws of great severity. Groups targeted by retroactive laws, were they to be denied all protection, would have a justified fear that a government once formed to protect expectations can now destroy them.

*Eastern Enters. v. Apfel*, 524 U.S. 498, 549 (1998) (Kennedy, J., concurring).  Indeed, Intervenor Leatherman's opposition points out that the General Assembly enacted this retroactive law specifically to punish SCE&G because of its supposedly imprudent conduct.  *See* Dk. 59 at 37. Retribution against an unpopular entity is not a legitimate government interest.  *See USDA v. Moreno*, 413 U.S. 528, 534 (1973).  The Act violates substantive due process.

## III.    THE ACT WILL CAUSE SCE&G TO SUFFER IRREPARABLE HARM.

Intervenors' argument against a finding of irreparable harm is, essentially, that any loss of money from reduced rates can be made up if the PSC (or the Court) were later to find that abandonment was prudent.  *See, e.g.*, Dkt. 59 at 31 ("SCE&G acknowledges that the only harm it faces from the Act are economic losses [that] generally do not constitute irreparable harm.").  As a preliminary matter, SCE&G will likely *not* be able to recover the loss.  Sovereign immunity prevents a suit against a government for money damages.  *See, e.g.*, *Board of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 374 n.9 (2001) (explaining that Congress did not abrogate "the States' sovereign immunity from suit by private individuals for money damages").  Moreover, the PSC is not authorized to award refunds to utilities based on past rates because this would "constitute[] retroactive rate-making."  *SCE&G Co. v. Pub. Serv. Comm'n*, 272 S.E.2d 793, 795 (S.C. 1980) (describing the "two specific instances" in which the PSC may prescribe refunds).  "If

expenditures cannot be recouped, the resulting loss may be irreparable." *Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010); *see also Manning v. Hunt*, 119 F.3d 254, 265 (4th Cir. 1997).

More fundamentally, intervenors' analysis ignores the cascading effects of a loss of investor confidence in a public utility, which relies on stable payment of dividends and the investor confidence that engenders to facilitate access to short-term credit markets to finance everything from maintenance to payroll. As demonstrated through expert testimony, the Act will cause unrecoverable economic loss to SCE&G in the form of loss of access to critical capital markets, reductions in capital maintenance, and loss of consumer and investor goodwill. *See Pub. Util. Comm'n of Texas v. Gen. Tel. Co. of the Sw.*, 77 S.W.2d 827, 829−32 (Tex. App. 1989), writ dismissed (Feb. 21, 1990) ("impaired ability to borrow funds, an increased cost of capital, a diminished cash flow, a substantial risk of a downrating of its bonds, reductions in its workforce and its capital budget, and a decreased ability to maintain its level and quality of service and competitive position" constitute irreparable harm); *Maitland Co. Inc. v. Terra First Inc.*, No. 3:94-662-17, 1994 WL 773882, at *19-20 (D.S.C. Oct. 27, 1994) ("loss of market share" and "danger of bankruptcy" demonstrate irreparable harm); *N. Am. Soccer League, LLC v. United States*, 296 F. Supp. 3d 442, 459 (E.D.N.Y. 2017) ("chilling effect" on potential new investors constitutes irreparable harm); *Update, Inc. v. Samilow*, No. 1:18CV462, 2018 WL 2289851, at *9 (E.D. Va. May 17, 2018) (loss of consumer goodwill and reputation).

Moreover, as noted by forensic accountant Ian Ratner, steady payment of dividends is essential to the stability of (low-yield but generally low-risk) public utilities, since dividends "communicate to investors that the company is stable, growing steadily and rewarding investors for their commitment to the company," while missed dividends "signal[] trouble" and cause loss of access to credit markets and downgrading of corporate debt. Dkt. 55-4 at ¶ 55. In response to

passage of the Act, SCE&G has "slashed its quarterly dividend by approximately 80% from 61.25 cents per share to 12.37 cents to preserve its options" as it seeks resolution of this matter. *Id*. ¶ 57. That, in turn, has caused a substantial decline in the stock price of SCE&G's corporate parent. *Id*. ¶¶ 69-74. And that has caused investors to downgrade SCE&G's bonds to "lowest investment grade" status, based on — as the investment analyst Moodys put it — "a political and regulatory environment that has become exceedingly contentious and uncertain." *Id*. ¶ 79; *see also* 55-1 ¶¶ 41-43 (noting recent significant decline in SCE&G's credit rating) (Hubbard Decl.).

This downgrade has serious real-world consequences: Even assuming no further dividends in 2018, SCE&G's negative cash flow for the year will quickly drain the company's existing cash reserve, making it difficult to meet the estimated $520 million in capital costs in 2018. *Id*. ¶ 80 ("With projected negative cash flow of $350 million and assuming no dividends for the balance of 2018, the outlook for quality maintenance of the existing electric infrastructure looks perilous."); *see also* Dkt. 55-1 ¶ 65 ("to the extent that the PSC does not fully adjust rates to reflect a higher cost of capital, customers face indirect harm in the form of reduced investment by SCE&G."). The downgrade has also constrained SCE&G's access to short-term capital markets, which the company uses to meet operational expenses including payroll and maintenance needs. Dkt 55-3 ¶¶ 24-25 (Lapson Decl.). Any further downgrading of SCE&G's credit rating will likely cause the company to have to pledge collateral to obtain short-term financing and supplies, further reducing its liquidity and "precipitating a downward spiral of investor flight and reduced supplier and banker confidence." *Id*. ¶ 27.

If the Act is not enjoined, SCE&G will also suffer operational consequences. Financially stressed companies are routinely unable to ensure "preventive maintenance, vegetation management, or routine types of capital expenditures that are essential to maintaining high service

quality." Dkt. 55-3 ¶ 30.  For a State facing hurricane season, this is particularly alarming.  Failure to take preventive measures could irreparably harm not only SCE&G, but its consumers as well.  The "Fourth Circuit has repeatedly recognized the threat of . . . the potential loss of goodwill . . . support[s] a finding of irreparable harm."  *Update, Inc.*, 2018 WL 2289851 at *9.  Loss to good will "is not incalculably great or small, just incalculable."  *Fed. Leasing, Inc. v. Underwriters at Lloyd's*, 650 F.2d 495, 500 (4th Cir. 1981); *see also Northgate Assocs. LLLP v. NY Credit Funding I, LLC*, 2008 WL 3200630, at *6 (M.D.N.C. Aug. 5, 2008).

The constitutional violations that SCE&G has demonstrated also create a presumption of irreparable harm supporting a preliminary injunction.  *See, e.g*., *Container Corp. of Carolina v. Mecklenburg Cty*., No. 3:92CV-154-MU, 1995 WL 360185, at *6 (W.D.N.C. June 22, 1992) (Commerce Clause violation).  *See also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (Fourth amendment rights); *Overstreet v. Lexington Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) ("Courts have also held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights."); *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992).  Intervenors' simplistic analysis ignores the reality of public utilities, whose access to operational capital is heavily dependent on investors' sense that the utility operates in a stable regulatory environment and offers steady returns.  The damage that the Act has done and will continue to do to investor confidence in SCE&G is a direct threat to the company's viability.

## IV.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR AN INJUNCTION.

There is a strong public interest "in avoiding implementation of unconstitutional legislation."  *Summers v. Adams*, No. 3:08-2265-CMC, 2008 WL 11347422, at *2 (D.S.C. Dec. 11, 2008).  In addition to harming SCE&G, implementation of the Act also poses grave concerns

about SCE&G's ability to literally and figuratively weather storms.  As Iris Griffin and Ellen Lapson testified, SCE&G will be forced to cut costs, and some of those costs will come from its budget to prepare for hurricanes, flooding, and other natural disasters.  The public interest is served by a utility that has access to capital sufficient to enable it to carry out its normal duties.  Moreover, as noted in the Hubbard Declaration, by increasing regulatory uncertainty, the Act undermines the public interest by raising "the cost of capital to utilities in the state, curtailing investment."  Dkt. 55-1 ¶ 67.  The resulting underinvestment leads "to electric service that is less reliable and robust," and reduces business investment and job growth associated with stable public utilities.  *Id.* ¶ 68. The Act also undermines the business climate in the State by scaring off investors who, rightly, are concerned about regulatory instability, and who will direct their business investments to less capricious political environments.  *Id.* ¶ 69.  For all these reasons, the balance of equities and public interest weigh decidedly in favor of a preliminary injunction.

## V.    THE COURT SHOULD WAIVE THE SECURITY REQUIREMENT OR SET A NOMINAL BOND AMOUNT.

Under Fed. R. Civ. P. 65(c), an injunction may issue "if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  But the *amount* of security is committed to the district court's discretion.  *See Fairfield Resorts, Inc. v. Fairfield Mountains Prop. Owners Ass'n, Inc.*, No. 1:06CV191, 2006 WL 2524188, at *6 (W.D.N.C. Aug. 29, 2006).  In cases where the movant has shown a likelihood of success on the merits and there is little likelihood of harm to the defendant, it is appropriate to set the security amount at zero, or at some nominal amount.  *See Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999) (citing 11A Charles Alan Wright et al., *Federal Practice & Procedure* § 2954, at 292 (2d ed. 1995)*; see also,*

*e.g.*, *Jorgensen v. Cassiday*, 320 F.3d 906, 919-20 (9th Cir. 2003); *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996).

Here, as shown above, SCE&G has demonstrated a high likelihood of success on the merits on its claims. If the preliminary injunction were eventually to be dissolved, no defendant would suffer any damage at all if the rates set by the PSC pursuant to the Act do not take effect until this case is finally resolved. Those rates would simply be held by SCE&G and can be returned to the PSC for distribution to ratepayers upon dissolution of the injunction. *See U.S. Airline Pilots Ass'n v. Velez*, No. 3:14–cv–00577–RJC–DCK, 2015 WL 5258725, at *7 (W.D.N.C. Aug. 27, 2015) (requiring no security where "the funds that are the object of this litigation and the object of Plaintiff's request for injunction will remain under [the plaintiff's] care throughout the pendency of this case"). Because of the strong showing made by SCE&G, and the minimal harm to defendants of delaying the reduction in rates should SCE&G ultimately be unsuccessful, the Court should set no or only a nominal security amount.

If the Court *were* to require the posting of some nominal security, it should permit SCE&G to draw the security amount from rates it collects pursuant to the BLRA, and hold the funds in escrow. Rule 65(c) does not necessarily require security to come in a particular form, such as a litigation bond. In fact, Rule 65.1 expressly distinguishes between bonds and other forms of security. *See* Fed. R. Civ. P. 65.1 ("Whenever these rules . . . require or allow a party to give security, and security is given through a bond or other undertaking with one or more sureties . . ."). In this case, the appropriate form of security, should any be required, would be escrowed rates that can be released upon final resolution to the appropriate party. That would be more than sufficient to preserve the status quo while the case is pending.

## CONCLUSION

For these reasons, the Court should grant SCE&G's preliminary injunction motion.

Respectfully submitted this 1st day of August, 2018.

s/ Steven J. Pugh

Steven J. Pugh (Fed. ID No. 7033)
Benjamin P. Carlton (Fed. ID No. 11797)
RICHARDSON PLOWDEN & ROBINSON, P.A.
1900 Barnwell Street (29201)
Post Office Drawer 7788
Columbia, South Carolina 29202
(803) 771-4400
spugh@richardsonplowden.com
bcarlton@richardsonplowden.com

and

I.S. Leevy Johnson (Fed. ID No. 2194)
George Craig Johnson (Fed. ID No. 6538)
JOHNSON, TOAL & BATTISTE, P.A.
Post Office Box 1431
Columbia, South Carolina 29202
(803) 252-9700
islg@jtbpa.com
George@jtbpa.com

and

David L. Balser (pro hac vice)
Ashley C. Parrish (pro hac vice)
Jonathan R. Chally (pro hac vice)
Brandon R. Keel (pro hac vice)
Julia C. Barrett (pro hac vice)
KING & SPALDING, LLP
1180 Peachtree Street NE
Atlanta, Georgia 30309
(404) 572-4600
dbalser@kslaw.com
aparrish@kslaw.com
jchally@kslaw.com
bkeel@kslaw.com
jbarrett@kslaw.com

ATTORNEYS FOR SOUTH CAROLINA
ELECTRIC & GAS COMPANY

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 1st day of August, 2018, I caused a true and correct copy of the foregoing to be filed with the Clerk of the Court using the CM/ECF system, which will automatically send notification of such filing and make available the same to all attorneys of record.

s/ Steven J. Pugh
Steven J. Pugh (Fed. ID No. 7033)
Richardson Plowden & Robinson, P.A.
Post Office Drawer 7788 (29202)
1900 Barnwell Street
Columbia, South Carolina 29201
(803) 771-4400
spugh@richardsonplowden.com
