**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | | |
|---|---|---|
| South Carolina Electric & Gas Company, | ) | Civil Action No.: 3:18-cv-01795-JMC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Cromer H. Randall, in his official capacity | ) | |
| as Chairman of the South Carolina Public | ) | **FINDINGS OF FACT, CONCLUSIONS** |
| Service Commission; Swain E. Whitfield, in | ) | **OF LAW, AND ORDER AND** |
| his official capacity as Commissioner of the | ) | **OPINION DENYING SCE&G'S** |
| South Carolina Public Service Commission; | ) | **MOTION FOR PRELIMINARY** |
| John E. Howard, in his official capacity as | ) | **INJUNCTION**[1] |
| Commissioner of the South Carolina Public | ) | |
| Service Commission; Elliot F. Elam, Jr., in his | ) | |
| official capacity as Commissioner of the | ) | |
| South Carolina Public Service Commission; | ) | |
| G. O'Neal Hamilton, in his official capacity | ) | |
| as Commissioner of the South Carolina | ) | |
| Public Service Commission; and Thomas J. | ) | |
| Ervin, in his official capacity as Commissioner | ) | |
| of the South Carolina Public Service Commission, | ) | |
| | ) | |
| Defendants.[2] | ) | |
| _____ | ) | |

Plaintiff South Carolina Electric & Gas Company ("SCE&G") brings this action pursuant

to 42 U.S.C. § 1983 alleging constitutional claims against the following Defendants in their

---

[1] Rule 52 of the Federal Rules of Civil Procedure requires the court to "state the findings and conclusions that support" the "granting or refusing [of] an interlocutory injunction." Fed. R. Civ. P. 52(a)(2). To the extent any findings of fact constitute conclusions of law, they are adopted as such; to the extent any conclusions of law constitute findings of fact, they are so adopted. Moreover, as this is a preliminary injunction, any facts identified "are not final determinations of disputed matters." *EZ Gard Indus., Inc. v. XO Athletic Co.*, No. 07-CV-4769 (JMR/FLN), 2008 WL 1827490, at *1 n.1 (D. Minn. Apr. 23, 2008).

[2] On July 1, 2018, the terms of former Defendants Robert T. Bockman and Elizabeth Fleming expired; Thomas J. Ervin began his term as a Commissioner of the South Carolina Public Service Commission; and, Cromer H. Randall became the Chairman of the South Carolina Public Service Commission. Pursuant to Federal Rule of Civil Procedure 25(d), Plaintiff substituted the new Defendants accordingly in its Amended Verified Complaint. (*Compare* ECF No. 1, *with* ECF No. 68.)

official capacities as Commissioners of the South Carolina Public Service Commission ("PSC"): Swain E. Whitfield, Comer H. Randall, John E. Howard, Elliot F. Elam, Jr., Thomas J. Ervin, and G. O'Neal Hamilton (collectively, "Defendants").  (ECF No. 68.)  Specifically, SCE&G alleges that its rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution; the Bill of Attainder Clause of Article 1, § 10 of the United States Constitution; and the Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution were violated when the South Carolina General Assembly passed (1) Act of June 28, 2018, 2018 South Carolina Laws Act 287 (H.B. 4375) ("Act 287"[3]) and (2) Act of July 2, 2018, 2018 South Carolina Laws Resolution 285 (S. 0954) ("Resolution 285").[4]  (ECF No. 68 at 7 ¶ 18 & 47 ¶ 239–53 ¶ 284.)

This matter is before the court on SCE&G's Motion for Preliminary Injunction (ECF No. 5), which is opposed by Defendants and by South Carolina House of Representatives Speaker Jay Lucas ("Speaker Lucas"), South Carolina Senate President Pro Tempore Hugh K. Leatherman, Sr. ("President Leatherman") (together, "Intervenor Defendants"), and South Carolina Attorney General Alan Wilson ("Attorney General Wilson").[5]  (ECF Nos. 31, 54, 59, 61.)  For the reasons set forth in detail below, the court **DENIES** SCE&G's Motion for

---

[3] "Act 287" was ratified as "R287," but is enumerated as Act 258.  To be consistent with the filings in this case, the court will refer to Act of June 28, 2018, 2018 South Carolina Laws Act 287 as "Act 287."

[4] "The PSC is charged with implementing the provisions of" Act 287 and Resolution 285.  (ECF No. 68 at 6–7 ¶ 17.)  According to SCE&G, "[e]ach of the defendants, as individual Commissioners on the PSC, have been, and are expected to be, personally involved in taking actions to implement [] Act [287 and Resolution 285] and violate SCE&G's constitutional rights."  (*Id.*)

[5] On July 18, 2018, the court granted Motions to Intervene filed by Intervenor Defendants.  (ECF Nos. 41, 82.)  Additionally, on July 5, 2018, Attorney General Wilson moved to file an Amicus Brief (ECF No. 10) and the court granted Attorney General Wilson's Motion on July 12, 2018.  (ECF Nos. 27, 87.)

Preliminary Injunction.  (ECF No. 5.)

## I.    JURISDICTION

1.    The court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) because SCE&G is suing Defendants pursuant to 28 U.S.C. § 1983 for violations of its rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution; the Bill of Attainder Clause of Article 1, § 10 of the United States Constitution; and the Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution.  (ECF No. 68 at 7 ¶ 18.)

2.    Additionally, the court has determined that its exercise of jurisdiction is not constrained by application of the Johnson Act, 28 U.S.C. § 1342, *Younger* abstention, *Pullman* abstention, *Burford* abstention, or sovereign immunity.  (*See* ECF No. 97 at 7–19.)

## II.    FINDINGS OF FACT RELEVANT TO PENDING MOTION

3.    This case arises out of SCE&G's abandonment of the construction of two nuclear reactors known as V.C. Summer Units 2 and 3 (the "Project") in Jenkinsville, South Carolina, and the South Carolina General Assembly's passage of Act 287 and Resolution 285.  (*E.g.*, ECF No. 68 at 1–2.)

4.    The purpose of the Project was to increase SCE&G's base load capacity and enable it to meet the electricity demands of its South Carolina customers.[6]  (*See* ECF No. 68 at 7 ¶ 20, 13 ¶ 54–14 ¶ 61.)

5.    SCE&G's incentive for the Project occurred as a result of the South Carolina General Assembly's passage of the Base Load Review Act, S.C. Code Ann. § 58-33-210 *et seq.*

---

[6] "Base load" is defined as "the minimum amount of electric power delivered or required over a given period of time at a steady rate."  U.S. Energy Information Administration, *Glossary*, https://www.eia.gov/tools/glossary/index.php?id=B (last visited on Aug. 6, 2018).

(2015[7]) ("BLRA"), which became "effective upon signature of the Governor on May 3, 2007." S.C. Code Ann. § 58-33-210.[8]

6.    The PSC is "vested with power and jurisdiction to supervise and regulate the rates and service of every public utility in this State and to fix just and reasonable standards, classifications, regulations, practices, and measurements of service to be furnished, imposed, or observed, and followed by every public utility in this State." S.C. Code Ann. § 58-3-140(A). As a result, all rates charged by a utility in the state of South Carolina must be approved by the PSC. *See* S.C. Code Ann. §§ 58-27-820, -830.

7.    On May 30, 2008, SCE&G filed a Combined Application for Certificate of Environmental Compatibility, Public Convenience and Necessity[9] (the "Application") with the PSC, pursuant to the BLRA. (ECF No. 68 at 14 ¶ 65.) SCE&G sought approval for construction of the Project based on a projected cost of $6.3 billion. (*Id.* ¶ 64.) SCE&G initially projected that it would complete V.C. Summer Unit 2 by April 1, 2016, and Unit 3 by January 1, 2019. (ECF No. 68-2 at 17.) In order to avail itself of tax credits and to get the revised rates under the BLRA, SCE&G needed to complete the Project by 2020. (ECF No. 99 at 58:20–23.) SCE&G

---

[7] All South Carolina Code sections from Title 58 are included in the 2015 codification of Title 58, and the court declines to repeat the year in each citation.

[8] "The [stated] purpose of the BLRA 'is to provide for the recovery of the prudently incurred costs associated with new base load plants . . . when constructed by investor-owned electrical utilities, while at the same time protecting customers of investor-owned electrical utilities from responsibility for imprudent financial obligations or costs.'" *S.C. Energy Users Comm. v. SCE&G*, 764 S.E.2d 913, 916 (S.C. 2014) (quoting *S.C. Energy Users Comm. v. Pub. Serv. Comm'n of S.C.*, 697 S.E.2d 587, 592 (S.C. 2010) (citing S.C. Code Ann. § 58-33-210)). The BLRA permitted utilities to apply for a "base load review order," which would establish that if a base load plant is constructed or being constructed in accordance with an approved construction schedule and approved capital costs estimates, then the plant's financing of capital costs for construction may be recovered through utility rates. S.C. Code Ann. §§ 58-33-220(4), 58-33-275.

[9] A "combined application" is "a base load review application which is combined with an application for a certificate under the Utility Facility Siting and Environmental Protection Act." S.C. Code Ann. § 58-33-220(6).

later amended the scheduling dates to convey that it would not complete Unit 2 until 2022 and Unit 3 until 2024.  (*Id.* at 60:8–12.)

8.      On March 2, 2009, the PSC approved SCE&G's Application to construct the Project finding that its construction "is reasonable and prudent."  (*See* ECF No. 68-3 at 6 ¶ 11; *see also* ECF Nos. 68-1, 68-2.)

9.      SCE&G began construction on the Project.  (ECF No. 68 at 20 ¶ 96.)

10.     On nine occasions between 2008 and 2016, the PSC approved SCE&G's revised-rate requests, permitting it to recover for the capital costs of the Project amounting to $445 million annually.  (ECF Nos. 68-6 to 68-14.[10])

11.     As of September 30, 2017, SCE&G has invested approximately $5 billion on the Project and $316 million in transmission costs related to delivery facilities.  (ECF No. 99 at 14:16–23; ECF No. 68 at 26 ¶ 124.)

12.     Ratepayers have paid to SCE&G roughly $2 billion in revised rates for financing the Project.  (ECF No. 99 at 61:10–15.)

13.     On July 31, 2017, SCE&G "announced that it would cease construction of the [Project's] Units and request recovery of its abandoned costs, an outcome expressly contemplated by the BLRA."  (ECF No. 68 at 31–32 ¶ 158.)

14.     On August 1, 2017, SCE&G filed a Petition for Prudency Determination Regarding Abandonment, Amendments to the Construction Schedule, Capital Cost Schedule and Other Terms of the BLRA Orders for the V.C. Summer Units 2 & 3 and Related Matters (the "Petition") with the PSC to abandon construction of the Project.  (ECF No. 68 at 32 ¶ 159.)  In

---

[10] PSC Order No. 2009-104(A), PSC Order No. 2009-696, PSC Order No. 2010-625, PSC Order No. 2011-738, PSC Order No. 2012-761, PSC Order No. 2013-680(A), PSC Order No. 2014-785, Order No. 2015-712, and PSC Order No. 2016-758.

the Petition, SCE&G alleges that it asked the PSC to "enter an order finding that SCE&G's decision to abandon the construction of the [V.C. Summer] Units was reasonable and prudent" and "sought authorization to calculate revised rates reflecting SCE&G's incurred construction costs and costs of abandonment, pursuant to the BLRA." (*Id.* ¶¶ 160–61.)

15.     On August 9, 2017, the South Carolina Office of Regulatory Staff ("ORS") moved to dismiss SCE&G's Petition. (*Id.* ¶ 162.)

16.     SCE&G contends that it voluntarily withdrew its Petition on August 15, 2017, "after legislative leadership demanded more time for legislators to review the project and threatened to bring the South Carolina General Assembly back into a special session for the specific purpose of preventing SCE&G from recovering its abandoned costs." (*Id.* ¶¶ 164–165.)

17.     On January 12, 2018, SCE&G and Dominion Energy, Inc., filed a Joint Application and Petition ("Joint Petition"), PSC Docket 2017-370-E, with the PSC for review and approval of the merger between SCE&G and Dominion. (ECF No. 31-1.) In the Joint Petition, SCE&G requested that the PSC permit SCE&G to recover up to $5 billion from ratepayers over the next 20 years for the abandoned Project. (*Id.* at 51–52.)

18.     SCE&G alleges that in response to the Project's abandonment, the South Carolina General Assembly passed Act 287 and Resolution 285. (ECF No. 68 at 36 ¶ 177.) Act 287 became law on June 28, 2018, and Resolution 285 became law on July 2, 2018. Act 287 instructs the PSC to set utility rates for SCE&G at a level equal to their current rates less the increases previously granted under the BLRA within five (5) days of the passage of the Act. 2018 S.C. Acts 258 § 3. Act 287 specified that the "experimental rate" would be effective from the PSC's implementation until the conclusion of the proceedings currently before the PSC regarding the Project. *Id.*

19.     Additionally, Resolution 285 prohibited the PSC from holding a hearing on the pending dockets[11] prior to November 1, 2018, and instructed the PSC to issue a final decision in the abandonment proceedings by December 21, 2018.  2018 S.C. Acts 285 § 1.

20.     Both the Act and the Resolution repealed any sections of law in conflict with their operation.  2018 S.C. Acts 258 § 2; 2018 S.C. Acts 285 § 3.

21.     Act 287 also repealed the BLRA for any future projects and provided definitions for prudency, imprudency, and fraud.  2018 S.C. Acts 258 §§ 1, 2.

22.     On June 29, 2018, SCE&G filed its Verified Complaint for Declaratory Judgment and Temporary, Preliminary, and Permanent Injunctive Relief against Defendants pursuant to 42 U.S.C. § 1983 challenging the constitutionality of both Act 287 and Resolution 285, asserting the elimination of the rate increases violates SCE&G's constitutional rights and "impermissibly interfere[s] with interstate commerce."  (ECF No. 68 at 2 ¶ 2.)  This lawsuit does not challenge

---

[11] The PSC "currently has several pending dockets in which it will need to address complex issues surrounding the prudency of the costs incurred on the Project, the prudency of abandonment, whether and to what extent revised rates are recoverable, and the final rate SCE&G will be permitted to charge its ratepayers."  (ECF No. 52-1 at 20.)  The matters are identified as:

> Joint Application and Petition of South Carolina Electric & Gas Company and Dominion Energy, Incorporated for Review and Approval of a Proposed Business Combination between SCANA Corporation and Dominion Energy, Incorporated, as May Be Required, and for a Prudency Determination Regarding the Abandonment of the V.C. Summer Units 2 & 3 and Associated Consumer Benefits and Cost Recovery Plans, Docket No. 2017-370-E;

> Friends of the Earth and Sierra Club, Complainant/Petitioner v. South Carolina Electric & Gas Company, Defendant Respondent, Docket No. 2017-207-E; and

> Request of the Office of Regulatory Staff for Rate Relief to South Carolina Electric and Gas Company's Rates Pursuant to S.C. Code Ann. § 58-27-920, Docket No. 2017-305-E.

(ECF No. 31 at 7.)  SCE&G is the only utility with pending docket matters before the PSC concerning the BLRA.  The court is informed that the aforementioned matters have been consolidated.  (*Id.*)

or seek review of any PSC order.  (*Id.* at 3 ¶ 4.)

23.     On July 2, 2018, SCE&G moved for a preliminary injunction based on its constitutional claims.  (ECF No. 5.)  SCE&G seeks relief from the alleged unconstitutional legislative enactment of Act 287 and Resolution 285.  More specifically, SCE&G seeks to enjoin Defendants from future implementation of Act 287 and Resolution 285.  SCE&G does not seek to enjoin any PSC orders regarding SCE&G's project construction, capital cost schedules, or rate increases.[12]

24.     On July 2, 2018, SCE&G sent the PSC a letter informing it that SCE&G had filed the instant Motion for Preliminary Injunction and requesting that the PSC consent to the injunction.  (ECF No. 94-36.)

25.     On July 2, 2018, the PSC issued Order No. 2018-459 (ordered by Defendants Elam, Ervin, Hamilton, Howard, Randall, and Whitfield) directing SCE&G to calculate a reduction in its retail electric rates and tariffs by approximately 15% and to submit full tariff sheet summaries.  (ECF No. 94-37.)

26.     On July 3, 2018, SCE&G sent the PSC a letter and attached the requested tariff sheet summaries.  (ECF No. 94-40.)

27.     On July 3, 2018, the PSC issued Order No. 2018-460 (ordered by Defendants Elam, Ervin, Hamilton, Howard, Randall, and Whitfield), setting an experimental rate requiring SCE&G to reduce its electric rates as required by Act 287.  (*See* ECF No. 33-4.)  The PSC's July 3, 2018 Order directs SCE&G to begin implementing the experimental rate in the first billing cycle in August, which begins on August 7, 2018.  (ECF No. 33-4; ECF No. 9 at 2.)  The

---

[12] Those orders include: PSC Order 2008-196 (E) approving SCE&G's combined application (ECF No. 68-1 to 68-3); PSC Order No. 2009-104(A) approving initial capital cost schedule and construction schedule (*id.*); and eleven PSC Orders approving SCE&G's requests for rate increases (ECF Nos. 68-6 to 68-14).

experimental rate is a monthly reduction of 14.8% for SCE&G's customers.  (ECF No. 99 at 91:5–9.)

28.    Act 287's requirement of an experimental rate, effective from April 1, 2018, forces SCE&G to (1) "refund" to customers $120 million collected from April to August 2018, and (2) lose approximately $30 million per month until the PSC's final decision on the abandonment proceedings.  (*Id.* at 16:16–22, 17:5–16.)

29.    On July 16, 2018, Defendants filed opposition to SCE&G's Motion for Preliminary Injunction.  (ECF No. 31.)

30.    On July 20, 2018, Defendants and Intervenor Defendants filed Motions to Dismiss pursuant to Rule 12(b)(1) and (b)(6) of the Federal Rules of Civil Procedure.  (ECF Nos. 48, 50, 52.)

31.    On July 23, 2018, Attorney General Wilson filed an Amicus Brief opposing SCE&G's Motion for Preliminary Injunction.[13]  (ECF No. 54.)

32.    On July 25, 2018, Intervenor Defendants filed opposition to the instant Motion for Preliminary Injunction.  (ECF Nos. 59, 61.)

33.    On July 26, 2018, the court granted in part and denied in part the Motions to Dismiss, dismissed the Complaint, and granted SCE&G leave to file an amended complaint until July 27, 2018.  (ECF No. 67.)

34.    On July 27, 2018, SCE&G filed a Verified Amended Complaint, renewing its request that the court: (1) "Enter a declaratory judgment declaring Act 287 and Resolution 285 are unconstitutional in that they constitute an unlawful taking; violate the substantive and procedural components of the Due Process Clause, and constitute an unlawful bill of attainder";

---

[13] After SCE&G filed its Amended Complaint (ECF No. 68), Attorney General Wilson renewed his Amicus Brief with leave from the Court.  (ECF Nos. 85, 87.)

and (2) "Enter a temporary, preliminary and permanent injunction directing the Chairman and Commissioners of the PSC, and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them, to refrain from implementing Act [287] and Joint Resolution [285]."  (ECF No. 68 at 53.)

35.     On July 28, 2018, Defendants and Intervenor Defendants filed renewed Motions to Dismiss pursuant to Rules 12(b)(1) and (b)(6).  (ECF Nos. 76, 77, 78.)

36.     On July 30, 2018, SCE&G filed a Memorandum in Opposition to Defendants and Intervenor Defendants' Motions to Dismiss.  (ECF No. 91.)

37.     The court heard the parties' arguments regarding the Preliminary Injunction and renewed Motions to Dismiss during a hearing on July 30–31, 2018.  (ECF Nos. 92, 95.)

38.     On August 1, 2018, SCE&G filed a Reply to the Opposition Briefs to its Motion for Preliminary Injunction.  (ECF No. 96.)

39.     On August 2, 2018, the court denied the renewed Motions to Dismiss.  (ECF No. 97.)

40.      As discussed below, upon review of the extensive briefing on the instant Motion and hearing the parties' detailed arguments, the court finds that the legal issues in dispute weigh against granting SCE&G the requested relief.  The parties' positions are discussed in greater detail below in the context of SCE&G's specific allegations.

### III.     LEGAL STANDARD AND ANALYSIS

A.     <u>Preliminary Injunctions Generally</u>

41.     The court's authority to issue a preliminary injunction arises from Rule 65, but "it is an extraordinary remedy never awarded as of right."  *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  A party seeking a preliminary injunction must establish all four of the

following elements: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest.  *Id.*; *The Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346–47 (4th Cir. 2009).

42.    The Fourth Circuit no longer recognizes a "flexible interplay among the four criteria for a preliminary injunction."  *Real Truth*, 575 F.3d at 347.  Each of these requirements "must be fulfilled as articulated."  *De la Fuente v. S.C. Dem. Party*, CA No. 3:16-cv-00322-CMC, 2016 WL 741317, at *2 (D.S.C. Feb. 25, 2016).

43.    "The traditional purpose of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of the lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits."  *De La Fuenta*, 2016 WL 741317, at *2.

B.    The Court's Request for Relief

44.    SCE&G seeks a preliminary injunction that: (a) stays the effect of Act 287 and Resolution 285; and (b) enjoins Defendants from instituting or implementing any of Act 287 and Resolution 285's provisions, "including its mandated retail electric rate reduction and refund provisions, until further order of the Court."[14]  (ECF No. 5 at 1.)

C.    The Court's Review

45.    In support of its Motion for Preliminary Injunction, SCE&G relies on its Memorandum of Law (ECF No. 5-1), Reply Memorandum (ECF No. 96), the PSC's June 28, 2018 notice of special commission business meeting, and the Declaration of Iris N. Griffin (ECF

---

[14] The parties do not offer argument as to whether SCE&G is seeking a prohibitory or a mandatory preliminary injunction and, as such, which standard is to be applied.  However, because the preliminary injunction SCE&G seeks is not appropriate under the less stringent standard, the court need not resolve this dispute.

No. 5-3), SCE&G's Senior Vice President and Chief Financial Officer and Treasurer.

46.     In opposition to the Motion for Preliminary Injunction, Defendants rely on their Memorandum of Law (ECF No. 31), a Joint Application and Petition by SCE&G and Dominion Energy, Inc., for review and approval of their merger (ECF No. 31-1), a September 26, 2017 Petition for rate relief filed by the ORS with the PSC (ECF No. 31-2), and the PSC's July 5, 2018 hearing officer directive (ECF No. 31-3).

47.     In opposition to the Motion for Preliminary Injunction, President Leatherman relies on his Memorandum of Law (ECF No. 59).

48.     In opposition to the Motion for Preliminary Injunction, Speaker Lucas relies on his Memorandum of Law (ECF No. 61).

49.     In opposition to the Motion for Preliminary Injunction, Attorney General Wilson relies on his Amicus Brief (ECF No. 54) and his Supplement to the Amicus Brief.  (ECF No. 85.)

50.     The court heard testimony from various witnesses and oral argument from the parties' counsel on July 30 to July 31, 2018.  (ECF Nos. 92, 95.)

51.     The parties make a plethora of arguments regarding the meritorious value of SCE&G's claims.  This court finds that SCE&G has not met its burden under the standard the Supreme Court set out in *Winter*.  Because SCE&G cannot show that all elements required for injunctive relief are met, the court refuses to grant injunctive relief to SCE&G. The court addresses below the vitality of SCE&G's assertions under the requirements set forth in *Winter* and reiterated by the Fourth Circuit in *Real Truth*.

## IV.     SPECIFIC FINDINGS AND CONCLUSIONS

A.     Clear Showing of Likely Success on the Merits

52.     "[P]laintiffs seeking preliminary injunctions must demonstrate that they are likely

to succeed on the merits." *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013) (citing *Winter*, 555 U.S. at 20). "Although this inquiry requires plaintiffs seeking injunctions to make a 'clear showing' that they are likely to succeed at trial, *Real Truth*, 575 F.3d at 345, plaintiffs need not show a certainty of success, *see* 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2948.3 (2d ed. 1995); *Pashby*, 709 F.3d at 321.

    i.   *SCE&G Cannot Establish a Clear Showing of Likely Success as to the Merits of Its Claim for an Unconstitutional Taking Based on a Redefinition of Property Rights and/or a Confiscatory Rate.*

53.    SCE&G asserts that Act 287 and Resolution 285 violate the Takings Clause of the Fifth Amendment because they confiscate SCE&G's property by cutting its rates to "confiscatory levels." (ECF No. 5-1 at 4; *see also* ECF No. 68 at 48 ¶¶ 251–52.) More specifically, SCE&G asserts that Act 287 and Resolution 285 (1) "set[] a confiscatory rate that prevents SCE&G from earning enough revenue for its capital costs and, in fact, 'jeapordize[s]' SCE&G's 'financial integrity,'" (2) "prohibit[] SCE&G from recovering a reasonable return on its investment, takes away SCE&G's ability to charge rates sufficient to recover amounts spent in reliance on the BLRA, would allow Dominion Energy to back out of a company-sustaining merger, and jeopardizes SCE&G's ability to access capital to fund short-term operations," (3) "make[] no attempt to determine the effect of the experimental rate on SCE&G," and (4) "mandate[] an arbitrary experimental rate and authorizes the PSC to adjust the rate, only if and when the PSC in its sole discretion deems it necessary." (ECF No. 5-1 at 18.)

54.    Both the United States Constitution and South Carolina Constitution prohibit the government from taking property without just compensation. U.S. Const. amends. V, XIV;[15] S.C. Const. art. I, § 13.[16]

---

[15] The Fifth Amendment to the Constitution of the United States declares that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. "The

13

55.     "The Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation." *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 194 (1985) (citing *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 297 n.40 (1981)).  "[B]ecause the Fifth Amendment proscribes takings without just compensation, no constitutional violation occurs until just compensation has been denied." *Id.* at 194 n.13.  "The nature of the constitutional right therefore requires that a property owner utilize procedures for obtaining compensation before bringing a § 1983 action." *Id.*

56.     "A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding, risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures." *Bluefield Waterworks & Improvement Co. v. Pub. Serv. Comm'n of W. Va.*, 262 U.S. 679, 692–93 (1923).  "The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties." *Id.* at 693. "A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally." *Id.*

---

Takings Clause of the Fifth Amendment[] [is] applicable to the States through the Fourteenth Amendment." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001) (citing *Chicago, Burlington & Quincy R.R. Co. v. Chicago*, 166 U.S. 226 (1897)).

[16] The South Carolina Constitution provides that "private property shall not be taken for private use without the consent of the owner, nor for public use with just compensation being first made for the property."  S.C. Const. art. I, § 13.

57.    A utility is only allowed "just and reasonable" rates that strike a balance between investors and ratepayers. *Permian Basin Area Rate Cases*, 30 U.S. 747, 770 (1968).  In this regard, rates cannot be so low as to be confiscatory to the utility but so high as to burden the consumer. *Mims v. Edgefield City Water*, 299 S.E.2d 484, 486 (S.C. 1983) (citing *Bluefield*).

58.    The United States Constitution expressly "protects utilities from being limited to a charge for their property serving the public which is so 'unjust' as to be confiscatory." *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307–08 (1989) (citing *Covington & Lexington Turnpike Road Co. v. Sandford*, 164 U.S. 578, 597 (1896) (A rate is too low if it is "so unjust as to destroy the value of [the] property for all the purposes for which it was acquired," and in so doing "practically deprive[s] the owner of property without due process of law."); *FPC v. Nat. Gas Pipeline Co.*, 315 U.S. 575, 585 (1942) ("By long standing usage in the field of rate regulation, the 'lowest reasonable rate' is one which is not confiscatory in the constitutional sense."); *FPC v. Texaco Inc.*, 417 U.S. 380, 391–392 (1974) ("All that is protected against, in a constitutional sense, is that the rates fixed by the Commission be higher than a confiscatory level.")).  "If the rate does not afford sufficient compensation, the State has taken the use of utility property without paying just compensation and so violated the Fifth and Fourteenth Amendments." *Duquesne*, 488 U.S. at 308.

59.    However, "a regulatory taking claim against a state is not ripe until (1) the state agency imposing the allegedly confiscatory regulation has taken final action against the plaintiff's property and (2) the plaintiff has pursued all available remedies under state law."[17]

---

[17] The court's exercise of its power of judicial review rests upon Article III of the Constitution and depends on the existence of a case or controversy. *See Preiser v. Newkirk*, 422 U.S. 395, 401 (1975).  Ripeness is a "subset[ ] of Article III's command that the courts resolve disputes, rather than emit random advice." *Bryant v. Cheney*, 924 F.2d 525, 529 (4th Cir. 1991).  The purpose of the ripeness doctrine "is to prevent the courts, through premature adjudication, from

*U.S. W. Commc'ns v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1126 (9th Cir. 1999) (citing *Williamson Cty.*, 473 U.S. at 186–97); *see also Sansotta v. Town of Nags Head*, 724 F.3d 533, 544 (4th Cir. 2013) ("For a takings claim against a state or its political subdivisions to be ripe in federal court, the plaintiff must first have sought compensation "through the procedures the State has provided for doing so.") (citing *Williamson Cty.*, 473 U.S. at 194). "Because the Takings Clause simply requires the payment of just compensation, not necessarily payment before or simultaneous with the taking, a plaintiff must first seek compensation from the state via the procedures that the state has established before suing the state in federal court." *Sansotta*, 724 F.3d at 544 (citing *Williamson Cty.*, 473 U.S. at 195).[18]

---

entangling themselves in abstract disagreements." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985); *see also Miller v. Brown*, 462 F.3d 312, 318–19 (4th Cir. 2006). A case is ripe for judicial decision where the issues are purely legal in nature, relate to an action which is final, and is not dependent on future uncertainties or contingencies. *Miller*, 462 F.3d at 319. In determining whether a case is ripe for review, the court must balance "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 188 (4th Cir. 2007). Ripeness becomes an issue when a case is anchored in future events that may not occur as anticipated, or at all. *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 200–201 (1983); *see also Dames & Moore v. Regan*, 453 U.S. 654, 689 (1981). "Ripeness is, thus, a question of timing." *Smith v. United States*, C/A No. 6:08-0203-CMC-WMC, 2008 WL 906699, at *3 (D.S.C. Apr. 1, 2008) (citing *Stinson v. Sullivan*, No. 1:07-cv-01311 LJO SMS HC, 2008 WL 115124, at *2 (E.D. Cal. Jan. 11, 2008) (citation omitted)). "The burden of proving ripeness falls on the party bringing suit." *Miller*, 462 F.3d at 319.

[18]    In *Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172 (1985), the plaintiff complained that the county's application of its zoning regulations to plaintiff's real estate development amounted to a taking without just compensation. *Id.* at 182. The Court took care to note that the trial court "granted a directed verdict to [the county] on the substantive due process and equal protection claims, and the jury found that respondent had not been denied procedural due process. Those issues are not before us." *Id.*, n.4. Thus, the only due process claim asserted by the plaintiff was a claim of a taking in violation of the Due Process Clause of the Fourteenth Amendment. *Id.* at 197. The Court held that the regulatory taking claim was unripe due to plaintiff's failure to seek a variance, *Id.* at 191–94, and because plaintiff had failed to "seek compensation through the procedures the State has provided for doing so." *Id.* at 194. Without

60. Upon review, the court observes that neither Act 287 nor Resolution 285 sets the specific experimental rate that SCE&G alleges constitutes a taking. Act 287 did instruct Defendants to exercise their authority and "provide an experimental rate that customers . . . shall pay during the pendency of litigation currently before the commission . . . ." 2018 S.C. Acts 258 § 3. However, Resolution 285 prevents Defendants from issuing a final rate determination until at least November 1, 2018, but no later than December 21, 2018. 2018 S.C. Acts 285 § 1.

61. Because of the foregoing, SCE&G is unable to satisfy the first *Williamson County* prong since the court has already concluded that Defendants have not taken final action against SCE&G's alleged property by implementing a rate that is confiscatory. (ECF No. 67 at 19, 22.)

62. The court further observes that even if it found that SCE&G satisfied the first *Williamson County* prong, it is unable to satisfy the second prong showing that it was denied just compensation because there is not any evidence in the record that SCE&G pursued to completion an inverse condemnation action in state court.[19] *See Williamson Cty.*, 473 U.S. at 196–97 ("Respondent has not shown that the inverse condemnation procedure is unavailable or inadequate, and until it has utilized that procedure, its taking claim is premature."); *see also, e.g.*, *Carolina Chloride, Inc. v. Richland Cty.*, 714 S.E.2d 869, 877 (S.C. 2011) ("Inverse condemnation is a cause of action by a property owner against a governmental entity to recover

---

judging the merits of the due process taking claim, the Court held that that claim was also premature due to plaintiff's failure to seek a variance. *Id.* at 199–200.

*Salt Creek, L.P. v. City of Warr Acres*, No. Civ. 01-1500-F, 2002 WL 32026152, at *9 (W.D. Okla. June 13, 2002).

[19] An inverse condemnation "may result from government-imposed limitations on the use of private property." *Byrd v. City of Hartsville*, 620 S.E.2d 76, 79 (S.C. 2005). "Private property" is property that is "protected from public appropriation–over which the owner has exclusive and absolute rights." Private property, *Black's Law Dictionary* (10th ed. 2014).

the value of property that has been effectively 'taken' by the governmental entity, although not through the process of eminent domain.") (citation omitted).

63.     Because SCE&G has failed to meet either prong of the test articulated in *Williamson County*, which requires final action by the state against the property owner, SCE&G cannot show a likelihood of success on the merits at this time on its claim asserting the seizing of its property by cutting rates to "confiscatory levels" in violation of the Takings Clause.[20]

> ii.     *SCE&G Cannot Establish a Clear Showing of Likely Success as to the Merits of Its Claim Alleging a Violation of Substantive and Procedural Due Process.*

64.     The Fourteenth Amendment prohibits states from depriving a person of property without substantive and procedural due process.  U.S. Const. amend. XIV.

65.     To succeed on a substantive due process claim, SCE&G must show "(1) that [it] had property or a property interest; (2) that the state deprived [it] of this property or property interest; and (3) that the state's action falls so far beyond the outer limits of legitimate governmental action that *no process* could cure the deficiency."  *Quinn v. Bd. of Cty. Comm'rs for Queen Anne's Cty., Md.*, 862 F.3d 433, 443 (4th Cir. 2017) (quoting *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 827 (4th Cir. 1995)).

66.     To succeed on a procedural due process claim, SCE&G must show (1) "[it] ha[s] a constitutionally cognizable life, liberty, or property interest," *Sansotta*, 724 F.3d at 540; (2) "that the deprivation of that interest was caused by 'some form of state action,'" *Id.* (quoting *Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 145 (4th Cir. 2009)); and

---

[20] Even though "[r]ipeness is a question of subject matter jurisdiction," the *Williamson County* requirement is not "a jurisdictional rule."  *Sansotta*, 724 F.3d at 545, 548.  Moreover, in Defendants and Intervenor Defendants Motions to Dismiss, they did not raise the issue of ripeness.  Ripeness is not the same as the abstention issues that were raised by Defendants and Intervenor Defendants.  "Because a district court can abstain only when it has subject matter jurisdiction, a case must be ripe before a district court may abstain."  *Sansotta*, 724 F.3d at 548 (citing *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).

(3) "that the procedures employed were constitutionally inadequate," *Patterson*, 566 F.3d at 145.

67.     SCE&G cannot establish it is likely to prevail on the merits of its due process challenges because SCE&G has not shown at this time it clearly has a property interest in revised rates under the BLRA.[21]

68.     The Constitution does not create property interests. *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). Property interests are "created and their dimensions defined by existing rules or understandings that stem from an independent source such as state law—rules or understanding that secure certain benefits and that support claims of entitlement to those benefits." *Id.* "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it . . . . He must have a legitimate claim of entitlement to it." *Id.*; *see also Beckham v. Harris*, 756 F.2d 1032, 1036 (4th Cir. 1985) ("The sufficiency of such a legitimate claim of entitlement must be decided by reference to state law, as evidenced by state statutes, local ordinances, rules, or mutually explicit understandings that support the claim." (citation omitted)).

69.     Under South Carolina law, "[t]o determine if the expectation of entitlement is sufficient 'will depend largely upon the extent to which the statute contains mandatory language that restricts the discretion of the [agency] . . . .'" *Grimsley v. S.C. Law Enf't Div.*, 721 S.E.2d 423, 427 (S.C. 2012) (quoting *Jacobson v. Hannifin*, 627 F.2d 177, 180 (9th Cir. 1980)); *Doyle v. City of Medford*, 606 F.3d 667, 672 (9th Cir. 2010) ("A regulation granting broad discretion

---

[21] The court's inquiry is not whether SCE&G "*may* collect PSC-approved rates following its abandonment announcement" (ECF No. 91-1 at 30 (emphasis added)), but whether SCE&G is *entitled* to collect PSC-approved rates. Under S.C. Code Ann. § 58-27-820, SCE&G may be required to accept the current PSC-approved rates, but that does not inform whether SCE&G holds an entitlement in those rates now that it has abandoned the Project.

to a decision-maker does not create a property interest."); *Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence, Kan.*, 927 F.2d 1111, 1116 (10th Cir. 1991) ("When analyzing whether a plaintiff presents a legitimate claim of entitlement, we focus on the degree of discretion given the decisionmaker . . . .").

70.    SCE&G posits the South Carolina Supreme Court "has held that a law that guarantees a person a future payment creates a cognizable property interest in that payment." (ECF No. 5-1 at 18 (citing *Grimsley*).)

71.    Additionally, SCE&G asserts the BLRA, in two of its subsections, contains mandatory language "entitl[ing] SCE&G to collect rate payments so as to recover its prudently incurred capital costs related to the nuclear facility construction and the cost of that capital." (ECF No. 5-1 at 20.)

72.    SCE&G first points to S.C. Code Ann. § 58-33-275(A), which provides, "[A] base load review order shall constitute a final and binding determination that a plant is used and useful for utility purposes, and that its capital costs are prudent utility costs and expenses and are properly included in rates so long as that plant is constructed or being constructed within the parameters of (1) the approved construction schedule including contingencies; and (2) the approved capital costs estimates including specific contingencies."  (*See also* ECF No. 5-1 at 19.)

73.    Under S.C. Code Ann. § 58-33-275(A), the capital costs to construct a nuclear plant are prudent and properly included in rates "*so long as*" (1) the plant is "constructed or being constructed" and (2) "within the parameters of . . . the approved construction schedule . . . and . . . the approved capital costs estimates" (emphasis added).  *See also* S.C. Code Ann. § 58-33-275(C) ("*So long as the plant is constructed or being constructed* in accordance with the

approved schedules, estimates, and projections . . . the utility must be allowed to recover its capital costs related to the plant through revised rate filings or general rate proceedings." (emphasis added)).

74.    The phrase "so long as" is "not purely [a] temporal construction[]; more often than not, [it] express[es] a condition rather than a time limit."  Bryan A. Garner, *Garner's Dictionary of Legal Usage* 82 (3d ed. 2011).  *See also Moro v. State*, 351 P.3d 1, 32 (Or. 2015) ("[T]he phrase 'as long as'[22] means 'provided that,' *Webster's Third New Int'l Dictionary* 129 (unabridged ed.[ ]2002), and serves the same function as the phrase 'if and only if,' Rodney Huddleston and Geoffrey K. Pullum, *The Cambridge Grammar of the English Language* 758 (2002).").

75.    Because, under S.C. Code Ann. § 58-33-275(A), the final and binding nature of a base load review order is conditioned upon whether (1) the plant is "constructed or being constructed" (2) "within the parameters of . . . the approved construction schedule . . . and . . . the approved capital costs estimates," it is not clear that any entitlement exists where a nuclear plant is not constructed or being constructed.[23]

76.    Accordingly, S.C. Code Ann. § 58-33-275(A) constrains the discretion of the PSC in setting utility rates according to its own base load review orders only *so long as* a nuclear

---

[22] The phrases "so long as" and "as long as" are defined together by Garner, *see* Garner*, supra* ¶ 74.

[23] SCE&G asserts Act 287 "forces SCE&G to fork over  $100 million it previously recovered in lawful rates."  (ECF No. 5-1 at 26.)  The court notes that the PSC's July 3, 2018 Order does require SCE&G to refund ratepayers, mandating a "one-time credit for the months of April, May, June and July should be implemented with the August 2018 billing cycle."  (ECF No. 33-4.) However, SCE&G does not challenge the PSC's July 3, 2018 Order.  (ECF No. 68 at 3 paragraph 4.)  Act 287 instructs the PSC how to calculate the experimental rate and the period to which that rate shall apply, but does not mandate a "refund," as suggested by SCE&G.  (ECF No. 99 at 16:16–22.)  Furthermore, because SCE&G abandoned the Project on July 31, 2017, SCE&G cannot legitimately claim an entitlement to revised rates collected after abandonment because it was no longer constructing the Project.

plant is constructed or being constructed within the parameters of the approved construction schedule and the approved capital costs.

77.     The court understands there to be three different rate periods at issue.  This first period is the time during which SCE&G was either constructing or otherwise abandoning the Project and charging ratepayers the revised rates approved by the nine base load review orders of the PSC.   The second rate period is the time during which SCE&G was no longer constructing the Project but continued to charge the revised rates.  The third time period will be governed by the outcome of the abandonment proceedings currently ongoing before the PSC, as the PSC must determine when SCE&G was either no longer constructing the Project or otherwise abandoning the Project and whether SCE&G's decision to abandon was prudent, entitling SCE&G to continue to recover the capital costs of the Project.  *See* S.C. Code Ann. § 58-33-280(K).

78.     The period during which S.C. Code Ann. § 58-33-275(A) may create a property interest would be the first, as it would coincide with language "so long as the plant is constructed or being constructed."   S.C. Code Ann. § 58-33-275(A).   During this period, a utility's claim of an entitlement to having its capital costs included in rates may be legitimate, as the statute uses language generally held to be mandatory like "shall."  *See* S.C. Code Ann. § 58-33-275(A) ("[A] base load review order shall constitute a final and binding determination that a plant is used and useful for utility purposes, and that its capital costs are prudent utility costs and expenses and are properly included in rates . . . .").  *See also Trumball Invs., Ltd. I v. Wachovia Bank, N.A.*, 436 F.3d 443, 447 (4th Cir. 2006) (stating "'shall' typically is mandatory in nature").   However, during the second and third periods, the "so long as the plant is constructed or being constructed" language ceases to constrain the discretion of the PSC,

decreasing the legitimacy of any expectation of entitlement to include the capital costs in rates.

79.    Similarly, the language in S.C. Code Ann. § 58-33-280(K) constrains the discretion of the PSC only insofar as "the utility . . . prov[es] by a preponderance of the evidence that the decision to abandon construction of the plant was prudent."

80.    Accordingly, in the event of abandonment after a base load review order approving rate recovery has been issued, the capital costs "shall nonetheless be recoverable . . . *provided that*" the utility can prove the greater weight of the evidence shows the decision to abandon the plant was prudent. S.C. Code Ann. § 58-33-280(K) (emphasis added).

81.    The mandatory language "shall nonetheless be recoverable" does not significantly restrict the discretion of the PSC because it can deny a utility recovery of its capital costs if the PSC determines the utility did not establish by a preponderance of the evidence that the utility's decision to abandon was prudent.  *See also* S.C. Code Ann. § 58-33-225(G) ("If the utility decides to abandon the project after issuance of a prudency determination . . . the preconstruction costs related to that project *may be* deferred . . . and *may be* included in rates in the utility's *next* general rate proceeding or revised rates proceeding, *provided that* as to the decision to abandon the plant, the utility shall bear the burden of proving by a preponderance of the evidence that the decision was prudent." (emphasis added)).

82.    Accordingly, SCE&G has not clearly shown that S.C. Code Ann. §§ 58-33-275(A) or 58-33-280(K) significantly limit the discretion of the PSC.

83.    Furthermore, no section of the BLRA limits the power of the South Carolina General Assembly to regulate utility rates.  *See Doyle*, 606 F.3d at 672 ("A regulation granting broad discretion to a decision-maker does not create a property interest.").  *See also* S.C. Const. art. IX, § 1 ("The General Assembly shall provide for appropriate regulation of common

carriers, publicly owned utilities, and privately owned utilities serving the public as and to the extent required by the public interest.").

84.    Even though the South Carolina General Assembly has entrusted the PSC with rate-making power, this grant of power is still subordinate to the General Assembly's rate-making authority.  *See Duquesne*, 488 U.S. at 313–14 ("It cannot seriously be contended that the Constitution prevents state legislatures from giving specific instructions to their utility commissions.  We have never doubted that state legislatures are competent bodies to set utility rates."); *Glendale Water Corp. of Florence v. City of Florence*, 265 S.E.2d 41, 42 (S.C. 1980) (stating the PSC was "creat[ed] by the General Assembly [and] derive[es] all its powers therefrom"); *Piedmont & N. Ry. Co. v. Scott*, 24 S.E.2d 353, 361 (S.C. 1943) ("If the conditions referred to in the [PSC] order are such that they should be remedied[,] this is a matter for the General Assembly, either by direct legislation to that end, or legislation enlarging the powers of the [PSC].").

85.    Based on the foregoing, SCE&G's expectation of entitlement under S.C. Code Ann. § 58-33-275(A) and S.C. Code Ann. § 58-33-280(K) is not legitimate or sufficient because the statutes do not significantly limit the discretion of the PSC or the South Carolina General Assembly.  *See Grimsley*, 721 S.E.2d at 427 ("To determine if the expectation of entitlement is sufficient 'will depend largely upon the extent to which the statute contains mandatory language that restricts the discretion of the [agency] . . . .'" (quoting *Jacobson*, 627 F.2d at 180)); *Jacobs*, 927 F.2d at 1116 ("When analyzing whether a plaintiff presents a legitimate claim of entitlement, we focus on the degree of discretion given the decisionmaker and not on the probability of the decision's favorable outcome.").

86.    To the extent S.C. Code Ann. § 58-33-275(A) does create a property interest, that

interest exists only "*so long as*" (1) the plant is "constructed or being constructed" (2) "within the parameters of . . . the approved construction schedule . . . and . . . the approved capital costs estimates." S.C. Code Ann. § 58-33-275(A) (emphasis added). *See Doyle*, 606 F.3d at 673 ("A factual contingency does not necessarily preclude the creation of a protected property interest. . . . [A] statute may create a property interest if it mandates a benefit when specific non-discretionary factual criteria are met.").

87.    The phrase "so long as" in S.C. Code Ann. § 58-33-275(A) conditions retention of any alleged property interest under S.C. Code Ann. § 58-33-275(A) on whether (1) the plant is "constructed or being constructed" (2) "within the parameters of . . . the approved construction schedule . . . and . . . the approved capital costs estimates." *See Texaco, Inc. v. Short*, 454 U.S. 516, 526 (1982) ("We have no doubt that, just as a State may create a property interest that is entitled to constitutional protection, the State has the power to condition the permanent retention of that property right on the performance of reasonable conditions that indicate a present intention to retain the interest.").

88.    SCE&G's abandonment of the Project, (ECF No. 5-1 at 7–8), means SCE&G is no longer performing the conditions necessary to retain any alleged property right under S.C. Code Ann. § 58-33-275(A), likely extinguishing any entitlement SCE&G could claim under S.C. Code Ann. § 58-33-275(A).

89.    To the extent S.C. Code Ann. § 58-33-280(K) creates a property interest, the phrase "provided that" in S.C. Code Ann. § 58-33-280(K) conditions any alleged interest upon SCE&G showing by a preponderance of the evidence that the utility's decision to abandon construction of the plant was prudent. S.C. Code Ann. § 58-33-280(K).

90.     SCE&G cannot claim an entitlement under S.C. Code Ann. § 58-33-280(K) until it makes this showing to the PSC.  *See* S.C. Code Ann. § 58-33-280(K) ("[T]he costs . . . related to the plant *shall nonetheless be recoverable . . .  provided that the utility bear the burden of proving by a preponderance of the evidence that the decision to abandon the plant was prudent*." (emphasis added)).

91.     Moreover the South Carolina General Assembly can likely extinguish property interests it has created if the conditions on which those interests depend are not met.  *See United States v. Locke*, 471 U.S. 84, 104 (1985) ("Even with respect to vested property rights, a legislature generally has the power to impose new regulatory constraints on the way in which those rights are used, or to condition their continued retention on performance of certain affirmative duties.  As long as the constraint or duty imposed is a reasonable restriction designed to further legitimate legislative objectives, the legislature acts within its powers in imposing such new constraints or duties.")  *See also Seldovia Native Ass'n, Inc. v. United States*, 35 Fed. Cl. 761, 773 (1996) (stating Congress "has the power to extinguish property interests it has created if the beneficiaries of the grant do not meet any conditions precedent").

92.     Upon SCE&G's abandonment of the Project, and thus failure to perform the necessary statutory conditions defined under S.C. Code Ann. § 58-33-275(A), the South Carolina General Assembly passed Act 287 and Resolution 285, exercising its power to regulate utility rates and "to impose new regulatory constraints on the way in which [any alleged property] rights are used, or to condition their continued retention on performance of certain affirmative duties." *Locke*, 471 U.S. at 104.

93.    Thus, because SCE&G has not shown it has a property interest under the BLRA, it has failed to establish a clear showing of likely success as to the merits of its claim for substantive and procedural due process.

iii.    *SCE&G Cannot Establish a Clear Showing of Likely Success as to the Merits of Its Claim for a Bill of Attainder.*

94.    The United States Constitution prohibits states from enacting "bills of attainder." U.S. Const. art. 1, § 10.

95.    A statute is an unconstitutional bill of attainder if it "determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon v. Admin. of Gen. Servs.*, 433 U.S. 425, 468 (1977). The Supreme Court later clarified that the *Nixon* definition contains three (3) elements: "specification of the affected persons, punishment, and a lack of a judicial trial." *Selective Serv. Sys. v. Minn. Pub. Interest Research Grp.*, 468 U.S. 841, 847 (1984).

96.    A law may not be directed at "an identifiable individual," *Nixon*, 433 U.S. at 468;[24] however, a law does not automatically violate the prohibition on bills of attainder by referring to an individual. *Id.* at 471–72.

97.    In *Nixon*, the law in question addressed policies for the storage of presidential papers. *Nixon*, 433 U.S. at 472. The law accepted the storage arrangements of the papers of all former presidents except Nixon, specifically provided for the preservation of Nixon's materials, and established a process for reviewing the general standards regarding the storage of presidential papers. *Nixon*, 433 U.S. at 472. Portions of the law only affected President Nixon

_____

[24] Defendants suggest that SCE&G may not assert that Act 287 is a bill of attainder because it is a corporation. (ECF No. 31 at 15–16 (citing *A Helping Hand, LLC v. Balt. Cty., Md.*, 299 F. Supp. 2d 501 n.3 (D. Md. 2004)).) However, the court in *Consol. Edison Co. of N.Y. v. Pataki*, 292 F.3d 338 (2d Cir. 2002), held "that corporations must be considered 'individual[s],' that may not be singled out for punishment under the Bill of Attainder Clause in Article I, Section 10." *Consol. Edison*, 292 F.3d at 349 (citation omitted).

and his papers, but he was "a legitimate class of one" because "[t]he Presidential papers of all [other] former Presidents . . . were already housed in functioning Presidential libraries" and "he alone has entered into a depository agreement, . . . which by its terms called for the destruction of certain of the materials." *Nixon*, 433 U.S. at 472. As a result, "Congress ha[d] reason for concern solely with the preservation of [Nixon's] materials," and it was permissible for Congress to specifically address the storage of his materials. *Nixon*, 433 U.S. at 472.

98.     Section 3 of Act 287, the portion addressing the creation and implementation of the experimental rate, identifies a single utility and changes only that utility's rates. *See* 2018 S.C. Acts 258 § 3 (creating S.C. Code Ann. § 58-334-10 ("(A) The investor-owned utility holding the majority interest in the V. C. Summer Nuclear Reactor Units 2 and 3 at Jenkinsville, South Carolina, has entered into a merger agreement with an out-of-state investor-owned utility. . . . (B) . . . This rate shall apply to all customers of the investor-owned utility identified in subsection (A), which has imposed nine rate increases for the purpose of funding the V. C. Summer project.")). By definition, there cannot be more than one "utility holding the majority interest in the V.C. Summer Nuclear Reactor Units 2 and 3 at Jenkinsville, South Carolina . . . ." Moreover, Act 287's references to SCE&G's potential merger with Dominion Energy, Inc. and the revised rates granted to SCE&G during the Project's construction further indicate that the South Carolina General Assembly intended for Act 287 to affect only SCE&G.

99.     However, SCE&G constitutes a legitimate class of one because SCE&G is the only utility to avail itself of the BLRA and recover capital costs from a base load project, *see* South Carolina Office of Regulatory Staff, *Historical Electric Residential Bills* (listing SCE&G as the only utility to receive a rate increase from the BLRA since its enactment in 2007), http://www.regulatorystaff.sc.gov/electric/Pages/RateAdjustments.aspx (last visited Aug. 3,

2018).

100.    Similar to *Nixon*, Act 287 contains both a general policy decision and a solution to a unique set of facts existing at the time of the law's passage.  In *Nixon*, Congress decided to review the policies affecting the storage of all presidential papers–that is, to establish a general policy.  *Nixon*, 433 U.S. at 472.  Act 287 represents a determination by the South Carolina General Assembly that the public interest requires the repeal of the BLRA.  *See* 2018 S.C. Acts 258 § 2 (preventing any further applications under the BLRA and repealing the BLRA upon the conclusion of the abandonment proceedings concerning the Project).  After establishing a new policy, the law in *Nixon* addressed the circumstances surrounding President Nixon's papers–the only ones that were not stored in a presidential library.  *Nixon*, 433 U.S. at 472.  Similarly, Act 287, after making a generalized policy determination about the BLRA, addresses the specifics of SCE&G's rates.  2018 S.C. Acts 258 § 3 ("The General Assembly has determined that Section 1, Article IX of the Constitution requires that the General Assembly exercise its authority to set certain utility rates for the purpose of protecting the public interest until a determination can be made by the appropriate regulatory and judicial authorities.").

101.    Thus, while Act 287 does specify an individual affected by the law, that individual constitutes a legitimate class of one.

102.    Moreover, even if Act 287 does impermissibly target SCE&G, SCE&G has not established a clear showing that the legislation is punitive.

103.    When considering whether legislative enactment is punitive, courts consider "(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, 'viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes'; and (3) whether the legislative records

29

'evinces a [legislative] intent to punish.'" *Selective Serv.*, 468 U.S. at 852 (quoting *Nixon*, 433 U.S. at 475–76, 478).  These three tests are referred to as the historical, functional, and motivational tests, respectively.  *Nixon*, 433 U.S. at 472–84.  Legislation need not satisfy all three tests to qualify as a bill of attainder.  *Selective Serv.*, 468 U.S. at 853.

104.    Traditionally, bills of attainder occurred when legislative power was used to (1) sentence "a named individual or identifiable members of a group to death," (2) imprison, banish, and punitively confiscate one's property by the sovereign"; or (3) bar "designated individuals or groups from participation in specified employments or vocations." *Nixon*, 433 U.S. at 474.  "The only traditional punishment implicated here is punitive confiscation of property." *Consol. Edison Co. of N.Y. v. Pataki*, 292 F.3d 338, 351 (2d Cir. 2002).  However, because the court finds that SCE&G does not have a property interest at issue at this time, *supra* p. 18 ¶ 62, it is unable to demonstrate that Act 287 satisfies the historical connotation of a bill of attainder.

105.    The Supreme Court has also applied a functional approach "analyzing whether the law under challenge, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes." *Nixon*, 433 U.S. at 475–76 (citing, *e.g.*, *Hawker v. New York*, 170 U.S. 189, 193–194 (1898); *Dent v. West Virginia*, 129 U.S. 114, 128 (1889); *Trop v. Dulles*, 356 U.S. 86, 96–97 (1958); *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–169 (1963)).  "Where such legitimate legislative purposes do not appear, it is reasonable to conclude that punishment of individuals disadvantaged by the enactment was the purpose of the decisionmakers." *Id.*

106.    In Act 287, the South Carolina General Assembly states that its purpose is "to set certain utility rates for the purpose of protecting the public interest until a determination can be made by the appropriate regulatory and judicial authorities."  2018 S.C. Acts 258 § 3.  However,

30

in Resolution 285, the South Carolina General Assembly recognized that SCE&G "has legal rights and remedies that must be considered and respected throughout the process of resolving cost recovery issues for the abandoned Project, yet believes that recognition of SC[][E&G]'s legal rights and remedies does not require that [] customers continue to pay one hundred percent of the rates previously authorized by the Commission when the Project was expected, upon completion to provide valuable services to the customers; . . . ."  2018 S.C. Acts 285.

107.    SCE&G relies on *Consolidated Edison* to stand for the proposition that "eliminating harm to innocent third parties is a purpose consistent with punishment," 292 F.3d at 352; however, that case is not similar to the case now before the court.  In *Consolidated Edison*, the New York State Assembly passed a law which found that Consolidated Edison failed to exercise reasonable care in its management of a nuclear reactor and prohibited the recovery of any of the costs which resulted from that action.  292 F.3d at 344 ("[T]he Consolidated Edison Company failed to exercise reasonable care on behalf of the health, safety and economic interests of its customers.  Therefore it would not be in the public interest for the company to recover from ratepayers any costs resulting from the February 15, 2000 outage at the Indian Point 2 Nuclear Facility. . . .  [T]he New York state public service commission shall prohibit the Consolidated Edison Company from recovering from its ratepayers any costs . . . ." (citing 2000 N.Y. Laws 190)).  The New York State Assembly used the law at issue in *Consolidated Edison* to establish that the utility had acted imprudently.  *Id.*

108.    In this case, the South Carolina General Assembly made no determination in Act 287 about the prudency of SCE&G's actions, instead leaving that determination to the PSC.  *See* 2018 S.C. Acts 258 § 1.  Furthermore, the New York State Assembly in *Consolidated Edison* permanently prevented recovery of the costs associated with the company's mismanagement.

*Consol. Edison*, 292 F.3d at 344.  In contrast, the experimental rate set in Act 287 is only a temporary bar on the recovery of SCE&G's costs of the Project.  SCE&G could still recover its costs in the abandonment proceedings determined by the PSC.  Accordingly, the court is not persuaded that the purpose of Act 287 is to punish SCE&G.

109.    The "third recognized test of punishment is strictly a motivational one: inquiring whether the legislative record evinces a[n] [] intent to punish." *Nixon*, 433 U.S. at 478 (citing *United States v. Lovett*, 328 U.S. 303, 308–314 (1946); *Kennedy*, 372 U.S. at 169–170).  The record must reflect a clear legislative intent to punish. *Flemming v. Nestor*, 363 U.S. 603, 617 (1960) ("[O]nly the clearest proof could suffice to establish the unconstitutionality of a statute on such a ground.").  "Statements by a smattering of legislators 'do not constitute [the required] unmistakable evidence of punitive intent.'" *Consol. Edison Co.*, 292 F.3d at 354 (quoting *Selective Serv.*, 468 U.S. at 856 n.15).  The court considered the transcript of the South Carolina Senate's June 27, 2018 hearing submitted by SCE&G.  (ECF No. 94-6.)  Upon review, the court is not persuaded at this time that the transcript provides justification for the conclusion that Act 287 evinces a legislative intent to punish.[25]

110.    As to the third element for a bill of attainder, Act 287 establishes the experimental rate without the protections of a judicial trial. *See* 2018 S.C. Acts 258 § 3 (instructing the PSC to set the experimental rate without conducting a hearing on the matter).

111.    Because SCE&G has failed to meet all elements of the test articulated by the United States Supreme Court in *Nixon* and *Selective Service*, which requires the infliction of

---

[25] At the preliminary injunction hearing, SCE&G presented statements of a few members of the South Carolina General Assembly who allegedly wanted to punish the company.  However, there are numerous instances where state senators expressly stated that their goal was not to punish SCE&G.  (*See* ECF No. 94-6 at 49:8–19, 50:1–3, 51:17–22, 60:1–5.)

punishment upon an identifiable individual without a trial, SCE&G cannot show a likelihood of success on the merits on its claim asserting a bill of attainder.

B.    Likelihood of Suffering Irreparable Harm Absent an Injunction, The Balance of Equities, and the Public Interest Factors

112.    Generally, in determining whether to grant a motion for injunctive relief, "[t]he court must also consider the balance of hardships between the litigants and the impact on the public at large prior to issuing an injunction."  *Uhlig, LLC v. Shirley*, C/A No. 6:08-cv-01208-JMC, 2012 WL 2458062, at *4 (D.S.C. June 27, 2012).

113.    However, SCE&G has not made a clear showing that it will likely succeed on the merits because the law on the questions at the heart of the dispute does not favor its positions. Therefore, because SCE&G cannot show a likelihood of success on the merits, this court need not address the other necessary elements for preliminary injunctive relief.  *La Union Del Pueblo Entero v. Fed. Emergency Mgmt. Agency*, 608 F.3d 217, 225 (5th Cir. 2010) ("Because we have determined that Plaintiffs cannot show a substantial likelihood of success on the merits, we need not address FEMA's additional arguments regarding the other necessary elements for preliminary injunctive relief.  The holding on the initial element is sufficient to vacate the injunction."); *Coleman v. Chase Bank*, C/A No. 3:14-cv-101, 2014 WL 2533400, at *3 (E.D. Va. June 5, 2014) ("Because Plaintiffs cannot show a likelihood of success on the merits, the Court need not address the remaining factors.").

## V.    CONCLUSION

114.    In sum, SCE&G has not established that it is clearly likely to succeed on the merits of its claims.  For the foregoing reasons and after careful consideration of the entire record, the court **DENIES** SCE&G's Motion for Preliminary Injunction.  (ECF No. 5.)

**IT IS SO ORDERED.**

*J. Michelle Childs*

United States District Judge

August 6, 2018
Columbia, South Carolina